## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
|  |  |
|---|---|
| **JAMES HAIDAK,** | \* |
| Plaintiff | \* |
| **v.** | \* |
| **UNIVERSITY OF MASSACHUSETTS AT AMHERST; ENKU GELAYE, Individually and in her official capacity as Dean of Students and Acting Vice Chancellor of Student Affairs and Campus Life of the University of Massachusetts at Amherst; and DAVID C. VAILLANCOURT, Individually and in his official capacity as Senior Associate Dean of Students of the University of Massachusetts at Amherst; and ALLISON BERGER, Individually and in her official capacity as Associate Dean of Students of the University of Massachusetts at Amherst** | **CIVIL ACTION NO. 14-CV-30049** |
| Defendants | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## VERIFIED COMPLAINT

**INTRODUCTION**

This is a verified complaint for monetary damages and injunctive relief filed by a student at the University of Massachusetts against the defendant University and certain administrators for federal civil rights violations and other causes of action due to the defendants' arbitrary, unfair, wrongful and unlawful decision to expel the student on December 3, 2013, and summarily deny his timely and meritorious appeal.

**JURISDICTION AND VENUE**

1.  This action arises under the Fourteenth Amendment to the United States

    Constitution, 42 U.S.C. § 1983, 20 U.S.C. § 1681, and the common and statutory

    law of Massachusetts.

2.  This Court has jurisdiction of this claim under, and by virtue of, 28 U.S.C. §

    1331.

3.  Venue is proper under 28 U.S.C. § 1391(b).  Each and all of the acts alleged

    herein were done by Defendants' agents and officials not as individuals, but under

    the color and pretense of regulations, practices, and customs of the University of

    Massachusetts at Amherst.

4.  This Court is authorized to issue the Injunctive Relief requested by Plaintiff under

    Rule 65 of the Federal Rules of Civil Procedure.

5.  This Court is authorized to grant Plaintiff's prayer for relief regarding costs,

    including a reasonable attorney's fee, under 42 U.S.C. § 1988.

**PARTIES**

6.  Plaintiff JAMES HAIDAK was at all times material to this complaint a student

    attending the Defendant University of Massachusetts at Amherst.  He currently

    resides in Potomac, Maryland.

7.  Defendant UNIVERSITY OF MASSACHUSETTS AT AMHERST ("the

    University") is a public body corporate and politic established, organized, and

    authorized under and pursuant to the laws of Massachusetts, with the authority to

    sue and be sued, and was at all times relevant herein, operating within the course

and scope of its authority and under color of state law and in receipt of federal

funding under Title IX, 20 U.S.C. §§ 1681-1688.

8.  Defendant ENKU GELAYE is, and was at all times relevant herein, the Dean of

Students at the University and Acting Vice Chancellor and acted within the course

and scope of her authority as Dean of Students and Acting Vice Chancellor.

9.  Defendant DAVID C. VAILLANCOURT is, and was at all times relevant herein,

a Senior Associate Dean of Students at the University and acted within the course

and scope of his authority as Senior Associate Dean of Students.

10.  Defendant ALLISON BERGER was at all times material to this complaint an

Associate Dean of Students at the University and acted within the course and

scope of her authority as Associate Dean of Students.

## STATEMENT OF FACTS

### *The Code of Student Conduct*

11.  In conjunction with the start of the 2012-2013 academic year, the University

promulgated, and the Board of Trustees adopted a *Code of Student Conduct*

(*CSC*).

12.  Section I.D of the *CSC* sets out the jurisdiction within which its regulations apply

and includes student conduct which occurs 1) at the University, 2) on the grounds

of the other four colleges within the Five College Consortium (Smith College,

Amherst College, Hampshire College, Mount Holyoke College), 3) at any event

sponsored by any of these institutions, and 4) in violation of the law or acts of

misconduct which occur in other locations when the behavior distinctly and

directly affects the University community.

13. Section I.D states that violations of the *CSC* regulations subject students to the disciplinary actions and procedures described therein.

14. In disciplinary actions, the burden of proof is at all times on the complainant, and the standard of proof for deciding a matter is by a preponderance of the evidence.

15. A student may request from the Dean of Students Office a written rationale for a conduct decision including how evidence was weighed and interpreted.

16. When a student is suspended from the University, all registration transactions during the period of suspension are prohibited; this restriction will not be removed until the period of suspension has expired and all disciplinary obligations are met.

17. A business day is defined as a day when University administrative offices are open.

18. Section II.A of the *CSC* is entitled "Regulations for Student Conduct and Scholarship.  Personal Identification and Representation"; this section sets out certain acts that constitute violations of the *CSC*.

19. Among other things, this section proscribes "dishonesty or misrepresentation, either orally or in writing, regarding charges brought under the *CSC* before hearing boards or officials of the University."

20. As will be noted in greater detail below, Lauren Gibney (Gibney), the complainant in this case, violated this regulation in multiple ways but was not subjected to any disciplinary action by the Defendants.

