# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
*****************************************
                                        *
JAMES HAIDAK,                           *
                                        *
        Plaintiff                       *
                                        *
v.                                      *
                                        *
UNIVERSITY OF MASSACHUSETTS             *        CIVIL ACTION NO.  14-CV-30049
AT AMHERST; ENKU GELAYE,                *
Individually and in her official capacity *      LEAVE TO FILE GRANTED ON
as Dean of Students and Acting Vice     *                3/21/14
Chancellor of Student Affairs and       *
Campus Life of the University of        *
Massachusetts at Amherst; and DAVID     *
C. VAILLANCOURT, Individually and       *
in his official capacity as Senior Associate *
Dean of Students of the University of   *
Massachusetts at Amherst; and           *
ALLISON BERGER, Individually and in     *
her official capacity as Associate  Dean of *
Students of the University of           *
Massachusetts at Amherst                *
                                        *
        Defendants                      *
                                        *
*********************************
```

## MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR INJUNCTIVE RELIEF

***Introduction***

Plaintiff James Haidak ("Plaintiff"), a twenty-two year-old former student at the

University of Massachusetts at Amherst ("the University), has brought this action seeking

equitable relief and monetary damages from the University and three of its officials for violations

of his constitutional, statutory, and common law rights in the context of a disciplinary proceeding

which culminated with his expulsion on December 3, 2013.  In the pages that follow, Plaintiff

will demonstrate how Defendants' deprivation of indispensable procedural rights on the basis of his sex resulted in a hearing that was fundamentally unfair and an outcome that was patently unjust.

Among other things, Plaintiff will show that Defendants: (a) disregarded his right to an expedited hearing; (b) improperly restricted his efforts be heard in his own defense; (c) imposed the most severe punishment possible notwithstanding the absence of substantial evidence; (d) refused to permit the assistance of counsel; (e) denied Plaintiff his right to confront and to cross-examine the sole witness against him; and (f) left Plaintiff's fate in the hands of a biased decision-maker.  Based on these and other transgressions, Plaintiff stands an excellent chance of prevailing on each of the claims set forth in his verified complaint.  Accordingly, he respectfully requests that this Honorable Court issue an order compelling Defendants to vacate his expulsion and permit his re-admission as a student in good standing at the University.

***Factual Background***

Plaintiff hereby incorporates the facts found in his verified complaint into this Memorandum of Law by reference.  The factual background that follows is a concise summary of the most pertinent evidence set forth in the verified complaint.  The University's 2012-2013 Code of Student Conduct is available on-line at:

http://www.umass.edu/dean_students/uploads/listWidget/28275/CodeofStudentConduct1213.pdf (last visited Mar. 17, 2014).  Copies of other documents presently in Plaintiff's possession and referenced herein are available upon request.

A.    *The Incident Giving Rise to Allegations of CSC Violations*

On April 16, 2013, Plaintiff was a twenty-two year-old undergraduate in his senior year at the University, majoring in Economics.  By the end of his junior year, Plaintiff had a G.P.A. of

4.0 and was a member of the Phi Beta Kappa honor society.  During his junior year, Plaintiff

began an intimate dating relationship with Lauren Gibney ("the complainant"), a fellow student

at the University.  On April 16, 2013, she was twenty years old.

  For their respective Spring 2013 semesters, Plaintiff and the complainant attended a study

abroad program at the University of Barcelona in Spain, administered by Academic Programs

International (API).  In February of 2013, Plaintiff's mother, Cecily Holiday ("Holiday"), an

employee of the U.S. Department of State, traveled to Barcelona with a colleague named Damon

C. Ladson (Ladson) due to concerns she had about reports she had received from her son

pertaining to acts of physical aggression by the complainant, including punching, slapping,

kicking, and biting.  While in Barcelona, Holiday and Ladson observed a deep bruise on

Plaintiff's upper arm that appeared to be a bite mark and were told by Plaintiff's roommate that

he had witnessed the complainant yelling at Plaintiff, slapping him, and biting him.  Holiday and

Ladson took the complainant out to lunch and, while there, questioned her about her physical

aggression toward Plaintiff.  The complainant maintained that she usually just did that when they

were playing around, but admitted that on occasion she did assault Plaintiff while in the midst of

arguing.

  On the evening of April 15, 2013, the complainant received news that a family member

to whom she was close had passed away.  That night, she consumed alcohol throughout the

evening and, by the time she and Plaintiff returned to her apartment at approximately 4:00 a.m.,

the complainant was intoxicated.  When Plaintiff proceeded to take out his laptop, the

complainant became irate, as she had previously expressed displeasure at the amount of time

Plaintiff spent on his laptop while in her company.   The complainant yelled at Plaintiff and

grabbed the screen of the laptop in an attempt to slam it shut.  When she did this, Plaintiff

observed rainbow lines appearing on his computer screen and became concerned that the complainant had broken the laptop.

During the verbal argument that ensued, Plaintiff placed his hand on the complainant's shoulder and asked her to stop when he saw her walking in the direction of his computer. The complainant proceeded to become physical by hitting and slapping Plaintiff's face. Plaintiff attempted to protect himself by holding the complainant's arms down, but she was able to strike him in the eye. As Plaintiff backed away covering his eye, the complainant kicked him in the groin and he fell to his knees. The complainant then grabbed his laptop on the bed and held it tightly in her arms. Once Plaintiff was able to retrieve his laptop from the complainant's grip, he gathered the rest of his belongings and left the apartment.

The next day, the complainant accused Plaintiff of assaulting her and he was summarily dismissed from API's program. API sent a copy of the complainant's written statement to Defendant Enku Gelaye, the Dean of Students at the University. According to the complainant, Plaintiff (1) put his hands around her neck and threw her on the bed, (2) twisted her arm and pushed her on the bed, (3) put his hands on pressure points of her body making her scream loudly while she was face-down on her bed, and (4) grabbed her wrists and punched himself in the face with her hands.

B.     *Initiation of Disciplinary Proceedings – The First Notice of Charge*

On April 19, 2013, Defendant Allison Berger, an Associate Dean at the University, issued a Notice of Charge, alleging that Plaintiff violated Code of Student Conduct ("*CSC*") provisions proscribing "Physical Assault" and "Endangering Behavior to Persons or Property." The Notice of Charge directed Plaintiff to schedule a conference with Defendant Berger to

"resolve the matter" and imposed an interim restriction that Plaintiff have no contact with the complainant.

During a disciplinary conference with Defendant Berger on May 1, 2013, Plaintiff denied the charges against him. He subsequently presented his version of events in a written statement and provided Defendant Berger with a photograph of the eye injury inflicted by the complainant on the night in question. Holiday also advised Defendant Berger that the complainant had admitted to physically assaulting and injuring Plaintiff while in Barcelona.

Based on the statements provided by Plaintiff and Holiday, Defendant Berger had reason to believe that the complainant had violated the *CSC* by physically assaulting Plaintiff both before and during the night in question. Defendant Berger exhibited deliberate indifference to these credible allegations against the complainant. Upon information and belief, gender was a motivating factor in Defendant Berger's selective enforcement of *CSC* provisions against Plaintiff but not the complainant – a similarly situated person for all intent and purposes. Upon information and belief, the University has historically and systematically pursued charges against males but not females in physical assault cases, solely on the basis of sex.

C.    *Initiation of Disciplinary Proceedings – The Second Notice of Charge*

Following her return from Barcelona, the complainant voluntarily resumed her relationship with Plaintiff and had intimate relations with him in an Amherst motel room on multiple occasions. In addition to this in-person contact, Plaintiff and the complainant also communicated multiple times a day via telephone calls, texting, email, and Skype.

On or about May 9, 2013, the complainant's parents discovered her ongoing communication with Plaintiff and contacted Defendant Berger. When asked by Defendant Berger to describe the nature of her contact with Plaintiff, the complainant stated that Plaintiff

had called her fifty-two times from his cell phone and a Skype number. The complainant did not disclose that she was complicit in the resumption of contact with Plaintiff and had been physically intimate with him.

In response to the complainant's allegations, Defendant Berger issued a Second Notice of Charge on May 28, 2013, accusing Plaintiff of 1) harassment, and 2) failure to comply with the no contact restriction imposed on April 19, 2013. By the time Defendant Berger issued the Second Notice of Charge on May 28, 2013, Plaintiff and Gibney had once again resumed their relationship and had once again been physically intimate in a motel room in Amherst.

