# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

*******************************************
                                          *
**JAMES HAIDAK,**                         *
                                          *
      Plaintiff                    *
                                          *
**v.**                                    *
                                          *
                                          *   **CIVIL ACTION NO. 14-CV-30049**
**UNIVERSITY OF MASSACHUSETTS**           *
**AT AMHERST; ENKU GELAYE, DAVID**        *
**C. VAILLANCOURT, and ALLISON**          *   **LEAVE TO FILE GRANTED ON**
**BERGER**                                *   **JUNE 4, 2014**
                                          *
      Defendants                   *
                                          *
*****************************************

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

*Introduction*

      In opposing Plaintiff James Haidak's motion for injunctive relief, Defendants vigorously contested his version of events by submitting sixteen exhibits attached to seven affidavits.  (*See* Dkt. No. 16, Defs.' Opp'n to Pl.'s Emergency Mot. for Inj. Relief; Dkt. No. 42, Defs.' 2nd Opp'n to Pl.'s Emergency Mot. for Inj. Relief.)  Submissions of this sort were to be expected as the failure to furnish such materials has sometimes proved fatal for parties seeking to demonstrate a likelihood (or unlikelihood) of success on the merits.  *See Jackson v. Fair*, 846 F.2d 811, 819 (1st Cir. 1988) (citing *Town of Burlington v. Dep't of Ed.*, 655 F.2d 428, 433 (1st Cir. 1981); *Williams v. Curtiss–Wright Corp.*, 681 F.2d 161, 164 (3d Cir.1982) (per curiam)).  Ultimately, this Court concluded that the parties' competing affidavits and exhibits[1] left the merits in a state of apparent

---

[1] For his part, Plaintiff relied upon thirty-five exhibits attached to five affidavits, in addition to his First Verified Complaint.

"equipoise" and denied Plaintiff's motion based on a failure to satisfy his burden of establishing both a likelihood of success and irreparable harm.  (Dkt. No. 45, Order.)

Now, in seeking the dismissal of Plaintiff's First Amended Complaint, Defendants pay lip service to black-letter law requiring this Court to "accept the Plaintiff's allegations as true, 'extending . . . every reasonable inference in [his] favor.'" (Dkt. No. 43, Mem. of Points & Authorities in Supp. of Defs.' Mot. to Dismiss 13 (citing *Coyne v. City of Somerville*, 972 F.2d 440, 443 (1st Cir. 1992).)  However, a review of Defendants' brief reveals their reliance on the very same seven affidavits and sixteen exhibits they previously provided.  (*See* Dkt. No. 43, Exs. 1-7.)  Because their motion cannot be allowed without resolving factual disputes in their favor, it ought to be denied without a hearing.

***Factual Background***

What follows is a concise summary of the most pertinent facts set forth in Plaintiff's First Verified Complaint.  As noted above and will be discussed in greater detail below, for purposes of the pending motion, these facts must be taken as true and all inferences drawn therefrom must be in Plaintiff's favor.  *Morales-Cruz v. Univ. of Puerto Rico*, 676 F.3d 220, 224 (1st Cir. 2012) (citation omitted).

A.       *The Incident Giving Rise to Allegations of CSC Violations*

On April 16, 2013, Plaintiff was a twenty-two year-old undergraduate in his senior year at the University of Massachusetts, majoring in Economics. (Dkt. No. 20, 1st Am. Compl. ¶ 51.)  During his junior year, Plaintiff began an intimate dating relationship with Lauren Gibney ("the complainant"), a fellow student at the University.  (*Id.* ¶ 54.)

For their respective Spring 2013 semesters, Plaintiff and the complainant attended a study abroad program at the University of Barcelona in Spain, administered by Academic Programs International (API).  (*Id.* ¶ 55.)  In February of 2013, Plaintiff's mother, Cecily Holiday ("Holiday"), an employee of the U.S. Department of State, traveled to Barcelona with a colleague named Damon C. Ladson (Ladson) due to concerns she had about reports she had received from her son pertaining to acts of physical aggression by the complainant, including punching, slapping, kicking, and biting.  (*Id.* ¶¶ 61-62.)  While in Barcelona, Holiday and Ladson observed a deep bruise on Plaintiff's upper arm that appeared to be a bite mark and were told by Plaintiff's roommate that he had witnessed the complainant yelling at Plaintiff, slapping him, and biting him.  (*Id.* ¶¶ 63-65.)  Holiday and Ladson took the complainant out to lunch and, while there, questioned her about her physical aggression toward Plaintiff.  (*Id.* ¶ 66.)  The complainant maintained that she usually just did that when they were playing around, but admitted that on occasion she did assault Plaintiff while in the midst of arguing.  (*Id.* ¶ 67.)

On the evening of April 15, 2013, the complainant received news that a family member to whom she was close had passed away.  (*Id.* ¶ 68.)  That night, she consumed alcohol throughout the evening and, by the time she and Plaintiff returned to her apartment at approximately 4:00 a.m., the complainant was intoxicated.  (*Id.* ¶ 70.)  When Plaintiff proceeded to take out his laptop, the complainant became irate, as she had previously expressed displeasure at the amount of time Plaintiff spent on his laptop while in her company.  (*Id.* ¶¶ 73-75.)  The complainant yelled at Plaintiff and grabbed the screen of the laptop in an attempt to slam it shut.  (*Id.* ¶ 76.)  When she did this, Plaintiff

observed rainbow lines appearing on his computer screen and became concerned that the complainant had broken the laptop.  (*Id.* ¶ 77.)

