IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| **JAMES HAIDAK,** | \* |
| Plaintiff | \* |
| **v.** | \* |
| **UNIVERSITY OF MASSACHUSETTS AT AMHERST; ENKU GELAYE, DAVID C. VAILLANCOURT, ALLISON BERGER and PATRICIA CARDOSO** | \* |
| Defendants | \* |

**CIVIL ACTION NO. 14-CV-30049-MAP**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL

***Introduction***

Plaintiff James Haidak ("Plaintiff"), a former student at the University of Massachusetts at Amherst ("the University), has brought this two-count complaint against the University and four of its officials for violating his constitutional and statutory rights in the context of a disciplinary proceeding which culminated with his expulsion. With respect to Count II, Plaintiff contends that the University transgressed Title IX by selectively enforcing its Code of Student Conduct (CSC) on the basis of his sex and the sex of the student who accused him of assaulting her.

From the outset of this litigation, Plaintiff has made clear his intention to use the discovery process to establish a significant sex-based disparity in the adjudication of disciplinary proceedings at the University. In order to do so, Plaintiff requires access to Student Conduct files generated in the context of complaints made against non-party

1

University students for alleged assaults. Now that the University has made clear its refusal to produce this documentation, Plaintiff seeks an order from this Court compelling the production of materials demonstrating the University's historical and current treatment of male and female students which go straight to the core of Plaintiff's Title IX claim.

### Nature of the Case[1]

In the spring of 2013, Plaintiff was a twenty-two year-old undergraduate in his senior year at the University. That semester, he attended a study abroad program in Barcelona. One of the other students in that program was his girlfriend, Lauren Gibney ("the complainant"), a fellow student at the University.

By all accounts, Plaintiff and the complainant had a dysfunctional relationship. Prior to April 16, 2013, each of them had made reports (to their respective mothers) claiming that the other had been abusive. In the early morning hours of that date, they got into an argument at her apartment which eventually turned physical. Each party would later claim the other was the first and only aggressor.

Following this altercation, the complainant contacted her mother who, in turn, contacted Kelly Gray ("Gray"), an Assistant Dean for Student Life at the University. Gray subsequently sent an email to nine University officials, including Allison Berger ("Berger"), David Vaillancourt ("Vaillancourt"), Enku Gelaye ("Gelaye), and Patricia Cardoso ("Cardoso"), the four individual defendants. In this email, Gray summarized the complainant's version of what occurred earlier that day, as well as a prior incident in February. Gray also relayed a desire expressed by the complainant's mother that Plaintiff

---

[1] Documentation in support of the background facts which follow is available upon request.

be expelled from the study abroad program and volunteered that the Office of Student Life could "assist with an Interim Suspension of [Plaintiff] if we go that route."

The study abroad program ignored Plaintiff's claim that he was actually the victim and summarily expelled him. On April 19, 2013, the University issued Plaintiff a Notice of Charge. He subsequently sent Berger a lengthy email reiterating that Lauren had assaulted him both before and during the night in question.

Although "hundreds of studies" have shown that "both men and women are violent in intimate partner relationships," Joan B. Kelly & Michael P. Johnson, *Domestic Violence: Differentiation Among Types of Intimate Partner Violence: Research Update and Implications for Interventions*, 46 FAM. CT. REV. 476, 480 (2008), University officials do not appear to have ever considered the possibility that Plaintiff's allegations were true or that the complainant's were false. In fact, even after reviewing Plaintiff's submission, which included photographs depicting injuries he attributed to the complainant, Gray felt comfortable proclaiming Plaintiff guilty. In an e-mail to Berger, Gelaye, and Cardoso, she explained the basis for her opinion:

> After looking at his history, I definitely don't believe he wasn't violent at some point in their relationship (or that night). What he was found Not Responsible for is even more interesting than what he was responsible for...[2]

---

[2] In 2010, Plaintiff "pushed and spat blood on [a] resident advisor" who attempted to break-up an altercation between Plaintiff and another student. Although Plaintiff was initially charged with assault and endangering behavior, those charges were dismissed when he accepted responsible for violating "University Policies and Regulations." Plaintiff was offered this disposition when it came to light that the reason he had blood in his mouth to spit was that he had been attacked by the other student. In 2012, Plaintiff was found Not Responsible for endangering behavior to persons or property. This charge stemmed from an off-campus party Plaintiff co-hosted that resulted in noise complaints from neighbors.