21. Section II.B of the *CSC* is entitled "Civility, Safety and Environmental Health"; this section sets out additional acts that constitute violations of the *CSC*.

22. Plaintiff was accused of violating the following regulations under this section:

    a.   Physical Assault

    b.   Harassment (2 counts)

    c.   Failure to Comply with Direction of University Officials (2 counts)

    d.   Endangering Behavior to Person or Property.

23. As will be noted in greater detail below, Gibney violated multiple regulations listed under section II.B but was not subjected to any disciplinary action by the Defendants.

24. In addition to outlining prohibited conduct, the *CSC* also sets forth detailed disciplinary procedures where allegations of *CSC* violations are made.

25. Once a charge is brought, the charged student must receive a "Notice of Charge" and be given the opportunity to request a "Disciplinary Conference."

26. At such a conference, "the nature of and the responsibility for an alleged offense is discussed," and a charged student is "advised of his . . . options to resolve the matter."

27. For minor violations, a sanction may be imposed, or the student could be found not responsible for the charges by the designated University official; there is no appeal for minor violations.

28. If an official of the University determines that a more serious infraction has been alleged and the parties cannot agree on the facts of the case or the proper outcome, the matter may be referred to a Hearing Board.

29. In the event of a hearing, the charged student shall be notified at least five business days prior to the date of the hearing.

30. Such notice shall be in writing and shall include, *inter alia*, a summary of the information upon which the charges are based and the procedures to be followed in the hearing.

31. Hearing Boards consist of not less than three, and not more than five, students and/or University employees.

32. The Hearing Board must consist of members who are impartial and be open only to the complainant, the charged student, Hearing Board members and witnesses; others shall be permitted only if the charged student and the complainant agree.

33. A recording of the hearing will be made for the use of the charged student.

34. Accused students may enlist the assistance of an advocate from the University community to represent him when the University is the complainant in the hearing, provided that such an advocate shall not be an attorney.

35. Both the complainant and charged student are entitled to view and receive copies of all submitted witness statements prior to the hearing.

36. Any recommendation of a Hearing Board shall be based only upon evidence and testimony at the hearing.

37. A Hearing Board shall include in the record a written summary of testimony, findings of fact, and rationale for any recommendation.

38. The entire record shall be forwarded, within two business days, to the Dean of Students.

39. The designated University official shall, within five business days after receiving the Hearing Board's report, render a written decision in the disciplinary matter,

consisting of findings of fact, sanction(s), and reasons therefore, which shall be
included in the record.

40. If a Hearing Board determines that a student has violated provisions of the *CSC*, a
designated University official may consider a host of factors in deciding on an
appropriate sanction, including "the student's present demeanor and past
disciplinary record, the nature of the offense," and "the severity of any damage,
injury, or harm resulting therefrom, and other factors."

### *Appeal of Disciplinary Finding and/or Sanction*

41. The decision of the University official that results from a hearing may be
appealed to a University Appeals Board (UAB), consisting of three University
employees and/or students appointed by the Chancellor or his or her designee(s).

42. The letter of appeal shall specifically allege and factually support one or more of
the following grounds:

   a. A procedural error or irregularity which materially affected the decision;

   b. New evidence not previously available which would have materially
   affected the decision;

   c. The decision is unsupported by substantial evidence, i.e., evidence that a
   reasonable mind might accept as adequate to support the decision; or

   d. The sanction is unsupported by the charges and/or the student's
   disciplinary history.

43. If a sufficient claim is presented under one or more of the specified grounds, the
UAB shall review a copy of the hearing records.

44. A recommendation from the UAB may include, but not be limited to, changes in sanctions, or a remand to a new Hearing Board.

45. The Vice Chancellor for Student Affairs and Campus Life will review the UAB's report and recommendation and issue a decision.

***Interim Restrictions***

46. A designee of the University "may impose restriction(s) upon a student pending disciplinary proceedings, such interim restrictions to become effective immediately without prior notice whenever there is ground to believe that the student is an imminent threat to himself or herself, to others, or to property, or the cause of serious imminent disruption to the University community."

47. "Interim restrictions may include, but are not limited to, the following: (1) suspension; (2) assignment to alternate housing; (3) limitation of access to designated University housing facilities and/or other campus facilities by time and location; (4) restriction of communication with named individuals or groups within the University community; and/or (5) the requirement to secure advance authorization to engage in a specified activity."

48. When an interim restriction is imposed, a charged student is entitled to meet with a representative of the University and "present his or her own version of the facts."

49. If the University representative determines that the interim restrictions will continue, the student is entitled to receive a written statement from the representative explaining the reasons for this decision.

50. If there is reason to believe that any of the interim restrictions imposed has been violated, the official shall request an expedited hearing under Section IV.D of the *CSC*.

### The Incident Giving Rise to Allegations of CSC Violations

51. As of April 16, 2013, the date of the alleged incident, Plaintiff was a twenty-two year old undergraduate in his senior year at the University, majoring in Economics.