D.     *Initiation of Disciplinary Proceedings – The Third Notice of Charge*

Upon his receipt of the Second Notice of Charge, Plaintiff requested a disciplinary conference, which was scheduled for June 19, 2013. Prior to that conference, on June 4, 2013, the complainant and her mother provided Defendant Berger with a copy of the complainant's phone records from April 24, 2013 through June 1, 2013, indicating calls and texts (without content) between the two. In an email to Defendant Berger on June 4, 2013, the complainant stated that the communications "consisted of [Plaintiff] trying to get me to agree to get back with him regardless of recent events and how I truly felt."

On June 17, 2013, Defendant Berger issued a Third Notice of Charge to Plaintiff, which set forth additional charges of harassment and violation of the no-contact order. Defendant Berger also imposed a new interim restriction, that of suspension, barring Plaintiff from the University. Berger ordered Plaintiff to meet with her in regard to the suspension on June 19, 2013 – the date previously scheduled to address the Second Notice of Charge.

In his defense to the harassment charges, Plaintiff provided Defendant Berger with print-outs of the text messages between himself and the complainant between April 24, 2013 and May

31, 2013. Although this evidence clearly established an ongoing, consensual romantic relationship between the two, Defendant Berger did not withdraw the harassment charges and refused to rescind the interim suspension.

E.    *The Hearing Board Delay and Plaintiff's Forced Withdrawal from the University*

Throughout the pendency of the pre-hearing disciplinary proceedings, Plaintiff's parents repeatedly contacted Defendant Berger requesting that a Hearing Board be scheduled. On August 5, 2013, Defendant Berger notified Plaintiff in an e-mail that his suspension would remain in effect until further notice, and that "my staff will contact you to schedule a Hearing Board." On August 27, 2013, Plaintiff's father, Dr. David Haidak, e-mailed Defendant Berger requesting that Plaintiff be permitted to defer his Fall semester at UMass, given that he was barred from campus, and a Hearing Board had not been scheduled to resolve his charges. On August 29, 2013, Defendant Berger responded to Plaintiff advising him to withdraw from the University.

On September 1, 2013, Plaintiff notified Defendant Berger that he was withdrawing "under duress." As of September of 2013, Plaintiff had four classes to complete in order to obtain his degree from the University.

F.    *209A Restraining Order Hearing – Eastern Hampshire District Court*

On August 13, 2013, the complainant contacted Plaintiff via Skype. By September 27, 2013, the resumption of their relationship had come to the attention of the complainant's parents and on that date, they took her to the Eastern Hampshire District Court to apply for a temporary restraining order at the suggestion of Defendant Berger. Following an *ex parte* proceeding, the complainant's request was granted. On October 2, 2013, the complainant delivered a copy of the temporary restraining order to Defendant Berger.

On October 10, 2013, a full hearing in the Eastern Hampshire District Court on the complainant's request to extend the restraining order was held before the Honorable Michael Mulcahy.  The complainant was the only witness to testify at this proceeding.

With respect to the night of April 16, 2013, she testified that Plaintiff "never actually hit me but he would place his hands on pressure points on my body" and that he "grabbed my wrists, punched himself in the face, and said I'm going to F you over and I'm going to bury you."  Under cross-examination by Plaintiff's counsel, the complainant acknowledged that she had been engaging in a sexual relationship with Plaintiff as recently as mid-September.  The complainant also acknowledged that she had been keeping her relationship with Plaintiff secret from her parents.  When shown a photograph of the mark on Plaintiff' arm – the same photograph previously provided to Defendant Berger – the complainant admitted causing the injury by biting Plaintiff.  The complainant also admitted that, after she delivered the aforementioned telephone records to Defendant Berger, she resumed her relationship with Plaintiff.

During the hearing, the complainant conceded that she engaged in intimate relations with Plaintiff during the previous summer in motel rooms in Amherst.  The complainant also conceded that she "just wanted [the University disciplinary proceedings] to be dropped, I didn't want it to come this far," and that everything had been "blown out of proportion."  After considering the complainant's testimony, Judge Mulcahy denied her request to extend the restraining order.

G.    *Pre-Hearing Activity in Contravention of the CSC*

On November 6, 2013, Associate Dean Patricia Cardoso (Cardoso), acting in her capacity as Procedural Advisor, emailed Plaintiff inviting him to send her any documents for her review

that he wished to provide as evidence at his upcoming Hearing Board. The following day, Plaintiff provided Cardoso with a transcript of the restraining order hearing in Eastern Hampshire District Court and requested that it be submitted as evidence. Cardoso consulted with Defendant Gelaye as to whether the transcript was relevant and admissible at the Hearing Board. Defendant Gelaye determined that it was not relevant and directed Cardoso to exclude it. Plaintiff also submitted photos to Cardoso of the bite mark inflicted by the complainant, but this evidence was also deemed irrelevant and was excluded.

Pursuant to Sections IV.E.4 and 5 of the CSC, as well as Student Conduct Hearing Board Procedures, a charged student is entitled to present witnesses, witness statements and "any other relevant information (i.e. pictures, phone/text records to be considered by the Board.)" A Hearing Board may only "exclude unduly repetitious or irrelevant evidence." There is no provision in the *CSC* that permits a Procedural Advisor, an Associate Dean of Students, the Dean of Students, or the Vice Chancellor to act as a gatekeeper concerning the admission of evidence at a hearing. Indeed, pursuant to Section IV.E.6 of the CSC, only Hearing Board members are authorized to carry out this role.

On November 15, 2013, at 5:43 p.m., Cardoso notified Plaintiff via e-mail that his Hearing Board would be held at 1:30 p.m. on November 22, 2013. The provision of only four days notice failed to comply with the requirement under Section IV.D of the *CSC* that a student be notified at least five business days prior to the date of a scheduled hearing. At the time of the notice, Plaintiff was living with his parents in Potomac, Maryland and was prohibited from entering campus pursuant to the interim restriction imposed by Defendant Berger on June 17, 2013. The failure of the University to provide Plaintiff with adequate notice of his Hearing Board deprived him of the ability to travel to Amherst to testify in person at the hearing.

In advance of the hearing, Plaintiff was told that while his attorney and a student advisor could attend the hearing, neither would be allowed to speak.  Plaintiff was also advised that after the complainant testified, he would not be permitted to question her directly.  Instead, he was instructed to submit questions for Hearing Board members to ask the complainant on his behalf. On November 20, 2013, Plaintiff submitted a list of thirty-six questions to Cardoso.  In drafting these questions, Plaintiff, of course, had no way of anticipating precisely what the complainant would say.

H.    *The Hearing Board*

On November 22, 2013 – over seven months after the incident in Barcelona – a Hearing Board was convened at the University.  A staff member and four students served as Board members.  Credibility was the central issue for the Hearing Board to determine – particularly with regard to the charge of Physical Assault.  The exclusion of the complainant's testimony at the restraining order hearing – coupled with Defendants' refusal to permit testimony from Holiday or the introduction of photographs depicting the bite mark on Plaintiff's arm – deprived the Board members of compelling evidence that the complainant had not been truthful in the accounts she had previously furnished to Defendant Berger.

Plaintiff's inability to be physically present due to the inadequate notice furnished by the Dean's office adversely affected his ability to establish his own credibility.  Whereas Board members were able to assess the complainant's appearance and demeanor from her actual presence at the hearing, no similar assessment could be made of Plaintiff as he was limited to participating from home via Skype.  Plaintiff's efforts to contest the evidence against him were further undermined when Board members neglected to ask the complainant most of the questions Plaintiff had submitted.

Ultimately, the Hearing Board recommended that Plaintiff be found responsible for physical assault and the two instances of failure to comply with direction of a university official, and not responsible for the two charges of harassment and endangering behavior to person or property.  Section IV.E.10 of the CSC requires a Hearing Board to substantiate its recommendation by entering in the record "a written summary of testimony, findings of fact(s), and rationale."  The Board failed to adhere to this requirement in its report; indeed, it provided no findings of fact in support of its recommendation.

Under the circumstances of this case, findings of fact were essential to explain and justify the Board's determination of whose version of events, or what portions of each version, it deemed credible.  The aforementioned procedural errors and irregularities committed by Defendants Berger and Gelaye undermined any confidence a reasonable person could have in the findings and recommendation made by the Board.  Had the Defendants Berger and Gelaye properly followed the applicable *CSC* regulations, it is reasonable to expect that the outcome of Plaintiff's hearing would have been different.  Upon information and belief, the outcome of Plaintiff's hearing was consistent with a pattern and practice of discrimination on the basis of sex at the University whereby male students accused of physically assaulting female students are routinely found responsible for such misconduct despite the absence of credible evidence supporting the charges against them.