During the verbal argument that ensued, Plaintiff placed his hand on the complainant's shoulder and asked her to stop when he saw her walking in the direction of his computer.  (*Id.* ¶ 82.)  The complainant proceeded to become physical by hitting and slapping Plaintiff's face.  (*Id.* ¶ 83.)  Plaintiff attempted to protect himself by holding the complainant's arms down, but she was able to strike him in the eye.  (*Id.* ¶ 84.)  As Plaintiff backed away covering his eye, the complainant kicked him in the groin and he fell to his knees. (*Id.* ¶ 85.)  The complainant then grabbed his laptop on the bed and held it tightly in her arms. (*Id.* ¶ 86.)  Once Plaintiff was able to retrieve his laptop from the complainant's grip, he gathered the rest of his belongings and left the apartment.  (*Id.* ¶ 87.)

The next day, the complainant accused Plaintiff of assaulting her and he was summarily dismissed from API's program.  (*Id.* ¶¶ 92, 97.)  API sent a copy of the complainant's written statement to Defendant Enku Gelaye, the Dean of Students at the University.  (*Id.* ¶ 95.)  According to the complainant, Plaintiff (1) put his hands around her neck and threw her on the bed, (2) twisted her arm and pushed her on the bed, (3) put his hands on pressure points of her body making her scream loudly while she was face-down on her bed, and (4) grabbed her wrists and punched himself in the face with her hands.  (*Id.* ¶ 96.)

B.      *Initiation of Disciplinary Proceedings – The First Notice of Charge*

On April 19, 2013, Defendant Allison Berger, an Associate Dean at the University, issued a Notice of Charge, alleging that Plaintiff violated Code of Student

Conduct ("*CSC*") provisions proscribing "Physical Assault" and "Endangering Behavior to Persons or Property."  (*Id.* ¶ 101.)  The Notice of Charge directed Plaintiff to schedule a conference with Defendant Berger to "resolve the matter" and imposed an interim restriction that Plaintiff have no contact with the complainant.  (*Id.* ¶ 102.)

During a disciplinary conference with Defendant Berger on May 1, 2013, Plaintiff denied the charges against him.  (*Id.* ¶ 103.)  He subsequently presented his version of events in a written statement and provided Defendant Berger with a photograph of the eye injury inflicted by the complainant on the night in question.  (*Id.* ¶ 104.)  Holiday also advised Defendant Berger that the complainant had admitted to physically assaulting and injuring Plaintiff while in Barcelona.  (*Id.* ¶ 107.)

Based on the statements provided by Plaintiff and Holiday, Defendant Berger had reason to believe that the complainant had violated the *CSC* by physically assaulting Plaintiff both before and during the night in question.  (*Id.* ¶ 108.)  Defendant Berger exhibited deliberate indifference to these credible allegations against the complainant. (*Id.* ¶ 109.)  Upon information and belief, gender was a motivating factor in Defendant Berger's selective enforcement of *CSC* provisions against Plaintiff but not the complainant – a similarly situated person for all intent and purposes.  (*Id.* ¶ 111.)  Upon information and belief, the University has historically and systematically pursued charges against males but not females in physical assault cases, solely on the basis of sex.  (*Id.* ¶ 112.)

C.      *Initiation of Disciplinary Proceedings – The Second Notice of Charge*

Following her return from Barcelona, the complainant voluntarily resumed her relationship with Plaintiff and had intimate relations with him in an Amherst motel room

on multiple occasions.  (*Id.* ¶ 113.)   In addition to this in-person contact, Plaintiff and the

complainant also communicated multiple times a day via telephone calls, texting, email,

and Skype.  (*Id.* ¶ 114.)

On or about May 9, 2013, the complainant's parents discovered her ongoing

communication with Plaintiff and contacted Defendant Berger.  (*Id.* ¶ 115.)  When asked

by Defendant Berger to describe the nature of her contact with Plaintiff, the complainant

stated that Plaintiff had called her fifty-two times from his cell phone and a Skype

number.  (*Id.* ¶ 116.)   The complainant did not disclose that she was complicit in the

resumption of contact with Plaintiff and had been physically intimate with him.  (*Id.* ¶

118.)

In response to the complainant's allegations, Defendant Berger issued a Second

Notice of Charge on May 28, 2013, accusing Plaintiff of 1) harassment, and 2) failure to

comply with the no contact restriction imposed on April 19, 2013.  (*Id.* ¶ 119.)  By the

time Defendant Berger issued the Second Notice of Charge on May 28, 2013, Plaintiff

and Gibney had once again resumed their relationship and had once again been

physically intimate in a motel room in Amherst.  (*Id.* ¶ 122.)

D.       *Initiation of Disciplinary Proceedings – The Third Notice of Charge*

Upon his receipt of the Second Notice of Charge, Plaintiff requested a

disciplinary conference, which was scheduled for June 19, 2013.  (*Id.* ¶ 123.)  Prior to

that conference, on June 4, 2013, the complainant and her mother provided Defendant

Berger with a copy of the complainant's phone records from April 24, 2013 through June

1, 2013, indicating calls and texts (without content) between the two.  (*Id.* ¶ 124.)   In an

email to Defendant Berger on June 4, 2013, the complainant stated that the

communications "consisted of [Plaintiff] trying to get me to agree to get back with him regardless of recent events and how I truly felt." (*Id.* ¶ 125.)

On June 17, 2013, Defendant Berger issued a Third Notice of Charge to Plaintiff, which set forth additional charges of harassment and violation of the no-contact order. (*Id.* ¶ 129.) Defendant Berger also imposed a new interim restriction, that of suspension, barring Plaintiff from the University. (*Id.* ¶ 131.) Berger ordered Plaintiff to meet with her in regard to the suspension on June 19, 2013 – the date previously scheduled to address the Second Notice of Charge. (*Id.* ¶ 132.)