Over the course of the next six and a half months, Plaintiff and the complainant continued their on-again, off-again romantic relationship.  During this time, the complainant falsely accused Plaintiff of harassing her on two separate occasions.  These allegations led Berger to suspend Plaintiff on an interim basis.  When Plaintiff presented Berger with print-outs of text messages conclusively establishing the consensual nature of the relationship, Berger neither withdrew the harassment charges nor rescinded the interim suspension.  Although these text messages made it clear that the complainant violated a Code of Student Conduct (CSC) provision prohibiting "dishonesty or misrepresentation, either orally or in writing, regarding charges brought under the CSC," the University made no effort to hold her accountable for her deliberately deceptive conduct.

This suit alleges that sex was a motivating factor in the selective enforcement of the CSC against Plaintiff but not Lauren – a similarly situated person for all intent and purposes.  Plaintiff contends that the disparate treatment he received is consistent with patterns and practices at the University.  More specifically, he asserts that the University has historically and systematically pursued charges against males but not females in physical assault cases on the basis of sex.  He also maintains that, in cases where students have been found responsible for physical assaults, the University has historically and systematically imposed punishments based on the sexes of the parties involved.

***Facts Relevant to Discovery Matters to be Decided***

On July 18, 2014, undersigned counsel sent a letter regarding Electronically Stored Information (ESI) to Jean Marie Kelley, counsel for the defendants.  (*See* Ryan Aff. ¶ 7.)  In a section entitled, "Description of Data to be Preserved," the letter stated: "This lawsuit

4

requires preservation of all information from Defendants' computers systems, removable

electronic media and other locations relating to *Lauren Gibney, James Haidak, and all*

*UMass students against whom complaints were made in the past ten years alleging non-*

*academic violations of the Code of Student Conduct.*"   (*Id.* ¶ 8.)

On March 13, 2015, undersigned counsel propounded interrogatories to the

University via e-mail and overnight mail to Attorney Kelley.   (*Id.* ¶ 12.) The interrogatories

defined the "incident" as entire series of events involving James Haidak as described in the

Second Amended Verified Complaint. (*Id.* ¶ 13.) The interrogatories defined the "subject

matter of this litigation" as consisting of the aforementioned "incident, as well as all other

allegations of physical assaults made against University students from January 1, 2004 to

January 1, 2014." (*Id.* ¶ 14.)

Interrogatory Number 5 stated: "Identify by name, sex, and date of birth all UMass

students against whom physical assault complaints were made from September 1, 2004 to

September 1, 2014, and the discipline imposed, if any, against each such student."   (*Id.* ¶

15.) Interrogatory Number 11(d) directed the University to identify "All email known to

you (including creation date, recipient(s) and sender(s)) that relate to, reference or are

relevant to the subject matter of this litigation." (*Id.* ¶ 16.)

On April 14, 2015, undersigned counsel served Requests for the Production of

Documents (RPDs) on all defendants. (*Id.* ¶ 17.) Request Numbers 4 and 5 to each

individual defendant were as follows:

> All personal diaries, notes, desk calendars, or other memoranda containing
> information pertaining to allegations contained in the Second Amended
> Complaint. This request includes, but is not limited to, data generated by
> calendaring, task management and personal information management (PIM)
> software (such as Microsoft Outlook, ACT!, PST, Yahoo, or Lotus Notes) . .
> . .

> Copies of all digital communications (such as email, voicemail, text
> messages, or instant messaging) pertaining to allegations contained in the
> Second Amended Complaint. This request includes, but is not limited to,
> communications contained on University of Massachusetts workstations and
> servers, as well as any home or portable systems that contain relevant data. . .
> .

(*Id.* ¶ 18.) Request Numbers 6 and 18 to the University were as follows:

> "For each interrogatory set forth in Plaintiff's Interrogatories, produce all
> documents which the University referred to, relied upon, consulted or used
> in any way in answering such interrogatory"; and

> "Complete case files related to complaints made against UMass students for
> alleged assaults from September 1, 2004 to September 1, 2014."

(*Id.* ¶ 19.)

On May 15, 2015, Attorney Kelley sent undersigned counsel an email regarding a

number of matters, including the status of the defendants' outstanding discovery. (*Id.* ¶ 20.)