52. From the time he entered the University in 2009, Plaintiff was a member of the Commonwealth Honors College.

53. By the end of his junior year, Plaintiff had a G.P.A. of 4.0 and was a member of the Phi Beta Kappa honor society.

54. As of April 16, 2013, Plaintiff had been in an intimate relationship with Gibney, a twenty-year old student at the University, for approximately two years.

55. For their respective Spring 2013 semesters, Plaintiff and Gibney attended a study abroad program at the University of Barcelona in Spain, administered by Academic Programs International (API).

56. API is a third-party organization based in Austin, Texas that offers program opportunities for students to study abroad in countries throughout the world.

57. API has its own admission procedures and requirements, code of conduct, and official transcript for credits earned.

58. Upon its acceptance of Plaintiff's application to study at the University of Barcelona, API provided him with an orientation packet along with its code of conduct.

59. Plaintiff, through his parents, paid API tuition, as well as room and board for his Spring semester at the University of Barcelona.

60. In January of 2013, Plaintiff's mother, Cecily Holiday (Holiday), an employee of the U.S. Department of State, was attending a meeting in Geneva, Switzerland.

61. Holiday received telephone calls from her son during this time complaining of Gibney's physical aggression towards him, including punching, slapping, biting, and kicking him.

62. Concerned for her son, Holiday and her colleague Damon C. Ladson (Ladson) travelled to Barcelona in February.

63. Upon her arrival, Holiday was horrified to see a deep bruise on Plaintiff's upper arm that appeared to be a bite mark.

64. When Ladson asked what had happened, Plaintiff responded, "Lauren bit me."

65. Plaintiff's roommate added that he had witnessed Gibney yelling at Plaintiff, slapping him, and biting him.

66. Holiday and Ladson took Gibney out to lunch and, while there, questioned her about her physical aggression toward Plaintiff.

67. Gibney maintained that she usually just did that when they were playing around, but admitted that on occasion she did assault Plaintiff while in the midst of arguing.

68. On the evening of April 15, 2013, Gibney received news that a family member to whom she was close had passed away.

69. Plaintiff was scheduled to work as a disc jockey (DJ) at a nightclub in Barcelona that evening, and Gibney opted to accompany him in an attempt to keep her mind off her loss.

70. Gibney consumed alcohol throughout the evening and, by the time she and Plaintiff returned to Gibney's apartment at approximately 4:00 a.m., she was intoxicated.

71. Plaintiff drank moderately during the evening in order to ensure the proper operation of the DJ equipment.

72. Gibney's apartment was very small; it contained a bedroom, living room, kitchen, and bathroom.

73. Plaintiff proceeded to sit on Gibney's bed and began using his laptop.

74. Gibney and Plaintiff had had a recent disagreement about the amount of time Plaintiff spent on his laptop while they were together.

75. Seeing Plaintiff utilizing his laptop caused Gibney to become irate.

76. Gibney yelled at Plaintiff and grabbed the screen of the laptop in an attempt to slam it shut.

77. When she did this, Plaintiff observed rainbow lines appearing on his computer screen and became concerned that Gibney had broken the laptop.

78. A verbal argument ensued, and Gibney demanded that Plaintiff take his bag and leave the apartment.

79. Given the late hour, and the unsafe neighborhood in which Gibney's apartment was located, Plaintiff objected to leaving.

80. Gibney initially retracted her demand and indicated that she was going to sleep on the couch.

81. Within minutes, however, the argument resumed when Gibney picked up Plaintiff's backpack containing his DJ equipment and threw it into the living room while once again demanding that he depart.

82. As Plaintiff stood in the bedroom, Gibney walked towards his computer, at which point Plaintiff placed his hand on her shoulder and asked her to stop.

83. Gibney then turned around and became physical, hitting and slapping Plaintiff's face.

84. Plaintiff attempted to protect himself by holding Gibney's arms down, but she was able to strike him in the eye.

85. As Plaintiff backed away covering his eye, Gibney kicked him in the groin and he fell to his knees.

86. Gibney then grabbed his laptop on the bed and held it tightly in her arms.

87. Once Plaintiff was able to retrieve his laptop from Gibney's grip, he gathered the rest of his belongings and left the apartment.

88. The next morning, Plaintiff returned to Gibney's apartment before class to return a cell phone she had placed in his backpack the night before.

89. During a short conversation, Plaintiff advised Gibney that their romantic relationship had reached a point beyond repair and that the two should simply be friends.

90. Plaintiff then left for class, offering to take notes for Gibney, who remained in bed nursing a hangover.

91. Shortly after Plaintiff communicated his desire to terminate their romantic relationship, Gibney discovered marks on her wrists and arms and took pictures of them.

92. Gibney then telephoned her API program contact at the Barcelona campus, Mireia Pujol (Pujol), and wrongfully accused Plaintiff of assaulting her the night before.