I.    *The Decision to Expel*

In a letter dated December 3, 2013, Defendant David Vaillancourt, a Senior Associate Dean at the University, adopted the recommendations of the Hearing Board and imposed the most severe sanction available by expelling Plaintiff.  Section IV.E.11 of the *CSC* requires the issuance of factual findings by the University official responsible for making the ultimate

decision in a disciplinary proceeding.   Defendant Vaillancourt's expulsion letter featured no such factual findings.   Instead, it simply stated that the decision was based on a review of "substantial materials presented regarding the incident."  This reference to a single incident, in the face of multiple charges relating to multiple incidents, demonstrates his failure to adequately review and consider the factors required by the *CSC*.

Upon receipt of Defendant Vaillancourt's expulsion letter, Plaintiff requested the rationale for the decision, as permitted by the *CSC*.  Defendant Vaillancourt failed to respond to Plaintiff's request.  Upon information and belief, Plaintiff's punishment was consistent with a pattern and practice of discrimination on the basis of sex at the University whereby male students found responsible of physically assaulting female students are routinely punished more severely than female students found responsible for assaulting male students.

J.    *The Appeal to the UAB*

On December 18, 2013, at approximately 4:30 p.m., Plaintiff submitted through his attorney a fifteen- page, single-spaced Letter of Appeal pursuant to Section VI of the *CSC*. Plaintiff alleged and specifically supported the following grounds:

- Procedural error or irregularity which materially affected the decision;

- The decision is unsupported by substantial evidence;

- The sanction is unsupported by the charges and/or the student's disciplinary history.

In his letter, Plaintiff noted that Defendant Gelaye, who was Acting Vice Chancellor as well as Dean of Students, had participated in the screening and exclusion of his proposed evidence and therefore it would be inappropriate for her to have any role in the adjudication of his appeal.  Ignoring Plaintiff's request that she recuse herself, Defendant Gelaye upheld Plaintiff's expulsion from the University.  In a letter dated December 19, 2013, Defendant

Gelaye stated that the UAB had reviewed Plaintiff' case "on each of the four grounds for appeal available under the 2011-12 Code of Conduct."

References in Defendant Gelaye's letter to an inapplicable version of the CSC and an adjudication of an appellate ground not even raised by Plaintiff illustrate the inadequate review provided of Defendant Vaillancourt's arbitrary and capricious decision and the Hearing Board's recommendations.

Following his expulsion, Plaintiff applied for, and obtained, admission to the University of Amsterdam.  As a result of his expulsion, the Plaintiff cannot transfer any of the credits he earned over the course of three and a half years as a student at the University.

*Argument*

A.    *Plaintiff Stands an Excellent Chance of Prevailing on the Merits of his Claims.*

    1.    **Due Process**

It is well-settled that "a student's interest in pursuing an education is included within the fourteenth amendment's protection of liberty and property."  *Gorman v. Univ. of R.I.*, 837 F.2d 7, 12 (1st Cir. 1988) (citation omitted).  "Hence, a student facing expulsion or suspension from a public educational institution is entitled to the protections of due process."  *Id.* (citations omitted).

"Once it is determined that due process applies, the question remains what process is due."  *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  "[A]t a minimum," the Due Process Clause "require[s] that deprivation of . . . liberty or property by adjudication be preceded by notice and opportunity for hearing *appropriate to the nature of the case*."  *Goss v. Lopez*, 419 U.S. 565, 579 (1975) (quoting *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306 (1950)) (emphasis added); *accord Gorman*, 837 F.2d at 13 ("Whether the hearing was fair depends upon

the nature of the interest affected and all of the *circumstances of the particular case*." (emphasis added)).  Because "things are not always as they seem to be," a student facing expulsion or suspension from a public educational institution must "at least have the opportunity to characterize his conduct and put it in what *he deems the proper context*."  *Goss*, 419 U.S. at 584 (emphasis added).

In *Goss*, the Court "stop[ped] short of construing the Due Process Clause to require, countrywide, that hearings *in connection with short suspensions* must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident."  *Id.* at 583 (emphasis added). However, Justice White emphasized that the Court's holding applied "solely to the short suspension, not exceeding 10 days" and that "[l]onger suspensions or expulsions . . . may require more formal procedures."  *Id.* at 584.[1]

Following *Goss*, federal courts have utilized the familiar three-factor test first set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), to assess the constitutionality of disciplinary proceedings.  *See, e.g.*, *Gorman*, 837 F.2d at 13.  This inquiry calls upon a court to consider: "(1) the nature of the private interest affected—that is, the seriousness of the charge and potential sanctions, (2) the danger of error and the benefit of additional or alternate procedures, and (3) the public or governmental burden were additional procedures mandated."  *Flaim v. Med. Coll. of OH*, 418 F.3d 629, 635 (6th Cir. 2005) (citation omitted).

---

[1] The Supreme Court later went on to hold that there is a "significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct," and "[t]his difference calls for far less stringent procedural requirements in the case of an academic dismissal."  *Bd. of Curators of Univ. of MO v. Horowitz*, 435 U.S. 78, 86 (1978).  In this case, there is no question Plaintiff was expelled for his purported violation of rules of conduct as he had an exemplary academic record.

Applying these principles, it is plain that the proceedings that culminated in Plaintiff's expulsion ran afoul of the Due Process Clause.  With respect to the first *Matthews* factor, Plaintiff "faced expulsion; therefore, his private interest was exceptionally robust."  *Siblerud v. Colo. State Bd. of Agriculture*, 896 F. Supp. 1506, 1516 (D. Colo. 1995) (citing William W. Van Alstyne, *Procedural Due Process and State University Students*, 10 UCLA L. REV. 368, 381 (1963), for the proposition that "[w]here the disciplinary proceeding could result in expulsion or indefinite suspension, the harm to the student in terms of terminating his education and foreclosing professional opportunities may well rival the harm in criminal proceedings."); *see also Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 16 (D. Me. 2005) (characterizing plaintiff's private interest as "compelling" due to "potential consequences" which "reach[ed] beyond [plaintiff's] immediate standing at the University").  As the First Circuit has recognized: "The interests of students in completing their education, as well as avoiding unfair or mistaken exclusion from the educational environment, and the accompanying stigma are, of course, paramount."  *Gorman*, 837 F.2d at 14.

Turning to the second factor, the danger of an erroneous deprivation could hardly have been higher.  Plaintiff's accuser was a twenty year-old with a penchant for drinking to excess and slapping and biting Plaintiff during disputes.  No witnesses observed the incident in question, which occurred in the early morning hours while the complainant was under the influence of alcohol and experiencing emotional turmoil related to the recent passing of a close family friend. It is undisputed that the only punches thrown during the encounter struck Plaintiff resulting in bruising to his face.  The complainant nevertheless disclaimed responsibility for these injuries by maintaining that Plaintiff manipulated her arms and somehow managed to use her fists to punch himself.

Although the parties subsequently engaged in a voluminous exchange of words via texts, Skype, email, and Facebook, Plaintiff made no admissions regarding the night in question. In contrast, the complainant all but retracted her allegations by conceding that the whole thing had been blown out of proportion and that her parents were much more invested in the disciplinary process than she was.

Given the nature and circumstances of the case, the procedures employed at the University were woefully inadequate. This becomes clear when one considers the list of protections frequently extended to students by district judges in the First Circuit.[2] In *Carey on Behalf of Carey v. Maine Sch. Admin. Dist. # 17*, 754 F. Supp. 906 (D. Me. 1990), for example, the court held that the following constituted minimum constitutional safeguards in student disciplinary hearings:

(1) The student must be advised of the charges against him;

(2) The student must be informed of the nature of the evidence against him;

(3) The student must be given an opportunity to be heard in his own defense;

---

[2] In a case decided the year before *Goss*, Judge Toledo held that, in the "normal case," a student ought to be afforded the following protections:

(1) adequate advance notice to the student of (a) the charges, (b) the specific, previously promulgated regulations under which the charges are brought, and (c) the evidence against the student; (2) a full, ***expedited evidentiary hearing*** (a) presided over by an impartial, previously uninvolved official, (b) the proceedings of which are transcribed, at which the student (c) can present evidence and (d) cross-examine opposing witnesses, (e) with the assistance of retained counsel; and (3) a written decision by the presiding official encompassing (a) findings of fact, (b) the substantial evidence on which the findings rest, and (c) reasons for the conclusion.

*Marin v. Univ. of P.R.*, 377 F. Supp. 613, 623 (D.P.R. 1974) (emphasis added). It would appear that the right to an "expedited evidentiary hearing" was omitted from the list of protections afforded as a matter of course to students in the District of Maine because of a presumption of "tight deadlines attendant to student disciplinary hearings from complaint to resolution." *Gomes*, 365 F. Supp. 2d at 21.