In his defense to the harassment charges, Plaintiff provided Defendant Berger with print-outs of the text messages between himself and the complainant between April 24, 2013 and May 31, 2013. (*Id.* ¶ 133.) Although this evidence clearly established an ongoing, consensual romantic relationship between the two, Defendant Berger did not withdraw the harassment charges and refused to rescind the interim suspension. (*Id.* ¶ 134.)

E.      *The Hearing Board Delay and Plaintiff's Forced Withdrawal from the University*

Throughout the pendency of the pre-hearing disciplinary proceedings, Plaintiff's parents repeatedly contacted Defendant Berger requesting that a Hearing Board be scheduled. (*Id.* ¶ 138.) On August 5, 2013, Defendant Berger notified Plaintiff in an e-mail that his suspension would remain in effect until further notice, and that "my staff will contact you to schedule a Hearing Board." (*Id.* ¶ 139.) On August 27, 2013, Plaintiff's father, Dr. David Haidak, e-mailed Defendant Berger requesting that Plaintiff be permitted to defer his Fall semester at UMass, given that he was barred from campus, and a Hearing Board had not been scheduled to resolve his charges. (*Id.* ¶ 141.) On

August 29, 2013, Defendant Berger responded to Plaintiff advising him to withdraw from the University. (*Id.* ¶ 142.) On September 1, 2013, Plaintiff notified Defendant Berger that he was withdrawing "under duress." (*Id.* ¶ 143.)

F.      *209A Restraining Order Hearing – Eastern Hampshire District Court*

On August 13, 2013, the complainant contacted Plaintiff via Skype. (*Id.* ¶ 140.) By September 27, 2013, the resumption of their relationship had come to the attention of the complainant's parents and on that date, they took her to the Eastern Hampshire District Court to apply for a temporary restraining order at the suggestion of Defendant Berger. (*Id.* ¶ 145.) Following an *ex parte* proceeding, the complainant's request was granted. (*Id.* ¶ 146.) On October 2, 2013, the complainant delivered a copy of the temporary restraining order she had obtained to Defendant Berger. (*Id.* ¶ 147.)

On October 10, 2013, a full hearing in the Eastern Hampshire District Court on the complainant's request to extend the restraining order was held before the Honorable Michael Mulcahy. (*Id.* ¶ 148.)   The complainant was the only witness to testify at this proceeding. (*Id.* ¶ 149.)

With respect to the night of April 16, 2013, she testified that Plaintiff "never actually hit me but he would place his hands on pressure points on my body" and that he "grabbed my wrists, punched himself in the face, and said I'm going to F you over and I'm going to bury you." (*Id.* ¶ 150.)  Under cross-examination by Plaintiff's counsel, the complainant acknowledged that she had been engaging in a sexual relationship with Plaintiff as recently as mid-September. (*Id.* ¶ 151.) The complainant also acknowledged that she had been keeping her relationship with Plaintiff secret from her parents. (*Id.* ¶ 152.) When shown a photograph of the mark on Plaintiff' arm – the same photograph

previously provided to Defendant Berger – the complainant admitted causing the injury by biting Plaintiff.  (*Id.* ¶ 153.)  The complainant also admitted that, after she delivered the aforementioned telephone records to Defendant Berger, she resumed her relationship with Plaintiff.  (*Id.* ¶ 154.)

During the hearing, the complainant conceded that she engaged in intimate relations with Plaintiff during the previous summer in motel rooms in Amherst.  (*Id.* ¶ 155.)  The complainant also conceded that she "just wanted [the University disciplinary proceedings] to be dropped, I didn't want it to come this far," and that everything had been "blown out of proportion."  (*Id.* ¶ 156.)  After considering the complainant's testimony, Judge Mulcahy denied her request to extend the restraining order.  (*Id.* ¶ 157.)

G.    *Pre-Hearing Activity in Contravention of the CSC*

On November 6, 2013, Associate Dean Patricia Cardoso (Cardoso), acting in her capacity as Procedural Advisor, emailed Plaintiff inviting him to send her any documents for her review that he wished to provide as evidence at his upcoming Hearing Board.  (*Id.* ¶ 158.)  The following day, Plaintiff provided Cardoso with a transcript of the restraining order hearing in Eastern Hampshire District Court and requested that it be submitted as evidence.  (*Id.* ¶ 159.)  Cardoso consulted with Defendant Gelaye as to whether the transcript was relevant and admissible at the Hearing Board.  (*Id.* ¶ 160.)  Defendant Gelaye determined that it was not relevant and directed Cardoso to exclude it.  (*Id.* ¶ 161.)[2]  Plaintiff also submitted photos to Cardoso of the bite mark inflicted by the complainant, but this evidence was also deemed irrelevant and was excluded.  (*Id.* ¶162.)

---

[2] Cardoso initially filed an affidavit stating that Plaintiff made the decision to exclude the transcript.  (*See* Dkt. No. 43, Ex. 2, Cardosa Aff. ¶ 12.)  She now acknowledges that in the course of consulting with Defendant Gelaye, she informed "Enku of *my* decision to

Pursuant to Sections IV.E.4 and 5 of the CSC, as well as Student Conduct Hearing Board Procedures, a charged student is entitled to present witnesses, witness statements and "any other relevant information (i.e. pictures, phone/text records to be considered by the Board.)" (*Id.* ¶163.) A Hearing Board may only "exclude unduly repetitious or irrelevant evidence." (*Id.* ¶164.) There is no provision in the *CSC* that permits a Procedural Advisor, an Associate Dean of Students, the Dean of Students, or the Vice Chancellor to act as a gatekeeper concerning the admission of evidence at a hearing. (*Id.* ¶165.) Indeed, pursuant to Section IV.E.6 of the CSC, only Hearing Board members are authorized to carry out this role. (*Id.* ¶ 166.)