She indicated that it was the University's intention to produce "all emails within [UMass']

possession, custody or control which constitute e-mails created or received by the individual

Defendants Enku Gelaye, David Vaillancourt, and Patricia Cardoso, during the period April

15, 2013 to December 22, 2013, and which can be accessed by use of the search term,

"Haidak" and which relate to the discipline against Plaintiff arising out of assault charges

asserted by Lauren Gibney." (*Id.* ¶ 21.)[3] Attorney Kelley also indicated that the University

"objects to and will not produce any documents from the above search which are protected

---

[3] Attorney Kelley also indicated that the University would "agree[] to produce all emails
within its possession, custody or control which constitute e-mails created or received by the
individual Defendant Allison Berger during the period April 15, 2013 to the end of her
employment at UMass, and which can be accessed by use of the search term, "Haidak" and
which relate to the discipline against Plaintiff arising out of assault charges asserted by
Lauren Gibney." (*Id.* ¶ 22.)

under the provisions of 20 U.S.C §1232g and 34 C.F.R. part 99 and/or M.G.L. ch. 66 §10

and ch. 66A." (*Id.* ¶ 23.)

On or about May 29, 2015, undersigned counsel received the University's

Interrogatory Answers. (*Id.* ¶ 24.) At the outset of these answers, the University lodged the

following objection:

> . . . Plaintiff purports to define "subject matter of this litigation" not as
> matters actually relating to this litigation, which concerns discipline arising
> out of Plaintiff's assault upon Lauren Gibney in April, 2013. Rather,
> Plaintiff defines "subject matter of this litigation" to include "all other
> allegations of physical assaults made against University students from
> January 1, 2004 to January 1, 2014."

(*Id.* ¶ 25.) In response to Interrogatory Number 5, the University stated:

> Defendant objects to this Interrogatory as being overly onerous, broad and
> burdensome and not reasonably calculated to lead to the discovery of
> admissible evidence. Defendant further objects to this Interrogatory as it
> seeks information protected by 20 U.S.C §1232g and 34 C.F.R. part 99 and
> may call for the production of information protected by M.G.L. ch. 66 §10
> and ch. 66A.

(*Id.* ¶ 26.) In response to Interrogatory Number 11(d), the University stated:

> Defendant objects to this Interrogatory as being overly broad and
> burdensome and not reasonably calculated to lead to the discovery of
> admissible evidence; and further objects to the term, "subject matter of this
> litigation" to the extent that that term purports to include matters outside the
> scope of the discipline against Plaintiff arising out of assault charges asserted
> by Lauren Gibney. Further, Defendant objects to and will not produce any
> information protected under the provisions of 20 U.S.C §1232g and 34
> C.F.R. part 99 and/or M.G.L. ch. 66 §10 and ch. 66A.
>
> Notwithstanding nor waiving these objections, Defendant agrees to produce
> all emails within its possession, custody or control which constitute e-mails
> created or received by the individual Defendants Enku Gelaye, David
> Vaillancourt, and Patricia Cardoso, during the period April 15, 2013 to
> December 22, 2013, and which can be accessed by use of the search term,
> "Haidak" and which relate to the discipline against Plaintiff arising out of
> assault charges asserted by Lauren Gibney. Defendant further agrees to
> produce all emails within its possession, custody or control which constitute
> e-mails created or received by the individual Defendant Allison Berger

during the period April 15, 2013 to the end of her employment at UMass, and which can be accessed by use of the search term, "Haidak" and which relate to the discipline against Plaintiff arising out of assault charges asserted by Lauren Gibney. Defendant notes, however, that it objects to and will not produce any documents from the above search which are protected by the attorney-client privilege.

Further, Defendant objects to and will not produce any documents from the above search which are protected under the provisions of 20 U.S.C §1232g and 34 C.F.R. part 99 and/or M.G.L. ch. 66 §10 and ch. 66A.

Further, Defendant agrees to produce the Student Affairs file maintained with regard to the discipline against Plaintiff arising out of assault charges asserted by Lauren Gibney, redacted to accord with the requirements of 20 U.S.C §1232g and 34 C.F.R. part 99.

(*Id.* ¶ 27.)

On August 3, 2015, undersigned counsel received a disc containing the Student Affairs file referenced in the University's Answer to Interrogatory Number 11(d). (*Id.* ¶ 28.) On August 6, 2015, undersigned counsel sent Attorney Kelley a letter via e-mail. (*Id.* ¶ 29.) This letter requested a discovery telephone conference pursuant to Local Rule 37.1(a). (*Id.* ¶ 30.) "In the hopes of making th[e] telephone conference as productive as possible," the letter outlined in detail the plaintiff's position with respect to certain areas of (potential) disagreement and requested that Attorney Kelley be prepared to address them. (*Id.* ¶ 30.)