93. Kalpen Trivedi (Trivedi) of the International Programs Office at the University advised Gibney to make a written statement of her version of events and to submit it to API so that they could take disciplinary steps.

94. Gibney submitted a statement to Pujol and the API Barcelona Director Marta Nieves Gomez that same day.

95. A copy of Gibney's statement was emailed to Defendant Gelaye on April 16, 2013.

96. This statement was consistent with Plaintiff's version of events in most respects, with the exception of her claims that he (1) put his hands around her neck and threw her on the bed, (2) twisted her arm and pushed her on the bed, (3) put his hands on pressure points of her body making her scream loudly while she was face-down on her bed, and (4) grabbed her wrists and punched himself in the face with her hands.

97. Following receipt of Gibney's statement on April 16, 2013, API staff directed Plaintiff to come to their office on campus, at which time he was given a written dismissal by the Barcelona API director.

98. API did not provide Plaintiff with an opportunity to respond to Gibney's allegations prior to dismissing him.

99.  API staff in Barcelona offered to take Gibney to the police station, to put her up in a hotel, and to provide her with counseling, all of which Gibney declined.

100.  By the time Plaintiff returned to the United States on or about April 23, 2013, he and Gibney had reconciled and resumed their romantic relationship.

***Initiation of Disciplinary Proceedings – The First Notice of Charge***

101.  On April 19, 2013, Defendant Berger issued Plaintiff a Notice of Charge, alleging that on April 16, 2013, he violated *CSC* provisions proscribing "Physical Assault" and "Endangering Behavior to Persons or Property."

102.  The Notice of Charge directed Plaintiff to schedule a conference with Defendant Berger to "resolve the matter" and imposed an interim restriction that Plaintiff have no contact with Gibney.

103.  During a disciplinary conference with Defendant Berger on May 1, 2013, Plaintiff denied the charges against him.

104.  He subsequently presented his version of events in a written statement and provided Defendant Berger with a photograph of the eye injury inflicted by Gibney on the night in question.

105.  Defendant Berger failed to provide Plaintiff with a determination in writing whether the interim restriction of no contact with Gibney would continue, or her reasons therefore, as required by Section VII.E of the *CSC*.

106.  Following the disciplinary conference on May 1, 2013, Holiday called Defendant Berger and requested that a no contact restriction be imposed on Gibney because she had initiated the resumption of communications with Plaintiff despite her knowledge of Plaintiff' no contact restriction.

107. Holiday also advised Defendant Berger that Gibney had admitted to physically assaulting and injuring Plaintiff while in Barcelona.

108. Based on the statements provided by Plaintiff and Holiday, Defendant Berger had reason to believe that Gibney had violated the *CSC* by: (i) physically assaulting Plaintiff both before and during the night in question; (ii) engaging in behavior which endangered both Plaintiff and his property; and (iii) providing a fundamentally dishonest account of the incident serving as the basis of the *CSC* charges against Plaintiff.

109. Defendant Berger was deliberately indifferent to these credible allegations against Gibney.

110. Among other things, Defendant Berger neither imposed a no contact restriction on Gibney nor instituted disciplinary proceedings against her.

111. Upon information and belief, gender was a motivating factor in Defendant Berger's selective enforcement of *CSC* provisions against Plaintiff but not Gibney – a similarly situated person for all intent and purposes.

112. Upon information and belief, the University has historically and systematically pursued charges against males but not females in physical assault cases, solely on the basis of sex.

### Initiation of Disciplinary Proceedings – The Second Notice of Charge

113. Following her return from Barcelona, Gibney had intimate relations with Plaintiff in an Amherst motel room on multiple occasions.

114. In addition to this in-person contact, Plaintiff and Gibney also communicated multiple times a day via telephone calls, texting, email, and Skype.

115.  On or about May 9, 2013, Gibney's parents discovered her ongoing communication with Plaintiff and contacted Defendant Berger.

116.  When asked by Defendant Berger to describe the nature of her contact with Plaintiff, Gibney stated that Plaintiff had called her fifty-two times from his cell phone and a Skype number.

117.  Gibney further claimed that she blocked Plantiff's cell phone number.

118.  Gibney did not admit to Defendant Berger that she was complicit in the resumption of contact with Plaintiff and had been physically intimate with him.

119.  In response to Gibney's allegations, Defendant Berger issued a Second Notice of Charge on May 28, 2013, accusing Plaintiff of 1) harassment, and 2) failure to comply with the no contact restriction imposed on April 19, 2013.

120.  Plaintiff's alleged failure to comply with the no contact restriction constituted a violation of an interim restriction.

121.  Pursuant to Sections IV.D and VII.D of the *CSC*, Defendant Berger should have sought an expedited hearing but did not.

122.  By the time Defendant Berger issued the Second Notice of Charge on May 28, 2013, Plaintiff and Gibney had once again resumed their relationship and had once again been physically intimate in a motel room in Amherst.

### *Initiation of Disciplinary Proceedings – The Third Notice of Charge*

123.  Upon his receipt of the Second Notice of Charge, Plaintiff requested a disciplinary conference, which was scheduled for June 19, 2013.