(4) The student must not be punished except on the basis of substantial evidence;

(5) The student must be permitted the assistance of a lawyer in major disciplinary hearings;

(6) The student must be permitted to confront and to cross-examine the witnesses against him; and

(7) The student has the right to an impartial tribunal.

*Id.* at 919 (citing *Keene v. Rodgers*, 316 F. Supp. 217, 221 (D. Me.1970);[3] *see also id.* (clarifying that a "[f]ailure to permit Plaintiffs to present witnesses" would run afoul of the third safeguard and therefore "constitute a due process violation").

After advising Plaintiff of the charges and the nature of the evidence against him, Defendants: (a) failed to provide an expedited hearing; (b) improperly restricted Plaintiff's efforts be heard in his own defense; (c) imposed the most severe punishment possible notwithstanding the absence of substantial evidence; (d) refused to permit the assistance of counsel; (e) denied Plaintiff his right to confront and to cross-examine the sole witness against him; and (f) left Plaintiff's fate in the hands of a biased decision-maker.

### *The Right to an Expedited Evidentiary Hearing*

---

[3] In *Carey*, Chief Judge Carter stated that while *Keene* preceded "the landmark Supreme Court precedents governing this subject," the decision was "consistent with those precedents and, therefore, retains its vitality." *Carey*, 754 F. Supp. at 919 n.7. Other courts and commentators have reached the same conclusion. *See, e.g.*, *Johnson v. Collins*, 233 F. Supp. 2d 241, 248 (D.N.H. 2002); David Doty, *By the Book:* Fuller v. Decatur Public Schools Board of Education School District 61 *and the Essential Elements of Student Due Process in K-12 Expulsion Proceedings*, 151 ED. LAW REP. 353, 359 (Apr. 26, 2001). While neither the Supreme Court nor the First Circuit has adopted these, or any other, bright-line rules for suspensions exceeding ten days or expulsions, Plaintiff contends that these seven requirements, along with the right to a full, expedited evidentiary hearing set forth in *Marin*, *see supra* note 2, "strike the appropriate balance between the competing interests of the parties in this case." *Johnson*, 233 F. Supp. 2d at 248.

In this case, over seven months passed from Plaintiff's receipt of the first notice of charge and the commencement of the disciplinary hearing. A review of cases and student conduct codes from across the country reveals few, if any, comparable intervals "between the notice and the hearing." Berger & Berger, *Academic Discipline: A Guide to Fair Process for University Student*, 99 COLUM. L. REV. 289, 298 (1999) (citing survey where a "mere 1%" of schools reported a "time interval between the notice and the hearing" of "more than two weeks"); *Hennessy v. City of Melrose*, 194 F.3d 237, 243 (1st Cir. 1999) (plaintiff "offered a hearing within 24 hours"); *Blanton v. State Univ. of N.Y.*, 489 F.2d 377, 379-80 (2d Cir. 1973) (incidents December 2-4; hearing December 18); *Donohue v. Baker*, 976 F. Supp. 136, 145-46 (N.D.N.Y. 1997) (telephonic notice of rape charge three days before hearing; written charges one day before hearing).

Here, the first notice of the charge was issued on April 19, 2013. Following a meeting with Defendant Berger on May 1, 2013, in which he denied the allegations against him, Plaintiff sought an "expedited hearing to resolve the disciplinary matter with a minimal impact on his education." *Gomes*, 365 F. Supp. 2d at 21 (noting that students "often" make this request for that reason). No such hearing was granted. *Cf. Bleiler v. Coll. of Holy Cross*, No. 11-11541-DJC, 2013 WL 4714340, at *1-2 (D. Mass. Aug. 26, 2013) (notice of sexual assault hearing on May 9; hearing on May 18).

Assuming *arguendo* that the initial failure to promptly refer the matter to a hearing board did not constitute a due process violation, there is no question that Defendants violated Plaintiff's constitutional rights when, on June 17, 2013, they suspended him on an interim basis but did not afford him a hearing until some five months later. As the Eleventh Circuit has noted, "a tentative decision . . . to suspend . . . students for some days may be made before a hearing as long as the

disciplinarian goes on to hold a prompt—given the practicalities—hearing at which the preliminary decision to suspend can be reversed." *C.B. By & Through Breeding v. Driscoll*, 82 F.3d 383, 387 (11th Cir. 1996).

The lengthy and inexcusable delay in this case caused considerable damage to Plaintiff as it not only placed his future academic career in a state of prolonged limbo, it ultimately compromised his ability "to respond, explain, and defend" his actions. *Gorman*, 837 F.2d at 13. Indeed, by the time the hearing was finally convened, Plaintiff was living and working in Maryland and had insufficient notice in order to make arrangements to attend the hearing in person. Because he was limited to participating via Skype, Hearing Board members had an inadequate opportunity to observe Plaintiff's demeanor and thereby conduct a thorough assessment of his credibility. In a case where the parties offered conflicting versions of events, the failure to afford Plaintiff his right to a prompt hearing ultimately left him at a distinct disadvantage in the credibility contest which determined his fate.

*The Opportunity to be Heard in One's Own Defense*

As noted above, *Goss* held that a public educational institution pursuing serious disciplinary sanctions has an obligation to let a student put the incident at issue "in what *he deems* the proper context." 419 U.S. at 584 (emphasis added). Five years later, over 80% of public schools in one survey reported that they had responded to *Goss'* command by affording students the right to call witnesses and present evidence. Edward J. Golden, *Procedural Due Process for Students at Public Colleges and Universities*, 11 J.L. & EDUC. 337, 345 (1980).

In this case, Plaintiff attempted to provide the proper context for the events of April 16, 2013, by introducing: (i) a transcript of a restraining order hearing containing testimony given under oath by the complainant; (ii) a photograph of his upper arm with a bite mark inflicted by

the complainant shortly before the night in question; and (iii) the testimony of his mother, Cecily

Holidy, regarding admissions made by the complainant concerning her history of violence

towards Plaintiff.[4]

This evidence was plainly relevant as it not only undermined the complainant's

credibility,[5] it established her propensity for violence.[6]  *See Cloud v. Trustees of Boston Univ.*,

720 F.2d 721, 725 (1st Cir. 1983) (holding that courts may refer to "court-established evidentiary

and procedural rules" in "measuring the adequacy and fairness of [a] hearing"); *see also Gomes*,

365 F. Supp. 2d at 25 (citing Fed. R. Evid. 412 in support of finding that right to due process did

not permit evidence of complainant's "past sexual history").  It was nevertheless excluded, not

by the Hearing Board pursuant to *CSC* IV.E.6, but by Defendant Gelave who injected herself

---

[4] *Contrast Donovan v. Ritchie*, 68 F.3d 14, 18 (1st Cir. 1995) (no due process violation where plaintiff could not point to "the presence of any evidence other than his own say-so that could shed light on his defense").

[5] Putting aside, for a moment, the conflicting testimony she gave concerning the Barcelona incident, the complainant acknowledged that she resumed a physically intimate relationship with Plaintiff when the two returned to the United States and that this relationship continued up until the day before she requested a restraining order on September 26, 2013.  The complainant also admitted concealing the resumption of her intimate relationship with Plaintiff from her parents, conceded that while she had slapped and bit Plaintiff, he had never struck her, and authenticated electronic messages she had sent professing a desire for disciplinary charges against Plaintiff "to be dropped" based on her sense that "things had been blown out of proportion."

[6] As the Massachusetts Supreme Judicial Court noted in 2005,

> Under Rules 404 and 405 of the Federal Rules of Evidence, all Federal courts now permit the introduction of evidence of the victim's violent character to support a defendant's self-defense claim that the victim was the first aggressor. Similarly, appellate courts in forty-five of the forty-eight State jurisdictions that have considered the issue have decided that some form of such evidence is properly admissible on the first aggressor issue, regardless whether the victim's violent character was known to the defendant at the time of the assault.

*Commonwealth v. Adjutant*, 443 Mass. 649, 654-56 (2005 (footnotes omitted).

into the proceedings as a kind of unofficial gatekeeper. These evidentiary rulings are the epitome of the "[s]ignificant and unfair departures from an institution's own procedures," which courts have found "can amount to a violation of due process." *Furey v. Temple Univ.*, 730 F. Supp. 2d 380, 396-97 (E.D. Pa. 2010) (citation omitted)).

The exclusion of the transcript from the restraining order hearing was particularly egregious. At that hearing, the Complainant gave testimony concerning the Barcelona incident which was inconsistent both with the written account she had previously provided to Defendant Berger and with the account she would furnish at the hearing. Under the circumstances, this evidence would have been admissible in court "because of the prior inconsistent statement exception to the hearsay rule." *Norton v. Spencer*, 351 F.3d 1, 9 n.3 (1st Cir. 2003) (citation omitted); *see also* Fed. R. Evid. 801(d)(1)(A); 613(b).