In advance of the hearing, Plaintiff was told that while his attorney and a student advisor could attend the hearing, neither would be allowed to speak. (*Id.* ¶ 182.) Plaintiff was also advised that after the complainant testified, he would not be permitted to question her directly. (*Id.* ¶ 183.) Instead, he was instructed to submit questions for Hearing Board members to ask the complainant on his behalf. (*Id.* ¶ 184.) On November 20, 2013, Plaintiff submitted a list of thirty-six questions to Cardoso. (*Id.* ¶ 185.) In drafting these questions, Plaintiff, of course, had no way of anticipating precisely what the complainant would say. (*Id.* ¶ 186.)

H.    *The Hearing Board*

On November 22, 2013 – over seven months after the incident in Barcelona – a Hearing Board was convened at the University. (*Id.* ¶ 187.) A staff member and four students served as Board members. (*Id.* ¶ 188.) Credibility was the central issue for the

---

exclude the transcript." (Dkt. No. 43, Ex. 7, 2nd Cardoso Aff. ¶ 7 (emphasis added).) As will be discussed, for reasons that remain unclear, Defendants continue to contend that Plaintiff was responsible for this decision. (Mem. of Points & Authorities in Supp. of Defs.' Mot. to Dismiss at 7.)

Hearing Board to determine – particularly with regard to the charge of Physical Assault. (*Id.* ¶ 190.)  The exclusion of the complainant's testimony at the restraining order hearing – coupled with Defendants' refusal to permit testimony from Holiday or the introduction of photographs depicting the bite mark on Plaintiff's arm – deprived the Board members of compelling evidence that the complainant had not been truthful in the accounts she had previously furnished to Defendant Berger.  (*Id.* ¶ 191.)

Ultimately, the Hearing Board recommended that Plaintiff be found responsible for physical assault and the two instances of failure to comply with direction of a university official, and not responsible for the two charges of harassment and endangering behavior to person or property.  (*Id.* ¶ 195.)  The aforementioned procedural errors and irregularities committed by Defendants Berger and Gelaye undermined any confidence a reasonable person could have in the findings and recommendation made by the Board.  (*Id.* ¶ 196.)   Had the Defendants Berger and Gelaye properly followed the applicable *CSC* regulations, it is reasonable to expect that the outcome of Plaintiff's hearing would have been different.  (*Id.* ¶ 197.)  Upon information and belief, the outcome of Plaintiff's hearing was consistent with a pattern and practice of discrimination on the basis of sex at the University whereby male students accused of physically assaulting female students are routinely found responsible for such misconduct despite the absence of credible evidence supporting the charges against them.  (*Id.* ¶ 198.)

I.      *The Decision to Expel*

In a letter dated December 3, 2013, Defendant David Vaillancourt, a Senior Associate Dean at the University, adopted the recommendations of the Hearing Board and imposed the most severe sanction available by expelling Plaintiff.  (*Id.* ¶ 199.)

Section IV.E.11 of the *CSC* requires the issuance of factual findings by the University official responsible for making the ultimate decision in a disciplinary proceeding.  (*Id.* ¶ 200.)  Defendant Vaillancourt's expulsion letter featured no such factual findings.  (*Id.* ¶ 201.)  Instead, it simply stated that the decision was based on a review of "substantial materials presented regarding the incident."  (*Id.* ¶ 202.)  This reference to a single incident, in the face of multiple charges relating to multiple incidents, demonstrates his failure to adequately review and consider the factors required by the *CSC*.  (*Id.* ¶ 203.)

Upon receipt of Defendant Vaillancourt's expulsion letter, Plaintiff requested the rationale for the decision, as permitted by the *CSC*.  (*Id.* ¶ 204.)  Defendant Vaillancourt failed to respond to Plaintiff's request.  (*Id.* ¶ 205.)  Upon information and belief, Plaintiff's punishment was consistent with a pattern and practice of discrimination on the basis of sex at the University whereby male students found responsible for physically assaulting female students are routinely punished more severely than female students found responsible for assaulting male students.   (*Id.* ¶ 206.)

J.      *The Appeal to the UAB*

On December 18, 2013, at approximately 4:30 p.m., Plaintiff submitted through his attorney a fifteen- page, single-spaced Letter of Appeal pursuant to Section VI of the *CSC*.  (*Id.* ¶ 207.)  Plaintiff alleged and specifically supported the following grounds:

- Procedural error or irregularity which materially affected the decision;

- The decision is unsupported by substantial evidence;

- The sanction is unsupported by the charges and/or the student's disciplinary history.

(*Id.* ¶ 208.)

12

In his letter, Plaintiff noted that Defendant Gelaye, who was Acting Vice Chancellor as well as Dean of Students, had participated in the screening and exclusion of his proposed evidence and therefore it would be inappropriate for her to have any role in the adjudication of his appeal. (*Id.* ¶ 209.)  Ignoring Plaintiff's request that she recuse herself, Defendant Gelaye upheld Plaintiff's expulsion from the University.  (*Id.* ¶ 210.) In a letter dated December 19, 2013, Defendant Gelaye stated that the UAB had reviewed Plaintiff' case "on each of the four grounds for appeal available under the 2011-12 Code of Conduct." (*Id.* ¶ 211.)

References in Defendant Gelaye's letter to an inapplicable version of the CSC and an adjudication of an appellate ground not even raised by Plaintiff illustrate the inadequate review provided of Defendant Vaillancourt's arbitrary and capricious decision and the Hearing Board's recommendations. (*Id.* ¶ 213.)