***The Rule 37.1 Discovery Conference***

A conference took place over the telephone on August 13, 2015, from 1:00 pm to 1:30 pm. (*Id.* ¶ 33.) Attorneys Luke Ryan and Bonnie Allen appeared on behalf of Plaintiff; Attorney Kelley appeared on behalf of Defendants. (*Id.*)

The parties were able to reach agreement on the following matters. (*Id.* ¶ 34.) First, the parties agreed to jointly seek a modification of the scheduling order as a result of unexpected delays experienced by the defendants in producing some of the documentation

requested by Plaintiff. (*Id.* ¶ 35.)[4]  Second, with respect to the University's Answers to Interrogatory Numbers 2 and 3, the parties agreed that defense counsel would undertake a further investigation to see if the existence of any additional documents should be disclosed in Supplemental Answers to these Interrogatories and, if so, whether the documents themselves should also be disclosed in the defendants' forthcoming production of documents. (*Id.* ¶ 37.) Third, with respect to Interrogatory No. 11a, the parties agreed that counsel for the Plaintiff would review the forthcoming emails to or from the individual defendants containing the search term, "Haidak." (*Id.* ¶ 38.) Following this review, counsel for the Plaintiff would propose the use of search terms in addition to "Haidak" aimed at discovering potential relevant electronic correspondence. (*Id.* ¶ 39.) Counsel for the Defendants agreed to consider utilizing any such proposed terms in an expanded search. (*Id.* ¶ 40.)[5]

During the telephone conference on August 13, 2015, the parties were unable to reach an agreement with respect to University Interrogatory Number 5 and University RPD Number 18. (*Id.* ¶ 42.) The following issue therefore must now be decided by the Court:

> Whether the Defendant University must produce complete, un-redacted copies of Student Conduct files related to complaints made against non-party University students for alleged assaults from September 1, 2004 to January 1, 2014.

(*Id.* ¶ 43.)

---

[4] This motion was filed on August 18, 2015, and allowed in part on August 21, 2015. (*Id.* ¶ 36 (citing Dkt. No. 73, Joint Mot. to Modify Scheduling Order; Dkt. No. 74, Electronic Order).)

[5] Undersigned counsel subsequently received a disc containing emails to or from the individual defendants containing the search term, "Haidak" and are in the process of consulting with an information technology expert for purposes of proposing additional search terms pursuant to the agreement with defense counsel. (*Id.* ¶¶ 41-42.)

***Statement of Moving Party's Position***

As noted above, Count II of the Second Amended Complaint seeks relief pursuant to Title IX of Education Amendments of 1972, 20 U.S.C. § 1681(a) (Title IX).  A claim of selective enforcement under Title IX "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). "To support a claim of selective enforcement, [Plaintiff] must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the University." *Mallory v. Ohio Univ.*, 76 Fed. Appx. 634, 641 (6th Cir. 2003).

In addition to citing preferential treatment the complaint received from the University based on her sex, Plaintiff wishes to present evidence concerning the handling of disciplinary matters from which the existence of a discriminatory animus might be inferred.  As the First Circuit has noted, "Title IX, like other anti-discrimination schemes, permits an inference that a significant gender-based statistical disparity may indicate the existence of discrimination." *Cohen v. Brown Univ.*, 101 F.3d 155, 171 (1st Cir. 1996). The gravamen of these types of "disparate impact" claims is that "facially neutral" policies or procedures are applied "more harshly on one group than another and cannot be justified" on a neutral basis. *Prescott v. Higgins*, 538 F.3d 32, 41 (1st Cir. 2008) (citation omitted).

The evidence Plaintiff requires to support a disparate impact claim is in the exclusive possession of the University.  Accordingly, he has propounded Interrogatory No. 5, which seeks the identification of UMass students against whom physical assault complaints were made during a ten year period, along with the discipline imposed against

10

said students, if any.  He has also specifically requested, under Rule 34, "[c]omplete case files related to complaints made against UMass students for alleged assaults" during that same period.