124.  Prior to that conference, on June 4, 2013, Gibney and her mother provided Defendant Berger with a copy of Gibney's phone records from April 24, 2013

through June 1, 2013, indicating calls and texts (without content) between the two.

125. In an email to Defendant Berger on June 4, 2013, Gibney stated that the communications "consisted of [Plaintiff] trying to get me to agree to get back with him regardless of recent events and how I truly felt."

126. Gibney also wrote in her email to Berger that she blocked Plaintiff "from every form of communication including all phones, facebook, twitter, and skype."

127. On June 13, 2013, Gibney sent a message to Plaintiff on his DJ Facebook page, to wit: "…"

128. This was texting code for her wish to resume communication with Plaintiff.

129. On June 17, 2013, Defendant Berger issued a Third Notice of Charge to Plaintiff, which set forth additional charges of harassment and violation of the interim restriction of no contact with Gibney.

130. Despite this alleged violation of the interim restriction of no contact imposed on April 19, 2013 (and again on May 28, 2013), Defendant Berger again failed to request an expedited Hearing Board pursuant to Section VII.D of *CSC*.

131. Instead, Defendant Berger imposed a new interim restriction, that of suspension, barring Plaintiff from the University.

132. Berger ordered Plaintiff to meet with her in regard to the suspension on June 19, 2013 – the date previously scheduled to address the Second Notice of Charge.

133. In his defense to the harassment charges, Plaintiff provided Defendant Berger with print-outs of the text messages between himself and Gibney between April 24, 2013 and May 31, 2013.

134. This evidence clearly established an ongoing, consensual romantic relationship between the two, and undermined the credibility of Gibney's claims.

135. Plaintiff had provided Berger with a photograph on May 1, 2013 depicting the bite mark on his arm inflicted by Gibney in Barcelona as corroboration that she had been the physical aggressor on the night in question, and to show a pattern of conduct of physically assaulting Plaintiff.

136. Having observed this injury and spoken directly with Gibney about the conduct that caused it, Holiday told Defendant Berger that she wished to be a witness and to submit a statement for consideration at Plaintiff's Hearing Board.

137. Defendant Berger advised Holiday that she would not be permitted to be a witness or to submit a statement.

### The Hearing Board Delay and Plaintiff's Forced Withdrawal from the University

138. Throughout the pendency of the pre-hearing disciplinary proceedings, Plaintiff's parents repeatedly contacted Defendant Berger requesting that a Hearing Board be scheduled.

139. On August 5, 2013, Defendant Berger notified Plaintiff in an e-mail that his suspension would remain in effect until further notice, and that "my staff will contact you to schedule a Hearing Board."

140. On August 13, 2013, Gibney contacted Plaintiff via Skype for the purpose of resuming their relationship.

141. On August 27, 2013, Plaintiff's father, Dr. David Haidak, e-mailed Defendant Berger requesting that Plaintiff be permitted to defer his Fall semester at UMass,

given that he was barred from campus, and a Hearing Board had not been
scheduled to resolve his charges.

142.  On August 29, 2013, Defendant Berger responded to Plaintiff advising him to
withdraw from the University.

143.  On September 1, 2013, Plaintiff notified Defendant Berger that he was
withdrawing "under duress."

144.  As of September of 2013, Plaintiff had four classes to complete in order to obtain
his degree from the University.

### 209A Restraining Order Hearing – Eastern Hampshire District Court

145.  On September 27, 2013, at the suggestion of Defendant Berger, Gibney and her
parents went to the Eastern Hampshire District Court to apply for a temporary
restraining order against Plaintiff.

146.  Following an *ex parte* proceeding, Gibney's request was granted on that date.

147.  On October 2, 2013, Gibney delivered a copy of the temporary restraining order
she had obtained to Defendant Berger.

148.  On October 10, 2013, a full hearing in the Eastern Hampshire District Court on
Gibney's request to extend the restraining order was held before the Honorable
Michael Mulcahy.

149.  Gibney was the only witness to testify at this proceeding.

150.  With respect to the night of April 16, 2013, Gibney testified that Plaintiff "never
actually hit me but he would place his hands on pressure points on my body," that
he placed his hands around her neck to restrain her, and that he "grabbed my

wrists, punched himself in the face, and said I'm going to F you over and I'm going to bury you."

151. Under cross-examination by Plaintiff's counsel, Gibney acknowledged that she had been engaging in a sexual relationship with Plaintiff as recently as mid-September.

152. Gibney also acknowledged that she had been keeping her relationship with Plaintiff secret from her parents.

153. When shown a photograph of the mark on Plaintiff' arm – the same photograph previously provided to Defendant Berger – Gibney admitted causing the injury by biting Plaintiff.

154. Gibney also admitted that, after she delivered the aforementioned telephone records to Defendant Berger, she resumed her relationship with Plaintiff.