Defendant Gelaye's decision to adopt overly-restrictive evidentiary rules at a hearing where the formal rules of evidence purportedly did not apply had dire consequences for Plaintiff. What should have been a clear-cut case of a baseless accusation made by a biased witness doing the bidding of her parents became a classic "he-said, she-said" scenario. In the final analysis, there is every reason to believe that if Plaintiff's constitutional right to present a defense had not been violated, the excluded evidence would have tipped the scales in his direction.

### *The Right Not to be Punished Except on the Basis of Substantial Evidence*

Because "substantial evidence . . . does not approach the preponderance-of-the-evidence standard normally found in civil cases," *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003) (citation omitted), it is clearly "a formula intended for appellate review," not for "the original task of resolving conflicts in the evidence," *Smyth v. Lubbers*, 398 F. Supp. 777, 798 (D.C. Mich. 1975). As Judge Adelman has observed:

> [S]tandards of review and standards of proof serve different purposes and address different questions. . . . [N]o lower a standard of proof than "preponderance of the evidence" could be acceptable. Under this standard, the relevant facts must be determined to be more likely than not. Therefore, by definition, any lesser standard of proof . . . would allow government officials to make decisions that they themselves believe are more likely than not wrong.

*Butler v. Oak Creek-Franklin School Dist.*, 172 F. Supp. 2d 1102, 1118 (E.D. Wis. 2001).

For the reasons set forth both above and below, Plaintiff maintains that the evidence against him was hardly substantial. Among other things, no witnesses, medical records, or electronic communications corroborated the complainant's claim that Plaintiff perpetrated the assault for which he was punished. Ultimately, the only evidence against him was an account he could neither impeach through prior inconsistent testimony nor effectively challenge by cross-examination. *See infra*.

Furthermore, if the evidence of Plaintiff's wrongdoing was insubstantial, the evidence supporting the sanction imposed was non-existent. Once the hearing board found Plaintiff responsible for the assault and in violation of the no contact orders, Plaintiff was not furnished with an opportunity to cite any mitigating factors that would have warranted a lesser penalty. For example, had Plaintiff been permitted a voice at his sentencing, he could have used it to: (i) cite his stellar academic record; (ii) point out that the complainant suffered no physical injuries; (iii) note the prior occasions when the complainant had inflicted physical injuries on him; and (iv) produce evidence of therapeutic treatment he had sought in an effort to understand his devotion to a relationship that was plainly dysfunctional.

Citing *Goss*, the Supreme Court has held that "[e]ven where the facts are clear, the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985) (citing *Goss v.*

*Lopez*, 419 U.S. at 583–84; *Gagnon v. Scarpelli*, 411 U.S. 778, 784-86 (1973)).  Here, the only opportunity Plaintiff had to present reasons why he should not have been expelled was through an appellate process that can only be described as a "sham."  *Levenstein v. Salafsky*, 164 F.3d 345, 351 (7th Cir. 1998).

As noted above, at approximately 4:30 p.m. on December 18, 2013, Plaintiff submitted a fifteen-page single-spaced appeal with thirty-two pages of exhibits.  Included in this appeal was an explicit request that Defendant Gelaye not participate in its adjudication given the role she played in excluding probative evidence.  The very next day, in a form letter exhibiting all the tell-tale signs of a hasty cut-and-paste job, Defendant Gelaye denied the appeal citing a ground Plaintiff did not raise, as well as an inapplicable, older version of the *CSC*.

In sum, Defendants disregarded "a fundamental due process requirement" to provide Plaintiff with "[t]he opportunity to present reasons, either in person or in writing, why proposed action should not be taken."  *Loudermill*, 470 U.S. at 546 (citation omitted).  Accordingly, the punishment they imposed was not, and could not have been, based on substantial evidence.

### *The Assistance of a Lawyer in Major Disciplinary Hearings*

The case for permitting the active assistance of an attorney in a proceeding that can result in an expulsion is compelling.  As two commentators have noted:

> Faced with expulsion, suspension, or a permanent stain on their transcript, few students, even if innocent, have the *sang-froid* not to feel great emotional tension before their accusers and in front of the person or panel who will determine their educational future.  That the hearing is "informal" and the panel is impartial does not lessen the tension.  Indeed, informality—in the sense that evidentiary and procedural standards are ignored—may actually add to the student's discomfort, especially if hearsay can be used against him.  And to the student under inquiry, the panel, likely to have senior faculty or more senior students, may seem quite forbidding.  This is hardly the environment in which we should expect anyone, let alone a young person (sometimes hardly past adolescence) to exercise cool judgment, to think clearly, to question effectively, or to testify helpfully.

Berger & Berger, *supra* at 341.

Twenty-five years ago in *Gorman*, the First Circuit found that "the weight of authority is against representation by counsel at disciplinary hearings, unless the student is also facing criminal charges stemming from the incident in question." 837 F.2d at 16.[7]  Subsequent case law suggests that, if a student is not simultaneously facing criminal charges, the existence of a right to the assistance of counsel hinges upon whether "the school proceeds through counsel or the procedures are overly complex." *Flaim*, 418 F.3d at 636.

Applying this principle in the recent case of *Richards v. McDavis*, No. 2:12–cv–846, 2013 WL 5297244 (S.D. Ohio Sept. 19, 2013), the court found that the plaintiff had no constitutional right to counsel because "[t]he University did not have its case presented by an attorney, the hearings were not procedurally complex, and the formal rules of evidence were not utilized." *Id.* at *10.  Here, although University officials did not proceed through counsel, they did make a number of critical evidentiary rulings which resulted in a hearing that was procedurally complex.  As previously discussed, Defendant Gelaye took it upon herself to exclude evidence that went to the heart of the credibility contest between Plaintiff and the complainant.  Had Plaintiff been afforded the assistance of counsel, it seems likely that, if nothing else, said attorney could have prevailed upon Defendant Gelaye to reconsider her improper evidentiary rulings.  *See supra* notes 5 and 6 and accompanying text.

<u>*The Right of Confrontation/Cross-Examination*</u>

Of all the procedural deficiencies, none was so injurious as denying Plaintiff the opportunity to cross-examine his accuser.  As the Supreme Court has recognized, "[i]n almost

---

[7] Previously, in *Gabrilowitz v. Newman*, 582 F.2d 100 (1st Cir. 1978), the First Circuit recognized that "[t]here are cases . . . holding that due process mandates the right to counsel at student expulsion proceedings." *Id.* at 104 (collecting cases).

every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) (citations omitted); *see also Greene v. McElroy*, 360 U.S. 474, 497 (1959) ("The belief that no safeguard for testing the value of human statements is comparable to that furnished by cross-examination, and the conviction that no statement (unless by special exception) should be used as testimony until it has been probed and sublimated by that test, has found increasing strength in lengthening experience." (quoting 5 J. Wigmore, EVIDENCE § 1367)).

In recognition of cross-examination's status as the "greatest legal engine ever invented for the discovery of truth," *California v. Green*, 399 U.S. 149, 158 (1970) (citation omitted), "over 90% of the public schools" in one survey "report[ed] that they afford the student . . . the prerogative to . . . cross-examine adverse witnesses." Berger & Berger, *supra* at 298. This percentage is reflected in case law from across the country. *See, e.g.*, *Wynar v. Douglas County Sch. Dist.*, 728 F.3d 1062, 1073 (9th Cir. 2013) (no due process violation where student "was given the right to be represented by an advocate of [his] choosing, including counsel, to present evidence and to call and cross-examine witnesses." (quotation marks omitted); *Phat Van Le v. Univ. of Medicine & Dentistry of N.J.*, 379 Fed. Appx. 171, 175 (3rd Cir. 2001) (construing the "risk of erroneous deprivation" as "low" where student was "afforded extensive procedural protections" that included "the right to present witnesses and evidence" and "the right to cross examine witnesses"); *London v. Directors of DeWitt Pub. Schools*, 194 F.3d 873, 877 (8th Cir. 1999) (plaintiff facing expulsion was "given a hearing where he was represented by counsel who had full opportunity to examine and cross-examine witnesses"); *Than v. Univ. of Texas Med. Sch. at Houston*, 188 F.3d 633, 634 (5th Cir. 1999) ("At the hearing, Than was represented by counsel, who called nine witnesses and introduced more than three score exhibits; cross-

examined all adverse witnesses; and made an opening statement and closing argument.”);

*Bundick v. Bay City Independent Sch. Dist.*, 140 F. Supp. 2d 735, 739 (S.D. Tex. 2001) (finding

no due process violation where “the District’s witnesses testified and were cross-examined”);

*Peterson v. Independent Sch. Dist. No. 811*, 999 F. Supp. 665, 673 (D. Minn. 1998) (no due

process violation where plaintiff “presented evidence and testimony and cross-examined

witnesses”).[8]  In fact, commentators have suggested that “[t]he schools’ extensive recognition of

the right to cross-examine . . . may help to explain the paucity of cases testing the deprivation of

the right.”  Berger & Berger, *supra*, at 348 n.307.