### *Pertinent Legal Principles*

A.    *Fed. R. Civ. P. 12(b)(6)*

Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that "a complaint must contain no more than 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Santiago v. Puerto Rico*, 655 F.3d 61, 72 (1st Cir. 2011) (quoting Fed. R. Civ. P. 8(a)(2)).  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court abrogated the deferential interpretation of this pleading requirement set forth in *Conley v. Gibson*, 355 U.S. 41 (1957).[3]  Two years later, in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Court clarified that:

---

[3] In their brief, Defendants ignore the fact that *Conley* is no longer good law and cite the case for a proposition not found in the opinion.  *Compare* Dkt. No. 43, Mem. of Points & Authorities in Supp. of Defs.' Mot. to Dismiss at 13 ("[T]he complaint may be dismissed

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. . . . The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Id.* at 678 (quotation marks and citation omitted).

The task of evaluating the sufficiency of a complaint now requires a "two-pronged approach." *Id.* at 679. Step one requires a court to "separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." *Morales–Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012). Step two calls for an analysis of "the remaining factual content" to determine whether there is a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotation marks omitted). As the First Circuit has noted:

> Although evaluating the plausibility of a legal claim requires the reviewing court to draw on its judicial experience and common sense, . . . the court may not disregard properly pled factual allegations, even if it strikes a savvy judge that actual proof of those facts is improbable. . . . Nor may a court attempt to forecast a plaintiff's likelihood of success on the merits; a well-pleaded complaint may proceed even if . . . a recovery is very remote and unlikely. . . . The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint.

*Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12-13 (1st Cir. 2011) (quotation marks and citations omitted).

---

if the Plaintiff cannot prove, beyond a doubt, that facts supporting her claims entitle her to relief. See *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)"), *with Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) ("[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."). Suffice it to say, while this "famous observation . . . earned its retirement" in *Twombly*, 550 U.S. at 563, the Court did not adopt a new standard requiring plaintiffs to prove the claims set forth in their complaints "beyond a doubt" to survive motions filed pursuant to Rule 12(b)(6).

B.      *Fed. R. Civ. P. 12(d)*

In reviewing a plaintiff's factual allegations and inferences to be drawn therefrom, a court is not necessarily confined to the four corners of the complaint.  Rather it "may augment these facts and inferences with data points gleaned from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice."  *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted).  "If," however, "on a motion under Rule 12(b)(6)," other "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d); *see also Collier v. City of Chicopee*, 158 F.3d 601, 602-04 (1st Cir. 1998) (discussing the notice and process required to convert a motion to dismiss into a motion for summary judgment).

C.      *Due Process*

It is well-settled that "a student's interest in pursuing an education is included within the fourteenth amendment's protection of liberty and property."  *Gorman v. Univ. of R.I.*, 837 F.2d 7, 12 (1st Cir. 1988) (citation omitted).  "Hence, a student facing expulsion or suspension from a public educational institution is entitled to the protections of due process."  *Id.* (citations omitted).

"Once it is determined that due process applies, the question remains what process is due."  *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  "[A]t a minimum," the Due Process Clause "require[s] that deprivation of . . . liberty or property by adjudication be preceded by notice and opportunity for hearing *appropriate to the nature of the case*."  *Goss v. Lopez*, 419 U.S. 565, 579 (1975) (quoting *Mullane v. Central Hanover Trust Co.*,

339 U.S. 306 (1950)) (emphasis added); *accord Gorman*, 837 F.2d at 13 ("Whether the

hearing was fair depends upon the nature of the interest affected and all of the

*circumstances of the particular case*." (emphasis added)).  Because "things are not

always as they seem to be," a student facing expulsion or suspension from a public

educational institution must "at least have the opportunity to characterize his conduct and

put it in what *he deems the proper context*."  *Goss*, 419 U.S. at 584 (emphasis added).

In *Goss*, the Court "stop[ped] short of construing the Due Process Clause to

require, countrywide, that hearings *in connection with short suspensions* must afford the

student the opportunity to secure counsel, to confront and cross-examine witnesses

supporting the charge, or to call his own witnesses to verify his version of the incident."

*Id.* at 583 (emphasis added).  However, Justice White emphasized that the Court's

holding applied "solely to the short suspension, not exceeding 10 days" and that "[l]onger

suspensions or expulsions . . . may require more formal procedures."  *Id.* at 584.

Following *Goss*, federal courts have utilized the familiar three-factor test first set

forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), to assess the constitutionality of

disciplinary proceedings.  *See, e.g.*, *Gorman*, 837 F.2d at 13.  This inquiry calls upon a

court to consider: "(1) the nature of the private interest affected—that is, the seriousness

of the charge and potential sanctions, (2) the danger of error and the benefit of additional

or alternate procedures, and (3) the public or governmental burden were additional

procedures mandated."  *Flaim v. Med. Coll. of OH*, 418 F.3d 629, 635 (6th Cir. 2005)

(citation omitted).

With respect to the first *Matthews* factor, the First Circuit has recognized that the

"interests of students in completing their education, as well as avoiding unfair or

16

mistaken exclusion from the educational environment, and the accompanying stigma are,

of course, paramount." *Gorman*, 837 F.2d at 14.  In light of these compelling interests,

district judges in the First Circuit considering the second and third *Matthews* factors have

afforded students facing expulsion the following procedural protections:

> (1) The student must be advised of the charges against him;

> (2) The student must be informed of the nature of the evidence against him;

> (3) The student must be given an opportunity to be heard in his own defense;

> (4) The student must not be punished except on the basis of substantial evidence;

> (5) The student must be permitted the assistance of a lawyer in major disciplinary hearings;

> (6) The student must be permitted to confront and to cross-examine the witnesses against him; and

> (7) The student has the right to an impartial tribunal.

*Carey on Behalf of Carey v. Maine Sch. Admin. Dist. # 17*, 754 F. Supp. 906, 919 (D. Me.