After making a number of boilerplate objections, the University's answer cites the Federal Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, and its implementing regulations, 34 C.F.R. § part 99.[6]  The following provisions of FERPA are relevant here: "No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of releasing, or providing access to, any personally identifiable information in education records other than directory information . . . *unless . . . such information is furnished in compliance with judicial order, or pursuant to any lawfully issued subpoena . . . .*" 20 U.S.C. § 1232g(b)(2)(B) (emphasis added).[7]

---

[6] The answer also states that Interrogatory No. 5 "may call for the production of information protected by M.G.L. ch. 66 § 10 and ch. 66A."  It is difficult to know what to make of this invocation of state law.  As one federal court has noted, it "would make no sense to permit state law to determine what evidence is discoverable in cases brought pursuant to federal statutes whose central purpose is to protect citizens from abuses of power by state and local authorities." *Torres v. Kuzniasz*, 936 F. Supp. 1201, 1208 (1996) (citation omitted); *see also* Fed. R. Ev. 501.

[7] "Personally identifiable information" is defined as follows:

The term includes, but is not limited to—
(a) the student's name;
(b) the name of the student's parent or other family member;
(c) the address of the student or student's family;
(d) a personal identifier, such as the student's social security number, student number, or biometric record;
(e) other indirect identifiers, such as the student's date of birth, place of birth, and mother's maiden name;
(f) other information that, along or in combination, is linked or linkable to a specific student that would allow a reasonable person in the school

As numerous courts have noted, FERPA "does not . . . . by its express terms,

prevent discovery of relevant school records under the Federal Rules of Civil Procedure."

*Richardson v. Board of Educ. of Huber Heights City Schools*, No. 3:12cv00342, 2014

WL 8619228, at * (S.D. Ohio Mar. 11, 2014) (citing *Edmonds v. Detroit Public School*

*Systems*, 12cv10023, 2012 WL 5844655, at *3 (E.D. Mich. Nov.19, 2012); *Ellis v.*

*Cleveland Mun. Sch. Dist.*, 309 F. Supp. 2d 1019, 1022 (N.D. Ohio 2004)); *see also*

*Bauer v. Kincaid*, 759 F. Supp. 575, 589 (W.D. Mo. 1991) ("FERPA is not a law which

prohibits disclosure of educational records."). Nor does FERPA "create a privilege that

allows an educational institution to refuse to disclose student information." *Nkemakolam*

*v. St. John's Military School*, No. 12-cv-2132-JWL-KGG, 2012 WL 6610980, at *3 (D.

Kan. Dec. 18, 2012). Accordingly, "documents covered by FERPA are indeed

discoverable in the context of a civil action." *Garza v. Scott & White Mem'l Hosp.*, 234

F.R.D. 617, 624 (W.D. Tex. Nov. 14, 2005) (citations omitted).[8]

---

> community, who does not have personal knowledge of the relevant
> circumstances, to identify the student with reasonable certainty; or
> (g) information requested by a person who the educational agency or
> institution reasonably believes knows the identity of the student to whom
> the education record relates.

34 C.F.R. § 99.3. The term "directory information" includes: "the student's name, address, telephone listing, date and place of birth, major field of study, participation in officially recognized activities and sports, weight and height of members of athletic teams, dates of attendance, degrees and awards received, and the most recent previous educational agency or institution attended by the student." 20 U.S.C. § 1232g(A)(5)(A).

[8] It should be noted that the Office for Civil Rights for the Department of Education (OCR) has also taken this position. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 289 (2002) (noting that "Congress expressly authorized the Secretary of Education" to interpret and enforce FERPA). On April 4, 2011, OCR issued a "Dear Colleague" letter explaining its view of the interplay between FERPA and Title IX:

In light of this well-established authority, courts in other jurisdictions routinely order the production of precisely the type of information Plaintiff now seeks. *See, e.g.*, *Doe v. The Reed Institute*, No. 15-cv-00617-MO (D. Or. Sept. 3, 2015) (Order Governing Treatment of Protected Nonparty Education Records Sought in Discovery); *Yu v. Vassar College*, 1:13-cv-04373-RA-MHD (S.D.N.Y. Mar. 6, 2014) (Order Concerning Confidential Information Produced in Discovery) and (Mar. 7, 2014) (Endorsed Order); *Dempsey v. Bucknell Univ.*, 4:11-cv-1679-MWB (M.D. Pa. June 29, 2012) (Order); *Doe v. Univ. of the South*, 4:09-cv-00062-HSM-SKL (E.D. Tenn. Feb. 9, 2010) (Order granting Motion for Issuance of Order Pursuant to FERPA).