155. During the hearing, Gibney conceded that she engaged in intimate relations with Plaintiff during the previous summer in a motel room in Amherst.

156. Gibney also conceded that she "just wanted [the University disciplinary proceedings] to be dropped, I didn't want it to come this far," and that everything had been "blown out of proportion."

157. After considering Gibney's testimony, Judge Mulcahy denied her request to extend the restraining order.

### Pre-Hearing Activity in Contravention of the CSC

158. On November 6, 2013, Associate Dean Patricia Cardoso (Cardoso), acting in her capacity as Procedural Advisor, emailed Plaintiff inviting him to send her any

documents for her review that he wished to provide as evidence at his upcoming Hearing Board.

159. The following day, Plaintiff provided Cardoso with a transcript of the restraining order hearing in Eastern Hampshire District Court and requested that it be submitted as evidence.

160. Cardoso consulted with Defendant Gelaye as to whether the transcript was relevant and admissible at the Hearing Board.

161. Defendant Gelaye determined that it was not relevant and directed Cardoso to exclude it.

162. Plaintiff also submitted photos to Cardoso of the bite mark inflicted by Gibney, but this evidence was also deemed irrelevant and was excluded.

163. Pursuant to Sections IV.E.4 and 5 of the *CSC*, as well as Student Conduct Hearing Board Procedures, a charged student is entitled to present witnesses, witness statements and "any other relevant information (i.e. pictures, phone/text records to be considered by the Board.)"

164. A Hearing Board may only "exclude unduly repetitious or irrelevant evidence."

165. There is no provision in the *CSC* that permits a Procedural Advisor, an Associate Dean of Students, or the Vice Chancellor to act as a gatekeeper concerning the admission of evidence at a hearing.

166. Indeed, pursuant to Section IV.E.6 of the *CSC*, only Hearing Board members are authorized to carry out this role.

167. On November 15, 2013, at 5:43 p.m., Cardoso notified Plaintiff via e-mail that his Hearing Board would be held at 1:30 p.m. on November 22, 2013.

168. The provision of only four days notice failed to comply with the requirement under Section IV.D of the *CSC* that a student be notified at least five business days prior to the date of a scheduled hearing.

169. At the time of the notice, Plaintiff was living with his parents in Potomac, Maryland and was prohibited from entering campus pursuant to the interim restriction imposed by Defendant Berger on June 17, 2013.

170. The failure of the University to provide Plaintiff with adequate notice of his Hearing Board deprived him of the ability to travel to Amherst to testify in person at the hearing.

171. Under Sections IV.D.2 and 4 of the *CSC*, the notice sent by Cardoso was supposed to be accompanied by "a description of the alleged act, including the time and place of the alleged act, and a summary of the information upon which the charges are based," as well as "the procedures to be followed in the hearing."

172. However, Plaintiff was only provided with information that related to the charges set forth in the First Notice of Charge.

173. Upon information and belief, Gibney was provided with all three sets of charges and information related thereto.

174. Further, Plaintiff was not provided with complete hearing procedures, but rather was given only page 2 of one three-page handout and one page of another two-page handout.

175. Unlike the incomplete documents provided to Plaintiff, Gibney's notice contained a complete set of all required documents under the *CSC*.

176. Pursuant to Section IV.E.4 of the *CSC*, "both the complainant and charged student are entitled to view *and receive copies* of all submitted witness statements prior to the hearing."

177. Plaintiff was therefore entitled to copies of Gibney's statements prior to the hearing, as well as copies of the photos she had submitted.

178. The hearing record contains three statements submitted by Gibney relating to her claims of misconduct committed by Plaintiff on April 16, 2013, May 9, 2013, and June 4, 2013.

179. The hearing record also contains copies of phone records submitted by Gibney, covering a period from April 24, 2013 to June 1, 2013, as well as eight photos of marks on her body allegedly caused by Plaintiff.

180. Copies of these materials were not provided to Plaintiff prior to the hearing.

181. When Plaintiff requested copies, Defendant Berger stated he could only look at this evidence while it remained in her possession.

182. In advance of the hearing, Plaintiff was told that while his attorney and a student advisor could attend the hearing, neither would be allowed to speak.

183. Plaintiff was also advised that after Gibney testified, he would not be permitted to question her directly.

184. Instead, he was instructed to submit questions for Hearing Board members to ask Gibney on his behalf.

185. On November 20, 2013, Plaintiff submitted a list of said questions to Cardoso.

186. In drafting these questions, Plaintiff, of course, had no way of anticipating precisely what Gibney would say.

*The Hearing Board*

187. On November 22, 2013 – over seven months after the incident in Barcelona – a Hearing Board was convened at the University.

188. Staff member DeVaughn King served as Chair, and four students – Melissa Fiore, John Sanders, Keith Sacenti, and Morgan Sax – sat as Board members.

189. Upon information and belief, Board members were insufficiently trained and unqualified to serve as fact finders in this case.

190. Credibility was the central issue for the Hearing Board to determine – particularly with regard to the charge of Physical Assault.