    Significantly, even those federal courts unwilling to find an automatic, due process right

to cross-examination have noted that when the nature of an expulsion case consists of a choice

“between believing an accuser and an accused, . . . cross-examination is not only beneficial, but

essential to due process.”  *Flaim*, 418 F.3d at 641; *see also Winnick v. Manning*, 469 F.2d 545,

550 (2d Cir. 1972) (“[I]f this case had resolved itself into a problem of credibility, cross-

examination of witnesses might have been essential to a fair hearing.”).[9]  These courts appear to

recognize that “[s]tatements that will be used as evidence of guilt, which are worth only as much

as the credibility of the witness delivering them, should be subject to cross-examination because

the outcome of the hearing rides on the weight given to these statements.”  Elizabeth

---

[8] As one state appellate court has observed: “[I]n expulsion proceedings, the private interest is
commanding; the risk of error from the lack of adversarial testing of witnesses through cross–
examination is substantial . . . .”  *Colquitt v. Rich Township High Sch. Dist. No. 227*, 699 N.E.2d
924, 931 (Ill. Ct. App. 1998).

[9] *See also* Brent M. Pattison, *Questioning School Discipline: Due Process, Confrontation, and
School Discipline Hearings*, 18 TEMP. POL. & CIV. RTS. L. REV. 49, 65 (2008) (“[I]n those cases
where the appropriateness of the discipline is completely dependent on the credibility of one
witness, the majority of courts seem to accept that due process would require confrontation
anyway.” (citation omitted)).

Ledgerwood Pendlay, Note, *Procedure for Pupils: What Constitutes Due Process in a University Disciplinary Hearing?*, 82 N.D. L. REV. 967, 991 (2006).

In *Gorman*, a student who was ultimately suspended was permitted to "cross-examine his accusers as to the incidents and events in question," but prevented from cross-examining "on his allegations of bias." 837 F.2d at 16. On appeal, the First Circuit found that "the right to *unlimited* cross-examination has not been deemed an essential requirement of due process in school disciplinary cases." *Id.* (emphasis added). Putting aside the criticism this statement has engendered,[10] Plaintiff plainly failed to receive the same confrontation rights afforded to the student in *Gorman*, as he was not permitted to conduct *any* cross examination of his accuser.

"What of an intermediate form of confrontation" that took place here, "in which the hearing panel act[ed] as a conduit and transmit[ted] [some of] the student's questions to the adverse witness?" Berger & Berger, *supra*, at 350.

> Effective cross-examination requires construction of a strong foundation—a series of preliminary questions, often quite innocent in themselves, that leads up to the admission or denial that weakens the witness's direct testimony. Often the cross-examiner may have to repeat or rephrase a query in order to move the witness to the next step. Sometimes, the witness answers evasively, in which case the examiner must pose follow-up questions to press him more closely. On occasion, the witness may answer in an unexpected way, suggesting to counsel an entirely different line of inquiry. None of this suits the conduit format, which operates as feebly as a 1,200 modem in an era of the 56K.
>
> Put simply, the accused student fails to receive fair treatment when members of the panel alone are allowed to confront the witness. The civil law parallel of the inquiring magistrate assumes an experienced examiner, who is already well-informed about the matter from the investigatory dossier. The typical disciplinary panel consists, by contrast, of students and faculty members, convened often for their very first hearing, unfamiliar (we would hope) with the events triggering the charge, and unlikely to have within the group a trained interrogator. Finally, only the student himself will have the requisite intense stake in challenging the witness as vigorously as possible.

---

[10] *See* Berger & Berger, *supra* at 347 ("In this cavalier treatment of Gorman's claim, the court failed to consider, let alone appreciate, that a cardinal purpose of cross-examination is to plumb the possible bias of a witness.").

*Id.* at 350-351.

The idea that a student's right to due process can be satisfied by allowing him to submit questions in advance of a hearing ignores the role that observing a witness' direct examination plays in constructing an effective cross-examination. *See* PONZER & DODD, CROSS-EXAMINATION: SCIENCE AND TECHNIQUES § 27:15 (2d Ed. 2004) ("[T]he cross-examiner is better served by actively listening and taking fewer notes than by taking very complete notes and missing the opportunity to absorb the non-verbal information," as well as "the impact of the witness on the trier of fact."). Of course, in this case, what little value the conduit system could have offered was undercut by the unwillingness or inability of Board members to confront Plaintiff's accuser.

A similar scenario unfolded in the recent case of *Furey v. Temple Univ.*, 884 F. Supp. 2d 223 (E.D. Pa. 2012). There, following a bench trial, Judge McLaughlin held that, in the abstract, "[t]he ability to pose questions through the Chair gave the plaintiff the opportunity to raise issues of credibility and truthfulness." *Id.* at 252. However, due, in part, to the failure of the panel to "closely question [the complainant] or ask many questions to test his credibility," the court found in favor of the plaintiff on his procedural due process claim and vacated his expulsion. *Id.* at 260, 261.

Prior to the disciplinary hearing in this case, Plaintiff submitted a list of three dozen questions which he expected would be posed to the complainant. A review of the recording of the proceeding will reveal that the Board more or less disregarded Plaintiff's list and asked few, if any, questions designed to test the complainant's credibility.

### *The Right to an Impartial Tribunal*

"Procedural due process is not satisfied when a person has a protected interest under the Due Process Clause and the individual responsible for deciding whether to deprive that person of his interest is biased." *Heyne v. Metro. Nashville Pub. Schools*, 655 F.3d 556, 566 (6th Cir. 2011). "Any other collateral procedural guarantees are largely without meaning if the deciding tribunal has in some way adversely prejudged the merits of the case." *Hill v. City of Clovis*, No. 1:11-cv-1391 AWI SMS, 2012 WL 787609, at *8 n.5 (E.D. Cal. Mar. 9, 2012) (quoting *Simard v. Bd. of Educ. of the Town of Groton*, 473 F.2d 988, 993 (2d Cir. 1973)).

In *Gorman*, the First Circuit concluded that the student had failed to meet his burden of proving the prejudice of his hearing body, notwithstanding evidence that a particular administrator had assumed "multiple roles" throughout the process. 837 F.2d at 15.[11] Given the multiple hats donned by Defendant Gelaye, this case bears a superficial resemblance to *Gorman*. Here, however, the allegation of bias is "based on more than mere speculation and tenuous inferences." *Id.* (citation omitted). This becomes clear when one considers the travel of the case.

Shortly after Plaintiff's summary expulsion from the API program in Barcelona,[12] Defendant Berger issued the first notice of charge. This notice did not impose a separation of Plaintiff from the University, and no steps were taken to promptly resolve the assault charge in order to prevent Plaintiff from endangering the complainant upon their return to campus at the

---

[11] This administrator, *consistent with duties outlined in the code of conduct*, served as an "advisor to [one] University board . . . and participated in its meetings as a non-voting member," then "served as the non-voting advisor to [a second] board, and also participated as a witness," before preparing the record for an appeal and "submit[ing] a rebuttal brief concerning plaintiff's procedural objections." *Id.* at 10-11. While the "various roles" of the administrator would have been "inappropriate in a judicial setting," the First Circuit found that the mere fact that the administrator wore "multiple-hats" was not, by itself, "evidence of bias and undue influence." *Id.* at 15.

[12] It should be noted that "no communication was sought by the [API] disciplinarian with the student in an effort to inform him of his dereliction and to let him tell his side of the story in order to make sure that an injustice is not done." *Goss*, 419 U.S. at 579 (characterizing this practice as a component of "a strange disciplinary system in an educational institution").

start of the fall semester.  Instead, Plaintiff was simply ordered to have no contact with the

complainant while the case was pending.  This initial response gives rise to a reasonable

inference that Defendants recognized that the allegations, even if proven true, would not warrant

anything more than a probationary sentence.