1990) (citing *Keene v. Rodgers*, 316 F. Supp. 217, 221 (D. Me.1970);[4] *see also id.*

---

[4] In *Carey*, Chief Judge Carter stated that while *Keene* preceded "the landmark Supreme Court precedents governing this subject," the decision was "consistent with those precedents and, therefore, retains its vitality." *Carey*, 754 F. Supp. at 919 n.7.  Other courts and commentators have reached the same conclusion.  *See, e.g.*, *Johnson v. Collins*, 233 F. Supp. 2d 241, 248 (D.N.H. 2002); David Doty, *By the Book:* Fuller v. Decatur Public Schools Board of Education School District 61 *and the Essential Elements of Student Due Process in K-12 Expulsion Proceedings*, 151 ED. LAW REP. 353, 359 (Apr. 26, 2001).  While neither the Supreme Court nor the First Circuit has adopted these, or any other, bright-line rules for suspensions exceeding ten days or expulsions, Plaintiff contends that these seven requirements, along with the right to a "full, expedited evidentiary hearing" set forth in *Marin v. Univ. of P.R.*, 377 F. Supp. 613, 623 (D.P.R. 1974), "strike the appropriate balance between the competing interests of the parties in this case."  *Johnson*, 233 F. Supp. 2d at 248.

(clarifying that a "[f]ailure to permit Plaintiffs to present witnesses" would run afoul of the third safeguard and therefore "constitute a due process violation").

D.    *Title IX*

Title IX of Education Amendments of 1972 provides, in pertinent part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a).[5]  To date, neither the Supreme Court nor the First Circuit has articulated the proper framework for analyzing "sex-based Title IX allegations" in the context of "disciplinary proceedings." *Bleiler v. Coll. of Holy Cross*, No. 11-11541-DJC, 2013 WL 4714340, at *5 (D. Mass. Aug. 26, 2013).  "In the Second Circuit, Title IX claims against universities arising from disciplinary hearings are evaluated under an 'erroneous outcome' or 'selective enforcement' standard."  *Id.* (citing *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715-16 (2d Cir. 1994)).[6]

1.    Erroneous Outcome

Under the erroneous outcome standard, a plaintiff must "cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding."  *Yusuf*, 35 F.3d at 715.  This can be accomplished by establishing "a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt

---

[5] "The statute's enforcement machinery includes an implied private right of action . . . ." *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65 (1st Cir. 2002) (citation omitted); *see also Santiago v. Puerto Rico*, 655 F.3d 61, 73 (1st Cir. 2011) (clarifying that this right permits suits against an "educational institution that receives federal funds but not against individuals who merely work for such an institution.").

[6] In this case, Plaintiff has "plead in the alternative that [he is] in both categories . . . ." *Yusuf*, 35 F.3d at 715.

the veracity of the charge." *Id.* Alternatively, a "complaint may also allege particular

procedural flaws affecting the proof." *Id.*

Assuming that a plaintiff can make such a showing, the next task is to

demonstrate a "causal connection between the flawed outcome and gender bias." *Id.*

Ultimately, "the question is whether the [University's] actions are motivated by sexual

bias or if the disciplinary hearing process constitutes a pattern of decision-making

whereby the [University's] disciplinary procedures governing . . . assault claims is

discriminatorily applied or motivated by a chauvinistic view of the sexes." *Bleiler*, 2013

WL 4714340, at *5 (citing *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 756 (E.D.

Tenn. 2009) (quotation marks omitted)); *see also Hazen Paper Co. v. Biggins*, 507 U.S.

604, 609 (1993) (stating that "[p]roof of discriminatory motive . . . can in some situations

be inferred from the mere fact of differences in treatment").

 2. Selective Enforcement

A claim of selective enforcement "asserts that, regardless of the student's guilt or

innocence, the severity of the penalty and/or the decision to initiate the proceeding was

affected by the student's gender." *Yusuf*, 35 F.3d at 715. "To support a claim of

selective enforcement, [a plaintiff] must demonstrate that a female was in circumstances

sufficiently similar to his own and was treated more favorably by the University."

*Mallory v. Ohio Univ.*, 76 Fed. Appx. 634, 641 (6th Cir. 2003).

In addition to the evidence of selective enforcement in a plaintiff's own case,

"Title IX, like other anti-discrimination schemes, permits an inference that a significant

gender-based statistical disparity may indicate the existence of discrimination." *Cohen v.

Brown Univ.*, 101 F.3d 155, 171 (1st Cir. 1996). The gravamen of these types of

"disparate impact" claims is that "facially neutral" policies or procedures are applied

"more harshly on one group than another and cannot be justified" on a neutral basis.

*Prescott v. Higgins*, 538 F.3d 32, 41 (1st Cir. 2008) (citation omitted).

### Argument

A.   *The Defendants' Brief Fails to Afford Plaintiff's Well-Pled Facts the Presumption
      of Truth to which They are Entitled.*

      In their memorandum, Defendants make no effort to separate the proverbial

"wheat from chaff" by identifying "conclusory legal allegations (which need not be

credited)."  *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012) (citing

*Iqbal*, 129 S.Ct. at 1949-50).  In fact, the brief's ten-page section entitled "Facts"

contains only one paragraph that makes any reference at all to "Plaintiff's description of

events." (Mem. of Points & Authorities in Supp. of Defs.' Mot. to Dismiss at 2.)[7]

      Here, Defendants provide a summary of Plaintiff's account of how the Barcelona

incident at the heart of this case began: "After Plaintiff became concerned that Gibney

may have broken his laptop, he at least concedes that '[a] verbal argument ensued . . . .'"