The significance of the evidence at issue cannot be overstated. In the analogous Title VII (employment discrimination) context,[9] plaintiffs have come to depend upon

---

> In 1994, Congress amended the General Education Provisions Act (GEPA), of which FERPA is a part, to state that nothing in GEPA "shall be construed to affect the applicability of . . . title IX of Education Amendments of 1972, . . . or other statutes prohibiting discrimination, to any applicable program." 20 U.S.C. § 1221(d). The Department interprets this provision to mean that FERPA continues to apply in the context of Title IX enforcement, *but if there is a direct conflict between the requirements of FERPA and the requirements of Title IX, such that enforcement of FERPA would interfere with the primary purpose of Title IX to eliminate sex-based discrimination in schools, the requirements of Title IX override any conflicting FERPA provisions.*

"Dear Colleague" Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Ed., at 13 n.32 (April 4, 2011) (emphasis added), *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

[9] As the Second Circuit has observed, "Title IX was enacted to supplement the Civil Rights Act of 1964's bans on racial discrimination in the workplace and in universities." *Yusef*, 35 F.3d at 714. "Because the statutes share the same goals and because Title IX mirrors the substantive provisions of Title VI of the Civil Rights Act of 1964, courts have interpreted Title IX by looking to the body of law developed under Title VI, as well as the case law interpreting Title VII." *Id; see also Franklin v. Gwinnet County Public Schools*, 503 U.S. 60, 75 (1992) (relying on Title VII case law in analyzing intentional discrimination under Title IX); *Cohen,* 101 F.3d at 171.

discovery requests for statistical and comparator evidence as a means to unearth evidence

capable of supporting an inference of discrimination. *See, e.g.*, *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792, 804 (1973) ("Especially relevant to [a showing of pretext]

would be evidence that white employees involved in acts against [the employer] of

comparable seriousness . . . were nevertheless retained or rehired."). As the First Circuit

has stated, when a plaintiff seeks to "raise an inference of . . . discrimination" through

such evidence,

> The test is whether a prudent person, looking objectively at the incidents,
> would think them roughly equivalent and the protagonists similarly
> situated. Much as in the lawyer's art of distinguishing cases, the "relevant
> aspects" are those factual elements which determine whether reasoned
> analogy supports, or demands, a like result. Exact correlation is neither
> likely nor necessary, but the cases must be fair congeners. In other words,
> apples should be compared with apples.

*Conward v. Cambridge School Committee*, 171 F.3d 12, 20 (1999) (citation omitted); *see*

*also Curto v. Smith*, 248 F. Supp. 2d 132, 146-47 (N.D.N.Y. 2003) (holding that Title IX

plaintiff cannot "compare apples and oranges" to establish discriminatory animus but

must prove that students "in similar circumstances" were treated differently).

In short, an enormous body of case law makes it clear that the requested

disciplinary records of non-party students are directly relevant to the matters at issue

here. Denying Plaintiff access to these materials would seriously and improperly

undermine his ability to seek redress for the University's selective enforcement of its

CSC on the basis of sex.

### *Conclusion*

For the reasons set forth above, Plaintiff respectfully requests that this Honorable

Court allow his Motion to Compel.

**THE PLAINTIFF**


By:     /s/ Luke Ryan
LUKE RYAN, BBO# 664999
SASSON, TURNBULL, RYAN & HOOSE
100 Main Street, 3rd Floor
Northampton, MA 01060
(413) 586-4800
(413) 582-6419 [FAX]


        /s/ Bonnie G. Allen
BONNIE G. ALLEN  BBO #563995
39 Main Street, Suite 8
Northampton, MA  01060
(413) 584-3515
(413) 586-7076 [FAX]

15

**CERTIFICATION PURSUANT TO FED. R. CIV. P. 37(a)(1) AND U.S. DIST.
CT. RULES, D. MASS., LOCAL RULES 7.1(A)(2), 26.2(C), AND 37.1(a)-(b)**

The plaintiff, James Haidak, by and through undersigned counsel, hereby certifies

that prior to filing his Motion to Compel Discovery, the plaintiff complied with the

provisions of the above-referenced rules by conferring in good faith with defense counsel

in a reasonable effort to reach agreement and/or narrow the areas of disagreement with

opposing counsel and obtain the discovery sought without court action.

/s/ Luke Ryan
Luke Ryan

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the plaintiff's Motion to Compel, filed through the

Electronic Case Filing System, will be sent electronically to the registered participants as

identified on the Notice of Electronic Filing on September 18, 2015.

/s/ Luke Ryan
Luke Ryan