191. The exclusion of Gibney's testimony at the restraining order hearing – coupled with Defendants' refusal to permit testimony from Holiday or the introduction of photographs depicting the bite mark inflicted by Gibney – deprived the Board members of compelling evidence that Gibney had not been truthful in the accounts she had previously furnished to Defendant Berger.

192. Plaintiff's inability to be physically present due to the inadequate notice furnished by the Dean's office adversely affected his ability to establish his own credibility.

193. Whereas Board members were able to assess Gibney's appearance and demeanor for her actual presence at the hearing, no similar assessment could be made of Plaintiff as he was limited to participating from home via Skype.

194. Plaintiff's efforts to contest the evidence against him were further undermined when Board members neglected to ask Gibney the questions Plaintiff had submitted.

195.  Ultimately, the Hearing Board recommended that Plaintiff be found responsible for physical assault and the two instances of failure to comply with direction of a university official, and not responsible for the two charges of harassment and endangering behavior to person or property.

196.  Section IV.E.10 of the *CSC* requires a Hearing Board to substantiate its recommendation by entering in the record "a written summary of testimony, findings of fact(s), and rationale."

197.  The Board failed to adhere to this requirement in its report; indeed, it provided no findings of fact in support of its recommendation.

198.  Under the circumstances of this case, findings of fact were essential to explain and justify the Board's determination of whose version of events, or what portions of each version, it deemed credible.

199.  The aforementioned procedural errors and irregularities committed by Defendants Berger and Gelaye undermined any confidence a reasonable person could have in the findings and recommendation made by the Board.

200.  Had the Defendants Berger and Gelaye properly followed the applicable CSC regulations, it is reasonable to expect that the outcome of Plaintiff's hearing would have been different.

201.  Upon information and belief, the outcome of Plaintiff's hearing was consistent with a pattern and practice of discrimination on the basis of sex at the University whereby male students accused of physically assaulting female students are routinely found responsible for such misconduct despite the absence of credible evidence supporting the charges against them.

***The Decision to Expel***

202. In a letter dated December 3, 2013, Defendant Vaillancourt adopted the recommendations of the Hearing Board and imposed the most severe sanction available by expelling Plaintiff.

203. Section IV.E.11 of the *CSC* requires the issuance of factual findings by the University official responsible for making the ultimate decision in a disciplinary proceeding.

204. Defendant Vaillancourt's expulsion letter featured no such factual findings.

205. Instead, it simply stated that the decision was based on a review of "substantial materials presented regarding the incident."

206. Defendant Vaillancourt's reference to a single incident, in the face of multiple charges relating to multiple incidents, demonstrates his failure to adequately review and consider the factors required by the *CSC*.

207. Upon receipt of Defendant Vaillancourt's expulsion letter, Plaintiff requested the rationale for the decision, as permitted by the *CSC*.

208. Defendant Vaillancourt failed to respond to Plaintiff's request.

209. Upon information and belief, Plaintiff's punishment was consistent with a pattern and practice of discrimination on the basis of sex at the University whereby male students found responsible of physically assaulting female students are routinely punished more severely than female students found responsible for assaulting male students.

*The Appeal to the UAB*

210.  On December 18, 2013, at approximately 4:30 p.m., Plaintiff submitted through his attorney a fifteen-page, single-spaced Letter of Appeal pursuant to Section VI of the *CSC*.

211.  Plaintiff alleged and specifically supported the following grounds:

- Procedural error or irregularity which materially affected the decision;

- The decision is unsupported by substantial evidence;

- The sanction is unsupported by the charges and/or the student's disciplinary history.

212.  In his letter, Plaintiff noted that Defendant Gelaye, who was Acting Vice Chancellor as well as Dean of Students, had participated in the screening and exclusion of his proposed evidence and therefore it would be inappropriate for her to have any role in the adjudication of his appeal.

213.  Ignoring Plaintiff's request that she recuse herself, Defendant Gelaye upheld Plaintiff's expulsion from the University.

214.  In a letter dated December 19, 2013, presumably written within one business day of receipt of Plaintiff's appeal, Defendant Gelaye stated that the UAB had reviewed Plaintiff' case "on each of the four grounds for appeal available under the *2011-12* Code of Conduct."

215.  According to Defendant Gelaye, the UAB, in recommending that Plaintiff's appeal be denied, determined the following:

a.  A procedural review revealed no procedural error sufficient to have materially affected the decision;

b. *The new evidence was insufficient to have materially effected the decision*,

c. The evidence within the case was sufficient to have supported the decision;

d. A balancing test of your disciplinary history and the seriousness of the charges supported the sanction as levied.

216. References in Gelaye's letter to an inapplicable version of the *CSC* and an adjudication of an appellate ground not even raised by Plaintiff illustrate the inadequate review of Defendant Vaillancourt's arbitrary and capricious decision and the Hearing Board's recommendations.