During his first conference with a representative of the Dean's office, Plaintiff denied any

wrongdoing and asserted that the complainant assaulted him on the night in question, as well as

on a number of previous occasions.  These accounts illuminating his accuser's propensity for

violence were not merely exculpatory to Plaintiff in terms of establishing the identity of the first

aggressor on April 16, 2013, *see* supra note 6 and accompanying text, they constituted evidence

of multiple *CSC* violations on the part of the complainant.  Instead of charging the complainant

with these violations (and ordering *her* to have no contact with Plaintiff), Defendants exhibited

the bias that would infect the entire disciplinary process by turning a blind eye to the

complainant's misbehavior.  *Cf. Heyne*, 655 F.3d at 568 (finding plaintiff met burden of proving

bias at pleading stage where allegation was that administrator "did not discipline [another

student] for his threat to [plaintiff] although the Code of Conduct prohibits threats by

students").[13]

Several weeks later, the complainant claimed that Plaintiff had been harassing her.  In

support of this accusation, she provided a phone bill revealing hundreds of text messages and

---

[13] In *Heyne*, the plaintiff was a high school student who drove his car over the foot of a classmate who subsequently threatened to kill him.  655 F.3d at 650.  After he received a ten-day suspension, the plaintiff brought suit alleging a violation of his right to due process due, in part, to a decision not to discipline the injured student for issuing the threat.  A federal district judge denied the defendants' motion to dismiss this claim, and the Sixth Circuit affirmed.  According to the *Heyne* court, the plaintiff had "plausibly suggest[ed]" the absence of "an impartial decision-maker" based, in part, on his allegation that an administrator "did not discipline [the injured student] for his threat to [plaintiff] although the Code of Conduct prohibits threats by students." *Id.* at 568.

calls from Plaintiff.  Defendant Berger responded by issuing a second notice of charge alleging

harassment and a violation of her previous no-contact order.[14]  Before Plaintiff could meet with

Defendant Berger to refute the harassment charge, the complainant provided additional phone

records demonstrating contact by Plaintiff.  This time, instead of merely disregarding the

complainant's dishonesty and taking her baseless harassment claim at face value, the Dean's

office issued a third notice of charge which immediately removed Plaintiff from school as an

interim restriction.

　　　　Two days later during his second conference with Defendant Berger, Plaintiff provided

the contents of the parties' electronic communications.  A cursory review of this evidence would

have made it clear to anyone that Plaintiff had not been harassing the complainant; he'd been

dating her.

　　　　Upon receipt of this evidence, an unbiased Dean's office would have withdrawn the

harassment charges[15] and rescinded the no-contact order the complainant had plainly misused as

a sword rather than a shield.  An unbiased Dean's office would have also brought charges against

the complainant under the *CSC* provision which prohibits "dishonesty or misrepresentation,

either orally or in writing, regarding charges brought under the CSC before hearing boards or

officials of the University."  Finally, having been sold a bill of goods by the complainant on the

harassment claims, an unbiased Dean's office would have given serious consideration to not

proceeding with the Barcelona assault charge in light of the obvious credibility problem with its

sole witness.  Notwithstanding conclusive evidence of the complainant's ongoing participation in

---

[14] This second notice of charge, like the first, did not impose an interim restriction that would
have kept Plaintiff off campus.

[15] *See CSC* § IV.B.2 ("If the University using the preponderance of standard concludes that there
is insufficient information to find the student responsible, the case will not be referred to a
hearing board for resolution, but closed with a 'Not Responsible' finding.").

a consensual relationship, Defendant Berger declined to take any such action and kept the interim suspension in place.

The authority for depriving a student of his constitutional rights prior to providing him with a hearing is limited to those instances where compelling evidence exists of dangerous or predatory conduct. *See Goss*, 419 U.S. at 582 ("Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school.").[16]  Suffice it to say, the use of this extraordinary power cannot be justified in the case of technical non-compliance with a no-contact order which, based on the conduct of the complainant, should have been rescinded (if there was ever any justification for its issuance in the first place).[17]

In retrospect, once the Dean's office violated Plaintiff's right to due process by suspending him without a hearing, an expulsion (or long term suspension) became a foregone conclusion, as University officials acquired a "direct, personal and substantial pecuniary interest" in such an outcome. *N.Y. State Dairy Foods, Inc. v. Northeast Dairy Compact Com'n*, 26 F. Supp. 2d 249, 264 (D. Mass. 1998) (citing *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821-22 (1986), for the proposition that the participation of a decision-maker with such an interest "constitutes a *per se* violation of due process").  If it was determined that Plaintiff was not the perpetrator but the victim of the Barcelona assault or that his misconduct only warranted a probationary sentence, the impropriety of the interim restriction would have been practically

---

[16] It should be noted that Plaintiff's failure to comply with the no-contact order caused no disruption of the academic process as said contact occurred off campus in between the spring and fall semesters.

[17] The second notice of charge which imposed the interim restriction all but concedes the limited nature of the authority for the separation order by portraying an innocuous, reciprocal dialogue between consenting adults as a "direct and imminent threat to [Plaintiff's] safety and the safety of the University community."

indisputable and the only question for subsequent litigation would have been the amount of damages to which Plaintiff was entitled for the loss of his educational benefits for the fall semester.[18]

   While Defendants may claim that Plaintiff was found responsible for the Barcelona assault by an independent hearing board comprising impartial students, compelling evidence suggests otherwise.  As previously noted, before determining whether a student has violated the *CSC*, a Student Conduct Hearing Board must first decide what evidence should be considered during the hearing.  By assuming this latter authority, Defendant Gelaye not only interfered with Plaintiff's right to present a defense (and necessitated the active assistance of counsel), she compromised "the indispensable prerequisites of integrity and objectivity" in the decision-making body.  *Gorman*, 837 F.2d at 15.

*       *       *       *       *

   As for the last *Matthews* factor, it is difficult to see how implementing the procedural safeguards set forth above could have or would have imposed an undue burden on Defendants.  First, a number of these protections – like the rights to an impartial tribunal and to be heard in one's own defense – are found in the *CSC*.  Expecting University officials to comply with a code they themselves authored hardly seems unreasonable.  Second, to the extent that the University has not adopted safeguards like the right of confrontation, it is noteworthy that this practice

---

[18] By expelling Plaintiff, it would appear that University officials sought to set up the defense which proved successful in *Hill By & Through Hill v. Rankin County, Miss. Sch. Dist.*, 843 F. Supp. 1112 (S.D. Miss. 1993).  In that case, like this one, the defendants transgressed the dictates of *Goss* by imposing a lengthy indefinite suspension before affording the student "a formal adversary hearing."  *Id.* at 1118.  Citing the student's ultimate expulsion, the court held that the transgression caused him no prejudice since an earlier hearing would have concluded with him being "expelled at that time instead of being placed on indefinite suspension" and therefore, "the result would be the same."  *Id.*

"seems not to have caused systemic breakdown at the numerous schools permitting cross-examination."  Berger & Berger, *supra* at 350.

Based on the foregoing, Plaintiff stands an excellent chance of prevailing on his claim that Defendants deprived him of his right to procedural process.

    2.    **Title IX**

Title IX of Education Amendments of 1972 provides, in pertinent part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."  20 U.S.C. § 1681(a).[19]  To date, neither the Supreme Court nor the First Circuit has articulated the proper framework for analyzing "sex-based Title IX allegations" in the context of "disciplinary proceedings."  *Bleiler v. Coll. of Holy Cross*, No. 11-11541-DJC, 2013 WL 4714340, at *5 (D. Mass. Aug. 26, 2013).  "In the Second Circuit, Title IX claims against universities arising from disciplinary hearings are evaluated under an 'erroneous outcome' or 'selective enforcement' standard."  *Id.* (citing *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715-16 (2d Cir. 1994)).  In this case, Plaintiff has "plead in the alternative that [he is] in both categories . . . ." *Yusuf*, 35 F.3d at 715.

*Erroneous Outcome*

Under the erroneous outcome standard, a plaintiff must "cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding."  *Id.*  This can be accomplished by

---

[19] "The statute's enforcement machinery includes an implied private right of action . . . ." *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65 (1st Cir. 2002) (citation omitted); *see also Santiago v. Puerto Rico*, 655 F.3d 61, 73 (1st Cir. 2011) (clarifying that this right permits suits against an "educational institution that receives federal funds but not against individuals who merely work for such an institution.").  "In a suit brought pursuant to this private right, both injunctive relief and damages are available."  *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009) (citation omitted).

establishing "a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge." *Id.* Alternatively, a "complaint may also allege particular procedural flaws affecting the proof." *Id.*

Assuming that a plaintiff can make such a showing, the next task is to demonstrate a "causal connection between the flawed outcome and gender bias." *Id.* Ultimately, "the question is whether the [University's] actions are motivated by sexual bias or if the disciplinary hearing process constitutes a pattern of decision-making whereby the [University's] disciplinary procedures governing . . . assault claims is discriminatorily applied or motivated by a chauvinistic view of the sexes." *Bleiler*, 2013 WL 4714340, at *5 (citing *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 756 (E.D. Tenn. 2009) (quotation marks omitted)).