(*Id.* at 2 (citing Compl., Paras. 75-79).)  Defendants then ask this Court to draw

inferences that can only be described as unfavorable to Mr. Haidak.  In their view, "it is

fair to assume" that Plaintiff's allegation of a verbal dispute over Gibney's rough

handling of his computer constitutes a concession that "he became enraged" and "had a

violent argument with his girlfriend." (*Id.*)

---

[7] Defendants provide the following preface to this reference: "Even upon reading just the
Plaintiff's description of events . . . ."  (Mem. of Points & Authorities in Supp. of Defs.'
Mot. to Dismiss at 2.)  Of course, just reading a plaintiff's description of events is
entirely appropriate when the task at hand is assessing the sufficiency of the complaint.

While Defendants might eventually convince a factfinder that this is what transpired, "at the pleadings stage, a district court may not choose between two plausible inferences that may be drawn from factual allegations" and dismiss a complaint "merely because [it] finds a [defendant's] version more plausible." *Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33, 42-43 (1st Cir. 2013) (quoting *Anderson News, LLC v. American Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012)); *see also Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304, 311 n.3 (D. Mass. 2013) (recognizing the obligation of a court to analyze well-pled facts "in the light most hospitable to the plaintiff's theory, and draw[] all reasonable inferences for the plaintiff" (citation omitted)). "Rather, a court "must resolve any ambiguities in [a plaintiff's] favor," *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 17 (1st Cir. 2011), and recognize that a "plausible but inconclusive inference from pleaded facts will survive a motion to dismiss," *Sepulveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 30 (1st Cir. 2010).

The remainder of the allegations set forth in the "Facts" section of Defendants' brief are not Plaintiff's but their own. Among other things, Defendants contend that: (i) disciplinary proceedings could not have been instituted against Gibney because "Plaintiff was not willing to submit a statement or engage as a complainant" (Mem. of Points & Authorities in Supp. of Defs.' Mot. to Dismiss at 5 (citing Cardoso Aff., Paras. 7-8)); and (ii) Plaintiff ultimately decided that "he didn't want the transcript [of the restraining order hearing] before the Board" (*id.* at 7 (citing Cardoso Aff., Para. 12)); *but see supra* note 2. The problem here is that "[t]he possibility of such . . . defense[s] . . . is inadequate to allow a defendant to prevail on a motion to dismiss when the plaintiff alleges a materially

different version of the facts." *Rodriguez-Vives v. P.R. Firefighters Corps of P.R.*, 743 F.3d 278, 283 (1st Cir. 2014).

    As noted above, Plaintiff's First Amended Verified Complaint contains well-pled allegations to the contrary. (*See* 1st Am. Compl. ¶¶ 103-12; *id.* ¶¶ 158-61.) At the risk of beating a dead horse, "[i]n ruling on a motion to dismiss, . . . a court should not decide questions of fact." *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 25 (1st Cir. 1987). The Court therefore must not only accept Plaintiff's version of events; it cannot even countenance Defendants'. *See Lopez-Machin v. Indupro*, 668 F. Supp. 2d 320, 322 (D.P.R. 2009) (declining to discuss "a conflicting version of the facts" proffered by defendants "because the action is still at the motion to dismiss stage").

    To be sure, some of what Defendants allege is consistent with allegations found in the First Amended Verified Complaint; moreover, an argument could be made that some of the exhibits they have furnished are suitable for consideration on the theory that they can be incorporated by reference into the complaint. (*Compare, e.g.*, Mem. of Points & Authorities in Supp. of Defs.' Mot. to Dismiss at 3 ("On April 19, 2013, the university issued a Notice of Charge ("NOC") to Plaintiff in the form of a letter." (citing Dkt. No. 43, Ex. 1, Berger Aff., Ex. B), *with* 1st Am. Compl. ¶ 101 ("On April 19, 2013, Defendant Berger issued Plaintiff a Notice of Charge . . . .").) Unfortunately, instead of using the complaint as the basis for their motion and doing the work of identifying which documents in their possession might be incorporated by reference into it, Defendants have simply recycled the pleadings they filed in opposition to Plaintiff's request for injunctive relief.

It is well-settled that "if evidence presented at a preliminary injunction hearing is to be relied on in deciding a motion to dismiss, the court must convert such motions into ones for summary judgment." *Rocket Learning, Inc. v. Rivera-Sanchez*, 851 F. Supp. 2d 384, 391 (D.P.R. 2012). Since this Court has already determined that the parties' preliminary injunction submissions left the merits of the case in a state of equipoise, the record as it now exists could not support an award of summary judgment to either party. A decision to convert Defendants' motion to dismiss into a motion for summary judgment would therefore be tantamount to an order dispensing with discovery and scheduling the case for trial.

Inasmuch as Mr. Haidak is anxious to have his day in court, this is one of those cases where "precise knowledge of the chain of events leading to the constitutional violation" is "unavailable to [the] plaintiff at this early stage of the litigation," *Ocasio-Hernandez*, 640 F.3d at 14, and "[t]he role of these defendants can be made clearer in discovery," *Marrero-Rodriguez v. Municipality of San Juan*, 677 F.3d 497, 502 (1st Cir. 2012). Accordingly, Plaintiff is not about to voluntarily "shelve the quest for discovery and dive head-first into the . . . maelstrom" of trial. *Dow v. United Broth. of Carpenters & Joiners of Am.*, 1 F.3d 56, 61 (1st Cir. 1993).

B.    *Plaintiff has Plainly Made Sufficient Factual Allegations to Withstand a Motion to Dismiss.*

There is no question that the First Amended Verified Complaint states two claims to relief that are plausible on their face. Its well-pled allegations tell the tale of a male Plaintiff who, while studying abroad in Barcelona, is subjected to repeated assaults at the hands of a female complainant. Following one of these assaults on April 16, 2014, the complainant falsely accuses Plaintiff of assaulting her and this results in his summary

dismissal by API from the study abroad program.  Back in Amherst on May 1, 2013,

Plaintiff provides a truthful version of events to Defendant Berger whose view of the case

is colored by rigid gender stereotypes; she refuses to entertain the possibility that Plaintiff

might be the victim of domestic violence instead of the perpetrator.