### *The Aftermath of Defendants' Unlawful Actions*

217. Following his expulsion, Plaintiff applied for, and obtained, admission to the University of Amsterdam.

218. As a result of his expulsion, the Plaintiff cannot transfer any of the credits Plaintiff earned over the course of four years as a student at the University.

## CLAIMS FOR RELIEF

### COUNT I – 42 U.S.C. § 1983
(All Defendants)

219. Plaintiff hereby incorporates and adopts each and every allegation in the preceding paragraphs numbered 1 through 218.

220. Pursuant to the Fourteenth Amendment to the United States Constitution, Plaintiff enjoys a property interest in his status as a student at the University and in the education he has undertaken to receive, as well as a liberty interest in his reputation.

221. Pursuant to the Fourteenth Amendment, Plaintiff also enjoys a right to equal protection of the laws, i,e, to be treated like all persons to whom he is similarly situated.

222. Defendants violated Plaintiff's clearly established rights secured by the Fourteenth Amendment, including but not limited to the right to procedural due process, by suspending Plaintiff without providing him a hearing or establishing that he constituted an "imminent threat" that would warrant such an interim restriction, by unreasonably delaying his disciplinary Hearing Board, and by subsequently expelling Plaintiff after a hearing at which he was denied his constitutional rights to notice of the allegations against him, to present evidence on his own behalf, and to contest the evidence against him.

223. Defendants also violated Plaintiff's clearly established rights secured by the Fourteenth Amendment, including but not limited to the right to equal protection of the laws, by declining to institute disciplinary proceedings against Gibney – a similarly situated person – due to the fact that Plaintiff was a male and Gibney was a female.

224. Defendants acted with reckless disregard for Plaintiff's constitutional rights.

225. As a direct and proximate result of these acts and omissions Plaintiff has suffered and continues to suffer the harms and damages as described above.

COUNT II – 20 U.S.C. § 1681
(Defendant University)

226. Plaintiff hereby incorporates and adopts each and every allegation in the preceding paragraphs numbered 1 through 225.

227. Pursuant to Title IX of the Education Amendments of 1972, Plaintiff has a right not to be subjected to university discipline where sex is a motivating factor in the decision to impose sanctions.

228. The University violated Plaintiff's statutory right to be free from discrimination on the basis of sex by subjecting Plaintiff to a disciplinary proceeding marked by the aforementioned procedural flaws that resulted in an innocent person being wrongly found to have committed an offense.

229. The University also violated Plaintiff's statutory right to be free from discrimination on the basis of sex by selectively enforcing *CSC* provisions against him while exhibiting deliberate indifference to *CSC* violations committed by Gibney.

230. The University further violated Plaintiff's statutory right to be free from discrimination on the basis of sex by punishing him more severely than a similarly situated female student would have been punished.

231. As a direct and proximate result of these acts and omissions Plaintiff has suffered and continues to suffer the harms and damages as described above.

## COUNT III – BREACH OF CONTRACT
### (Defendant University)

232. Plaintiff hereby incorporates and adopts each and every allegation in the preceding paragraphs numbered 1 through 230.

233. Plaintiff has paid the University sums of money for his education, and in return, the University has contracted to provide Plaintiff with access to its undergraduate degree programs.

234. The relationship between the parties is contractual in nature, and each party to the contract owes to the other certain duties, some of which are enumerated in the *CSC*.

235. The University has breached its obligations to Plaintiff under this contractual arrangement and Plaintiff has been, and continues to be, damaged by this breach.

236. In addition, the University has failed to honor its obligation of good faith and fair dealing imputed in each contract entered into in the Commonwealth of Massachusetts.

237. As a direct and proximate result of these acts and omissions Plaintiff has suffered and continues to suffer the harms and damages as described above.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants jointly and severally on all counts of this complaint. Plaintiff further requests that this Court:

A. Issue an Injunction enjoining Defendants, Defendants' agents, employees and all persons in active concert or participation with them, from violating Plaintiff's constitutional rights by continuing the expulsion that was imposed against Plaintiff on December 3, 2013.

B. Retain jurisdiction of this matter for the purpose of enforcing this Court's order.

C. Award to Plaintiff compensatory damages in an amount to be determined at trial.

D.    Award Plaintiff the reasonable costs and expenses of this action, including attorney's fees, in accordance with 42 U.S.C. § 1988.

E.    Grant such other and further relief as this Court deems equitable and just under the circumstances.

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

PLAINTIFF DEMANDS A TRIAL BY JURY

**THE PLAINTIFF**

By: ____/s/ Luke Ryan_____
LUKE RYAN, BBO# 664999
SASSON, TURNBULL, RYAN & HOOSE
100 Main Street, 3rd Floor
Northampton, MA 01060
(413) 586-4800
(413) 582-6419 [FAX]

_____/s/ Bonnie G. Allen____
BONNIE G. ALLEN  BBO #563995
39 Main Street, Suite 8
Northampton, MA  01060
(413) 584-3515
(413) 586-7076 [FAX]