As previously noted, a multitude of reasons exist to doubt the veracity of the most serious charge against Plaintiff, and numerous procedural flaws had profound effects on the proof. The question thus becomes whether it is likely that Plaintiff will be able to prove that "gender bias was a motivating factor behind the erroneous finding." *Yusuf*, 35 F.3d at 715.

In *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993), the Court made it clear that although "[p]roof of discriminatory motive is critical, . . . it can in some situations be inferred from the mere fact of differences in treatment." *Id.* at 609 (citation omitted). At this point in the litigation, there may not be smoking gun evidence of a discriminatory animus. However, stark differences in the treatment of the parties strongly suggests official action based on archaic assumptions and a chauvinistic view of the sexes.

As previously discussed in detail, Plaintiff repeatedly advised the Dean's office in advance of his hearing that the complainant had physically abused him both on the night in question and throughout their relationship. While accused persons often make such allegations

35

under the assumption that the best defense is a good offense, Plaintiff furnished substantial

corroboration for his claims in the form of photographs, a written witness statement, and

admissions made by the complainant while under oath in a court proceeding.

The decision to ignore such evidence appears to have been based on nothing more than

the statistical improbability of a male suffering an assault at the hand of a female.  While

Plaintiff would acknowledge that the majority of domestic violence victims are female and the

substantial majority of perpetrators are male, there are obviously instances where the victim is

male and the perpetrator is female.  *See* Joan B. Kelly & Michael P. Johnson, *Domestic Violence:*

*Differentiation Among Types of Intimate Partner Violence: Research Update and Implications*

*for Interventions*, 46 FAM. CT. REV. 476, 480 (2008) ("Based on hundreds of studies, it is quite

apparent that both men and women are violent in intimate partner relationships.").

In sum, there is every reason to believe that the sex of the parties led University officials

to make decisions that resulted in Plaintiff being improperly found responsible for the most

serious charge against him.

<u>*Selective Enforcement*</u>

A claim of selective enforcement "asserts that, regardless of the student's guilt or

innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected

by the student's gender."  *Yusuf*, 35 F.3d at 715.  "To support a claim of selective enforcement,

[Plaintiff] must demonstrate that a female was in circumstances sufficiently similar to his own

and was treated more favorably by the University."  *Mallory v. Ohio Univ.*, 76 Fed. Appx. 634,

641 (6th Cir. 2003).

As noted above, the complainant in this case was similarly situated to Plaintiff in that she

was accused by a University student of assaultive conduct in the context of a dating relationship.

In spite of these similarities, the complainant was not simply spared the expulsion that befell

Plaintiff; no disciplinary proceedings were instituted against her.  For the reasons set forth above,

it would appear that the complainant received this preferential treatment solely as a result of her

sex.[20]  Accordingly, Plaintiff is reasonably likely to prevail on his claim of a Title IX violation

based on selective enforcement as well.

     3.    **Breach of Contract**

    Finally, Plaintiff is equally likely to prevail on his breach of contract claim.  "That the

relationship between a university and its students has a strong, albeit flexible, contractual flavor

is an idea pretty well accepted in modern case law."  *Dinu v. President & Fellows of Harvard*

*Coll.*, 56 F. Supp. 2d 129, 130 (D. Mass. 1999) (citing *Mangla v. Brown Univ.*, 135 F.3d 80, 83

(1st Cir. 1998)).  "So too, is the proposition that a student handbook, like the occasional

employee handbook, can be a source of the terms defining the reciprocal rights and obligations

of a school and its students."  *Id.* (citations omitted).

    In light of the "the familiar rule that the contract should be construed against its drafter,"

*Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 248 (1995) (O'Connor, J., concurring in part and

dissenting in part), a strong argument exists that Defendants have breached their contractual

obligations to Plaintiff through the aforementioned unfair and prejudicial departures from the

---

[20] In addition to the evidence of selective enforcement in Plaintiff's own case, "Title IX, like other anti-discrimination schemes, permits an inference that a significant gender-based statistical disparity may indicate the existence of discrimination."  *Cohen v. Brown Univ.*, 101 F.3d 155, 171 (1st Cir. 1996).  The gravamen of these types of "disparate impact" claims is that "facially neutral" policies or procedures are applied "more harshly on one group than another and cannot be justified" on a neutral basis.  *Prescott v. Higgins*, 538 F.3d 32, 41 (1st Cir. 2008) (citation omitted).  While Plaintiff may not be in a position to establish a significant gender-based statistical disparity at this point in the litigation, he anticipates that discovery will reveal that University officials are much more likely to instigate disciplinary proceedings against males accused of assaulting females than vice versa and that males found responsible for assaulting females receive much more punitive sanctions than females found responsible for assaulting males.

institution's own procedures.  As Chief Justice Ireland once noted, "if the university puts forth rules of procedure to be followed in disciplinary hearings, the university should be legally obligated to follow those rules" lest the university be permitted to "make promises to its students that are nothing more than a 'meaningless mouthing of words.'"  *Schaer v. Brandeis Univ.*, 432 Mass. 474, 485 (2000) (citation omitted) (Ireland, J., dissenting).

B.      *Each Day his Separation from the University Remains in Effect, Plaintiff Suffers Irreparable Harm.*

In *Goss*, the Court assumed, absent evidence to the contrary, that a student who is suspended or expelled would "irreparably lose his educational benefits."  419 U.S. at 581 n.10. In this case, the court need not make any assumptions.  When Defendant Berger suspended Plaintiff as an "interim restriction" on June 17, 2013, he was four classes shy of receiving his degree from the University.  But for the Defendants' flagrant disregard of his constitutional and statutory rights, Plaintiff would be applying for admission to graduate school or relying on his stellar academic record to obtain employment.  Unless and until his expulsion is rescinded, Plaintiff will be forced to repeat three and a half years of coursework or enter a competitive job market with nothing more than a high school diploma.

C.      *The Balance of Harms Plainly Tilts in Plaintiff's Direction.*

As noted above, if the requested injunctive relief is not granted, Plaintiff will be stuck in a state of limbo either re-taking unchallenging, introductory level college classes or doing work that is not commensurate with his abilities.  Conversely, if such relief were to be granted, it is difficult to see what harm would befall the Defendant University – particularly if Plaintiff were permitted to complete his degree by transferring credits from another educational institution.

D.      *The Public Interest Favors Plaintiff.*

In criminal cases, judges often instruct juries that "[t]he government always wins when justice is done, regardless of whether the verdict be guilty or not guilty." *United States v. Thomann*, 609 F.2d 560, 565 (1st Cir. 1979); *see also Thomas v. United States*, 544 F. Supp. 2d 71, 74 (D. Mass. 2008). In *Goss*, the Court expressed a similar sentiment by noting that "it disserves . . . the interest of the State" whenever sanctions are imposed which are "in fact unwarranted." 419 U.S. at 579.

At the core of such statements is an understanding that when officials at a public institution do not play by the rules they themselves generate, it breeds contempt for said rules and the institution. *See Olmstead v. United States*, 227 U.S. 438, 485 (1928) (Brandeis, J., dissenting). Respecting the constitutional rights of students at public schools is particularly important. For as Zechariah Chafee, Jr. once observed, "an institution which professes to prepare youth for life in a democracy might wisely give them an example of fair play when it is conducting its own affairs." Zechariah Chafee, Jr., *The Internal Affairs Of Associations Not For Profit*, 43 HARV. L. REV. 993, 1027 (1930).

In the final analysis, when an unwarranted sanction follows the deprivation of important procedural rights, the public interest can only be served by promptly returning the parties to their respective positions before the deprivation of such rights occurred.

### Conclusion

Based on the foregoing, Plaintiff respectfully requests that this Honorable Court allow his Emergency Motion for Injunctive Relief.

**THE PLAINTIFF**


By: _____/s/ Luke Ryan_____
LUKE RYAN, BBO# 664999
SASSON, TURNBULL, RYAN & HOOSE
100 Main Street, 3rd Floor
Northampton, MA 01060
(413) 586-4800
(413) 582-6419 [FAX]

/s/ Bonnie Allen
BONNIE G. ALLEN, BBO #563995
39 Main Street, Suite 8
Northampton, MA  01060
(413) 584-3515
(413) 586-7076 [FAX]



<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the Memorandum of Law in Support of Emergency Motion for Injunctive Relief, filed through the Electronic Case Filing System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that a paper copy was sent by e-mail to Attorney Jean Kelley at jkelley@umassp.edu on March 21, 2014.



/s/ Luke Ryan

Luke Ryan