Following that meeting, Defendant Berger apparently decides to keep the interim

restriction of a no-contact order in place but neglects to provide Plaintiff with a written

statement explaining the reasons for this decision.  The complainant subsequently makes

false claims of harassment.  Before providing Plaintiff with the opportunity to

demonstrate that his contact with the complainant came in the context of a consensual,

dating relationship, Defendant Berger suspends him from the University.

Following a conference call on June 19, 2013, Plaintiff provides documentary

evidence in the form of text messages conclusively establishing the baseless nature of the

harassment claims.  Upon receipt of this evidence, Defendant Berger neither withdraws

the new harassment charges[8] nor rescinds the no-contact order which has plainly been

used by the complainant as a sword rather than a shield.[9]  Instead, Defendant Berger

keeps the interim restriction of a suspension in place thereby forcing Plaintiff to withdraw

from the University.

---

[8] *See CSC* § IV.B.2 ("If the University using the preponderance of [*sic*] standard
concludes that there is insufficient information to find the student responsible, the case
will not be referred to a hearing board for resolution, but closed with a 'Not Responsible'
finding.").

[9] Defendant Berger also overlooks the complainant's blatant violation of a *CSC* provision
which prohibits "dishonesty or misrepresentation, either orally or in writing, regarding
charges brought under the CSC before hearing boards or officials of the University."

Five *months* later,[10] Procedural Advisor Patricia Cardoso, acting at the behest of, or in concert with, Defendant Eknu Gelaye, takes it upon herself to exclude highly probative evidence of the complainant's propensity for violence and prior inconsistent statements.  These pre-hearing evidentiary rulings made by an unofficial gatekeeper[11] effectively eviscerate Plaintiff's ability to be heard in his own defense and constitute "[s]ignificant and unfair departures from an institution's own procedures," which courts have found "can amount to a violation of due process."  *Furey v. Temple Univ.*, 730 F. Supp. 2d 380, 396-97 (E.D. Pa. 2010) (citation omitted).

At the hearing itself, Plaintiff is not permitted to confront the sole witness against him.  *But see Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) ("In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." (citations omitted)); *see also Greene v. McElroy*, 360 U.S. 474, 497 (1959) ("The belief that no safeguard for testing the value of human statements is comparable to that furnished by cross-examination, and the conviction that no statement (unless by special exception) should be used as testimony until it has been probed and sublimated by that test, has found increasing strength in lengthening experience." (quoting 5 J. Wigmore, EVIDENCE §

---

[10] *But see C.B. By & Through Breeding v. Driscoll*, 82 F.3d 383, 387 (11th Cir. 1996) ("[A] tentative decision . . . to suspend . . . students for *some days* may be made before a hearing as long as the disciplinarian goes on to hold a prompt—given the practicalities—hearing at which the preliminary decision to suspend can be reversed."  (emphasis added)).

[11] Pursuant to the *CSC*, only the Hearing Board itself has the authority to exclude evidence.

1367)).[12]  At the conclusion of this profoundly flawed process, Plaintiff is found responsible for assaulting the complainant and Defendant David Vaillancourt imposes the most severe sanction available by expelling him.

Taking the well-pled facts as true, the Court must assume that Plaintiff did not commit the assault for which he was expelled.  The Court must also assume that gender bias was a motivating factor that led to this erroneous outcome.  As noted above, Plaintiff and the complainant received starkly different treatment throughout the disciplinary process.  Whereas the complainant's accusations of an assault led to charges against Plaintiff, indistinguishable accusations by him were not acted upon.[13]  When the complainant lodged complaints of harassment, Defendant Berger assumed her allegations were truthful and summarily suspended Plaintiff.  When Plaintiff provided documentary proof demonstrating the true nature of his contact with the complainant, Defendant Berger kept the suspension in place and did not hold the complainant accountable for her blatant misrepresentations.  Drawing the inferences from the well-pled facts in the light most favorable to Plaintiff, the Court must conclude that this *CSC* was selectively enforced against him due to the individual Defendants' archaic assumptions and a chauvinistic view of the sexes.

---

[12] Significantly, even those federal courts unwilling to find an automatic, due process right to cross-examination have noted that when the nature of an expulsion case consists of a choice "between believing an accuser and an accused, . . . cross-examination is not only beneficial, but essential to due process."  *Flaim v. Med. Coll. of OH*, 418 F.3d 629, 641 (6th Cir. 2005); *see also Winnick v. Manning*, 469 F.2d 545, 550 (2d Cir. 1972) ("[I]f this case had resolved itself into a problem of credibility, cross-examination of witnesses might have been essential to a fair hearing.").

[13] The explanation Defendant Berger offered in her affidavit for this differential treatment – that Plaintiff failed to submit a statement that met the criteria for instituting a complaint – obviously cannot be credited by the Court at this stage of the proceeding.

*Conclusion*

Based on the foregoing, Plaintiff respectfully requests that the Court deny

Defendants' Motion to Dismiss.


**THE PLAINTIFF**


By: _____/s/ Luke Ryan_____
LUKE RYAN, BBO# 664999
SASSON, TURNBULL, RYAN & HOOSE
100 Main Street, 3rd Floor
Northampton, MA 01060
(413) 586-4800
(413) 582-6419 [FAX]


_____/s/ Bonnie G. Allen____
BONNIE G. ALLEN  BBO #563995
39 Main Street, Suite 8
Northampton, MA  01060
(413) 584-3515
(413) 586-7076 [FAX]

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the Plaintiff's Opposition to Defendants' Motion to Dismiss, filed through the Electronic Case Filing System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on June 4, 2014.

<u>/s/ Luke Ryan</u>
Luke Ryan