## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

JAMES HAIDAK,                )
       Plaintiff,          )
                    )
v.                     )
                    )  **CIVIL ACTION NO. 14CV30049**
UNIVERSITY OF MASSACHUSETTS  )
AT AMHERST; ENKU GELAYE, DAVID C.  )
VAILLANCOURT, ALLISON BERGER, and  )
PATRICIA CARDOSO,         )
       Defendants        )
_____)

## OPPOSITION OF DEFENDANT UNIVERSITY OF MASSACHUSETTS AT AMHERST TO PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

This action was brought by Plaintiff James Haidak, who alleges that he was not provided with sufficient process in a university discipline matter arising out of a female student's assault charges against him.  The University of Massachusetts Amherst ("UMass") imposed a sanction of expulsion upon Plaintiff after a Hearing Board had determined that he had assaulted the female student and had failed to observe 2 orders issued by the university to have no contact with that student.  Plaintiff has now filed a 2d  Amended Verified Complaint in this matter, brought in two counts: Count One against the individual Defendants for a violation of the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983; and Count Two against the university for violation of Title IX of the Education Amendments of 1972.  He further seeks an injunction enjoining the continued imposition of the expulsion.

In connection with Plaintiff's lawsuit he has now filed a Motion to Compel in which he seeks an order for UMass to produce, "unredacted copies of Student Conduct files related to

complaints made against non-party University students for alleged assaults from Sept. 1, 2004 to

January 1, 2014."  Defendant submits that such a request is overly broad and burdensome and

not reasonably calculated to lead to the discovery of admissible evidence; and, further, that the

request should be denied under the provisions of 20 U.S.C §1232g and 34 C.F.R. part 99 and/or

M.G.L. ch. 66 §10 and ch. 66A.  Accordingly, Defendant UMass hereby files this Opposition to

Plaintiff's Motion to Compel.

      Defendant also relies upon the following:

-- **Court Documents No. 38 and 43--Exhibits 1,2, 3, and 4,** attached to Defendant's Motion to
Dismiss in this matter, previously filed as **Court Documents No. 38 and 43.**

--**Court Document No. 23**,  **Levin Aff., Ex. 1** to Plaintiff's Reply to Defendants' Opposition to
Motion for Injunctive Relief, e-mails dated Oct. 2 and Oct. 9, 2013, contained within **Ex. B** to
Levin Aff.).

--**Exhibit A** (attached)--Affidavit of Kelly Gray.

--**Exhibit B** (attached)— Letter of Plaintiff counsel to the court, dated 3/6/14, in <u>Yu</u> matter.

--**Exhibit C** (attached)— Joint Motion for Issuance of Order Pursuant to FERPA—in <u>Doe v.
Univ. of the South</u> matter.

--**Exhibit D** (attached)— Defendants' Joint Motion for an Order Regarding Education Records
in <u>Bucknell</u> matter.

--**Exhibit E** (attached)— Order of June 29, 2012 in <u>Bucknell</u> matter.

--**Exhibit F** (attached)--Aff. of Enku Gelaye.

## FACTS

      As alleged by Plaintiff, in April, 2013, Plaintiff and Gibney were in an intimate

relationship; and for the Spring 2013 semester, they were attending a study abroad program at

the University of Barcelona in Spain, administered by Academic Programs International (API).

(2d Amended Compl., Paras. 55-56).  On the evening of April 15, 2013, Plaintiff and Gibney had

spent the evening out.  According to Plaintiff, he drank "moderately;" however, he describes

Gibney as "intoxicated." (Paras. 69-72).  Plaintiff alleges that they argued; "Gibney yelled at

Plaintiff and grabbed the screen of [his] laptop in an attempt to slam it shut;" and when she did

this, "Plaintiff observed rainbow lines appearing on his computer screen and became concerned

that Gibney had broken the laptop."  After Plaintiff became concerned that Gibney may have

broken his laptop, he concedes that at the least "[a] verbal argument ensued, and Gibney

demanded that Plaintiff take his bag and leave the apartment.  Given the late hour, and the unsafe

neighborhood in which Gibney's apartment was located, Plaintiff objected to leaving." (2d

Amended Compl., Paras. 76-80).  Even upon reading just the Plaintiff's description of events, it

is fair to assume that he became enraged when he thought his laptop was broken; had a violent

argument with his girlfriend Gibney; and then refused to leave her apartment when she asked

him to do so.

On April 16, 2013, Lauren's mother contacted the UMass Dean of Students Office,

including Senior Associate Dean Allison Berger, and provided an e-mail account of the April 16

incident and also an earlier incident on February 26, in which James had put his hands on

Lauren's throat in a public nightclub; and later spit in her face and threatened her with the fact

that his mother was a lawyer, and there was nothing she could do.   (See 4/16/2013 e-mails,

**MTD Ex. 1-Berger Aff.- Ex. B**).[1]  In order to institute disciplinary proceedings, Lauren had to

submit her own statement about the incident.  **(MTD Ex. 1**-**Berger Aff**., Para. 6).

---

[1] In referring to Exhibits as "**MTD**," Defendant is making reference to **Exhibits 1,2, 3, and 4,**
attached to Defendant's Motion to Dismiss in this matter, previously filed as Court Documents
No. 38 and 43.  The only Exhibits which Defendant relies upon which have not been previously
produced as Exhibits to other pleadings in this case are **Exhibit A,** the Affidavit of Kelly Gray;
**Exhibits B – E**, court documents in cases cited by the Plaintiff; and **Exhibit F**, the Affidavit of
Enku Gelaye.

On April 16, 2013, Lauren provided her statement to the university in support of the charges she was filing against Plaintiff.  (See **MTD Ex. 1-Berger Aff. - Ex. C**).  In her statement Lauren described returning to her apartment with the Plaintiff at 4:00AM on April 16.  They argued about the computer.  "He got very upset and started screaming at me that I was 'breaking' his computer when it was clearly fine."  She asked him to leave more than once.  When he didn't leave, she began to put his things by the door.

> He got angry and yelled at me for touching his things and began to put his hands on me and trying to restrain me. From here on everything is somewhat a blur to me but from what I can remember he was trying to hurt me in any way possible without actually hitting me. He put his hands around my neck and pushed me onto my bed so I would try to defend myself in any way that I could. I believe I tried to hit him away but just nearly hit his chin and hit him in the groin. Once I got away, I remembered that my phone was in his backpack which I put near the door so I went to go try and get it and he again screamed at me for touching his things and I stated "I'm just trying to get my phone out of your bag" and he again grabbed me, twisted my arm and pushed me on to my bed. Then I noticed his computer sitting on my bed so I held it in my arms and said give me my phone and I will give you your computer. I had no intention of breaking his computer by any means, I just wanted to get my phone so I could contact API and get help. So while I kept politely asking him for my phone he put his hands on pressure points of my body and pushed as hard as he could to the point of me screaming very loudly into my bed face down.  We then heard some knocking which I believed to be the neighbors so I told him at this point he had to leave again. He then responded by saying something along the lines of "I don't care, you are the one who will be in trouble for having guests past 10 pm, not me".  I then gave him his computer and tried to get my phone again and he grabbed my neck and said "I'm going to f*** you over" and "I'm going to bury you".  At this point he grabbed my wrists and punched himself in the face with my hands. Both of my hands were very sore after except my right hand hurt more and I am left handed.  After I continued to cry and scream begging him to stop, he let go and continued punching himself in the face screaming  "Lauren stop hitting me" trying to make my roommate Hannah hear and think that I was hitting him.  He then smiled at me viciously and repeated "I'm going to f* * * you over so bad".  I called him a "monster" and at this point gave up in my effort to get my phone and just wanted him to leave. He gathered his things and saw my pressed powder makeup on the floor, which is $22.  He looked at me, stepped on it and said "crunch, oops" called me the "c***" word and walked out the door. (**MTD Ex. 1-Berger Aff. - Ex. C**).

4

On April 19, 2013, the university issued a Notice of Charge ("NOC") to Plaintiff in the form of a letter.  (See **MTD Ex. 1-Berger Aff. - Ex. D**).  The NOC informed him that a report had been received indicating that he had allegedly violated the provisions of the CSC; and that he was being charged with violations of  2012-13/II.B.1-Physical Assault and 2012/13/II.B.17a-Endangering Behavior.  The NOC stated directives to call to schedule a conference to meet with a Dean of Students staff member; and also advised him that he was not to have any direct and/or indirect contact with Lauren.  (Berger Aff., Para. 5).

On May 9, 2013, Lauren advised the Dean of Students Office that Plaintiff had been contacting her by phone and by text messages.  As a result of Plaintiff's violation of the earlier no contact order, a second NOC was issued on May 28, 2013, charging him with 2 additional violations of the CSC: 2012-13/II.B.2-Harassment and 2012/13/II.B.13-Failure to Comply with the Direction of University Officials.  (See **MTD Ex. 1-Berger Aff. - Ex. E**).

On June 4, 2013, Lauren contacted the Dean of Students Office and provided phone records which indicated that Plaintiff had continued to contact her by phone many times after the first no contact order of April 19 and then continuing after the second no contact order of May 28.  As a result, in consultation with the Dean of Students Office team, it was determined that an Interim Restriction of Suspension would be issued to Plaintiff due to his behaviors representing a direct and imminent threat.  The Interim letter was sent on June 17, 2013, and Plaintiff was charged with 2 violations of the CSC: 2012-13/II.B.2-Harassment and 2012/13/II.B.13-Failure to Comply with the Direction of University Officials.  (**MTD Ex. 1-Berger Aff. - Ex. F**).

Assistant Dean of Students Patricia Cardoso was responsible for scheduling the Hearing Board for the CSC charges against the Plaintiff.  As part of the process, she had a number of communications by e-mail and over the telephone with him.  During most of those

conversations, Plaintiff was very emotional.  In a typical conversation, they would talk for 10 minutes; then Plaintiff would cry for 20 minutes.  (**MTD Ex. 2-Cardoso Aff.**, Paras. 1-4).

During several of the conversations, Plaintiff told Dean Cardoso that he didn't want a Hearing Board.  He said words to the effect that his life was over; and he just wanted the charges against him dismissed.  The Dean responded that because he was disputing the charges against him, the only way to proceed was to convene a Hearing Board to decide whether or not he was responsible for the charges.  Several times Plaintiff said to Dean Cardoso that the charges against him should be dropped because Lauren had been in voluntary contact with him since they had returned from Barcelona.  She told him that even if that were true, it did not change the fact that the restrictions were still in place.  He had violated the no contact order put in place by Dean Berger.  She also told him that he should have gone to Dean Berger to let her know that this was occurring.  (**MTD Ex. 2-Cardoso Aff.**, Paras. 5-6).

In this case Lauren had submitted a complaint that met the conduct threshold, and Plaintiff was therefore charged for the alleged violations.  Dean Cardoso informed Plaintiff that if he felt that Lauren had violated the CSC, he could submit a statement that would be reviewed to determine if the threshold for conduct was met.  He always responded that he didn't wish to file any charges against Lauren; he just wanted it over; and this usually was followed by hysterical cries.  Dean Cardoso cannot recall any instance in which she was involved where the university has filed charges without a complaining witness or a police report.  She would not have recommended the filing of charges against Lauren where Plaintiff was not willing to submit a statement or engage as a complainant.  (**MTD Ex. 2-Cardoso Aff.**, Paras. 7-8).

On August 30, 2013, Plaintiff called Enku Gelaye, Vice Chancellor for Student Affairs and Campus Life for the University of Massachusetts at Amherst.   Plaintiff had been frantic

with Dean Berger and with V-C Gelaye's assistant that he needed to talk with her.  He complained that he believed that Dean Berger was discriminating against him with respect to the pending charges against him under the CSC.  When V-C Gelaye asked him for specific information about what he believed indicated discrimination, he was not able to provide any response.  The Vice Chancellor then offered to have the case assigned to a new dean.  Plaintiff asked whether that meant that the case would not go to a hearing.  She said no; however, at the hearing level, Dean Berger would not be involved.  She explained to him that a hearing was the appropriate place for a resolution where facts are in dispute.  (**MTD Ex. 4-Gelaye Aff**., Paras. 2-4).  Plaintiff also wanted to know about his options of filing a complaint against Lauren.  V-C Gelaye explained those options, including filing with the Dean of Students Office.  However, a complaint against Lauren would not change the status of his case.  The Hearing Board would review all of the information and determine whether he more than likely violated the Code. (**MTD Ex. 4-Gelaye Aff**., Para. 5).  Plaintiff also wanted the interim suspension removed.  V-C Gelaye told him that that was not an option; the hearing was the next step.  She explained to him that he was on interim suspension because he violated a restriction that the university had put in place.  In his mind, because Lauren was contacting him, it was OK to ignore the stay away order. She said that the university imposed the interim suspension because he had failed to comply with a very specific directive on a health and safety issue.  (**MTD Ex. 4-Gelaye Aff**., Para. 6).

A Hearing Board was scheduled for November 22, 2013 to hear the charges against Plaintiff.  (**Ex. 2-Cardoso Aff.**, Para. 13).   The Board was made up of 4 students and one staff member.  They heard testimony from Plaintiff by telephone and from Lauren.  They reviewed pictures of bruises on Lauren's wrists and arms.  Plaintiff had Attorney Luke Ryan present at the hearing.  (See Hearing Board Report, **MTD Ex. 3-Vaillancourt Aff. - Ex. A**).

The Board made its decision and issued its Report.  (**MTD Ex. 3-Vaillancourt Aff. - Ex. A**).  The Board found Plaintiff Responsible for 3 violations of the CSC, two for Failure to comply with direction of University officials, and one for assault in connection with the April 16, 2013 incident.  The Board found that Plaintiff was Not Responsible for the 3 remaining charges: Endangering Behavior and 2 charges of Harassment.

## ARGUMENT

## I.  PLAINTIFF HAS NOT MET THE "SIGNIFICANTLY HEAVIER BURDEN" IMPOSED UPON HIM WHERE HE SEEKS THE PRODUCTION OF SENSITIVE AND CONFIDENTIAL STUDENT RECORDS.

In Count II of the Second Amended Complaint, Plaintiff purports to bring this lawsuit against the university pursuant to Title IX of the Education Amendments of 1972, which provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  To raise a cognizable claim of sex discrimination, a plaintiff must plausibly allege that "a particular course of action [was undertaken] at least in part because of, not merely in spite of, its adverse effects upon" his sex. Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979).

In the discovery which has already taken place in this matter, the university Defendants have filed Answers to Interrogatories by UMass, Enku Gelaye, Patricia Cardoso, and David Vallaincourt.[2]  In addition, the university has voluntarily produced the entire Student Affairs file maintained with regard to the discipline against Plaintiff arising out of assault charges asserted by Lauren Gibney, redacted to accord with the requirements of 20 U.S.C §1232g and 34 C.F.R. part 99.  The university has also produced copies of all emails within its possession, custody or

---

[2] Former employee Berger has not yet filed Answers to Interrogatories because of serious health matters.

control which constitute e-mails created or received by the individual Defendants Enku Gelaye,

David Vaillancourt, and Patricia Cardoso, during the period April 15, 2013 to December 22,

2013, and which can be accessed by use of the search term, "Haidak" and which relate to the

discipline against Plaintiff arising out of assault charges asserted by Lauren Gibney.[3]

However, in addition to the documents which pertain to the discipline at issue, Plaintiff

now seeks an order that the university produce, "unredacted copies of Student Conduct files

related to complaints made against non-party University students for alleged assaults from Sept.

1, 2004 to January 1, 2014."  Defendants submit that such a request is overly broad and

burdensome and not reasonably calculated to lead to the discovery of admissible evidence; and,

further, that the request should be denied under the provisions of 20 U.S.C §1232g and 34 C.F.R.

part 99 and/or M.G.L. ch. 66 §10 and ch. 66A.

The order now being sought by Plaintiff would require the university to open to the

Plaintiff private and sensitive disciplinary files concerning students not related in any way to the

current litigation.  Courts have recognized that such files constitute "education records" as

defined by the Family Educational Rights and Privacy Act ("FERPA").  United States v. Miami

Univ., 91 F. Supp. 2d 1132, 1149 (S.D. Ohio 2000) aff'd, 294 F.3d 797 (6th Cir. 2002).   While

Plaintiff is correct in stating that FERPA does not create an absolute privilege barring the

production of student discipline records such as the ones here requested, he does not adequately

address the significant privacy interests of the nonparty students, nor does he meet the

---

[3] Omitting only documents from the above search which are protected by the attorney-client privilege and documents from the above search which are protected under the provisions of 20 U.S.C §1232g and 34 C.F.R. part 99 and/or M.G.L. ch. 66 §10 and ch. 66A.  Further, with regard to former employee Berger, such e-mails have been produced for the time period to the end of her employment at UMass.

"significantly heavier burden" placed on him under FERPA to establish a need for these records

that outweighs the privacy interests of the third party students.  (See Alig-Mielcarek v. Jackson,

286 F.R.D. 521, 526 (N.D. Ga. 2012): "[W]hen addressing objections to the disclosure of

educational records, courts have permitted discovery only when the party requesting the records

has met a 'significantly heavier burden' to show that its interests in obtaining the records

outweighs the significant privacy interest of the students."). [4]

      In addition, the request would impose an enormous burden upon the university.

Currently, the Amherst campus receives 2,000-3,000 conduct matters per year.  Several years

ago those numbers were significantly higher; and may have been approximately 4,000-5,000 in

the 2004 time period.  Further, the Amherst campus only began keeping a comprehensive

electronic tracking system, with refined search capacity, around 2011.[5]  Because definitions of

terms such as "assault" have changed over time, any search for such records would entail going

through all of the files to determine whether they came within the scope of the request.  It is the

university's belief that a search as envisioned by the request here at issue would probably take

the efforts of 2 persons from the Dean's Office over a period of a month or more.  (See Aff. of

Enku Gelaye—**Exhibit F**).  Especially where Plaintiff has not come forward with evidence that

---

[4] In addition, the courts have not ordered the production of FERPA records as extensively as suggested by Plaintiff, since Plaintiff cites to cases in which the courts found that FERPA was not even implicated.  (See Ellis v. Cleveland Mun. Sch. Dist., 309 F.Supp.2d 1019, 1022—The court found that the information being sought was held in teacher records , and not student records, so FERPA was not implicated).  See also  Bauer v. Kincaid, 759 F.Supp.575, 578 and 590—The case involved a university student who was also a reporter for the school paper.  She was attempting to obtain incident reports about crimes that occurred on campus.  The court allowed the information to be given to the student/journalist because the incident reports of crimes on campus were not considered educational records under FERPA).

[5] Prior to that time the campus maintains paper files.  There is a policy of keeping such files only for a period of 7 years after the date of an incident; so some or all of the documentation from the period beyond 7 years may have been destroyed.

he has been treated differentially because of his sex, any balancing of interests in this case should weigh in favor of the university.

### A.   Plaintiff Has Made No Showing That The University Undertook Any Actions Against Plaintiff Based Upon Plaintiff's Sex.

Before arguing that this court should order the production of private and sensitive records of student disciplines at UMass for a 10-year period, and in order to meet the heavier burden imposed upon him, Plaintiff is required to come forward with evidence that he has suffered discrimination on account of his sex.  It is not enough to state that he is a male, and that he "asserts" that he has been treated differently on account of that fact.  Disparate impact allegations and conclusory assertions of intentional bias are insufficient to sustain a Title IX lawsuit. "[W]here the well-pleaded facts do not permit the court to infer more that the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2)); see also Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2nd. Cir. 1994) ("The fatal gap is . . . the lack of a particularized allegation relating to a causal connection between the flawed outcome and gender bias.")

Here, Plaintiff does nothing more than make generalized assertions without any basis in fact:

> "This suit alleges that sex was a motivating factor in the selective enforcement of the CSC against Plaintiff but not Lauren - a similarly situated person for all intent and purposes. Plaintiff contends that the disparate treatment he received is consistent with patterns and practices at the University. More specifically, he asserts that the University has historically and systematically pursued charges against males but not females in physical assault cases on the basis of sex. He also maintains that, in cases where students have been found responsible for physical assaults, the University has historically and systematically imposed punishments based on the sexes of the parties involved." (Pl. Memo, p.4).

Nothing in Plaintiff's Motion demonstrates that he has been treated differently because of his sex; and he does not meet the "significantly heavier burden" placed on him under FERPA.

In attempting to show that he has been subjected to differential treatment, Plaintiff relies upon 2 arguments, both of which are fatally flawed.  First, he alleges that the university never "considered the possibility that Plaintiff s allegations were true or that the complainant's were false;" and purports to base this upon a single comment made by university employee Kelly Gray in an e-mail:

> After looking at his history, I definitely don't believe he wasn't violent at some point in their relationship (or that night). What he was found Not Responsible for is even more interesting than what he was responsible for. ..(Pl. Memo, p.3)

Plaintiff next argues that Gray's comment demonstrates that the university "must have" harbored animosity toward Plaintiff as a male student.  However, the comment is in fact based upon nothing more than a documented history of Plaintiff's conduct while a student at UMass.  This Plaintiff had a prior history of discipline involving alcohol abuse, anger control issues and violence.  As set out by Gray in her Affidavit (**Exhibit A** to this Opposition), after being notified of the incident, she reviewed summaries contained in the Conduct System regarding both Lauren and James.  Lauren had no history of discipline.  James had several prior incidents.  Gray found 2 of those incidents to be of concern.  The first occurred on September 6, 2009, when James had just arrived on campus and was moving in.  In that report he was already described by staff as "agitated" and under the influence.  Gray found this very unusual, since few such incidents occur while students are still moving into the dorms.  However, it was the February 27, 2010 report that Gray found particularly concerning.  James was found not responsible for Endangering Behavior and Harassment/Physical Assault, but the report stated "**You struck the student several times with your fist. You also pushed and spat blood on the resident advisor**

**during the incident. You were unable to control your anger and continually repeated verbal threats against the student."**  Gray states in her Affidavit that she did not know what had happened in the conduct meeting that led to the Not Responsible findings, but the report seemed very clear.  She believed that these two reports pointed toward a student with a pattern of alcohol and drug use and an inability to control emotions/actions.  Nothing in Gray's comments suggests that Gray harbored discriminatory intent toward James as a male student; but only that she was commenting on a student's prior discipline which might cast some light upon the current situation.  In fact, where James had several prior incidents of discipline, and Lauren had none, it is clear that in this context, James and Lauren could not be described as "similarly situated."  Plaintiff's attempt to utilize this as a basis for his burdensome request is clearly inadequate.

**B.      Plaintiff and His Accuser Lauren Gibney Are Not "Similarly Situated" With Regard To Their Willingness To File Charges Against One Another; And There Can Be No Reasonable Inference That The Lack Of Charges Against Lauren Would Suggest Improper Treatment Of Plaintiff Based Upon His Sex.**

There is only one other argument raised by Plaintiff in his attempt to meet the "significantly heavier burden" before production of this nature should be ordered.  Plaintiff argues that after their return to the United States, Lauren falsely accused James of harassing her; but that the university "made no effort to hold her accountable for her deliberately deceptive conduct." (Pl. Memo, p. 4).  Again, however, Plaintiff has mis-stated the facts surrounding this matter.  Plaintiff and Lauren were never "similarly situated" with regard to the filing or not-filing of charges.

As set out in the **Berger** and **Cardoso Affidavits** (previously filed in this matter and attached as Exhibits 1 and 2 in support of Defendants' Motion to Dismiss—Court Document No. 43), the process at UMass always begins with the filing of a report or statement, often a report by a student, but sometimes by a faculty or staff member or a university police officer or municipal

13

police officer.  When such a report is submitted, it is reviewed to determine whether it meets the threshold for initiating a disciplinary process.  (**MTD Ex. 1**-**Berger Aff**., Para. 6; **MTD Ex. 2**-**Cardoso Aff**., Paras. 7-8).  Here, Lauren filed a statement on April 16, 2013 and requested that charges be brought against the Plaintiff.  (**MTD Ex. 1**-**Berger Aff**., Para. 7).  By contrast, on a number of occasions, Assistant Dean of Students Patricia Cardoso specifically advised Plaintiff that if he felt that Lauren had violated the CSC, he could submit a statement that would be reviewed to determine if the threshold for conduct had been met.  He always responded that he didn't wish to file any charges against Lauren; he just wanted it over.  (**MTD Ex. 2**-**Cardoso Aff**., Paras. 7-8).  Later, in November, Plaintiff again spoke with Dean Cardoso about an earlier incident, and showed her a photo of himself with what looked like a bruise on his arm.  (**MTD Ex. 2**-**Cardoso Aff., Ex. B**).  Dean Cardoso again encouraged him to submit a statement about the incident; however, he refused to do so. (**MTD Ex. 2**-**Cardoso Aff**., Para. 11).  In addition, in August, 2013, Plaintiff asked Vice-Chancellor Gelaye about his options of filing a complaint against Lauren.  She explained those options, including filing with the Dean of Students Office. (**MTD Ex. 4**-**Gelaye Aff**., Para. 5).

Throughout this matter Plaintiff consistently declined to file charges against Lauren. Despite suggestions throughout Plaintiff's pleadings that Plaintiff was discouraged from filing such a complaint, the best evidence is that, **up to this day,** Plaintiff never sought to initiate such charges.  His Hearing Board had completed its work, and Associate Dean Vaillancourt had advised Plaintiff of its findings on December 3, 2013 (see **MTD Ex. 3**-**Vaillancourt Aff., Ex. F**).  Even according to advice supplied by Plaintiff's judicial advisor Stasie Levin, Plaintiff could

have initiated charges against Lauren any time up to one year after an alleged incident.[6] Plaintiff

has certainly been represented by able counsel during this entire period of time; however, he has

declined to initiate any such charges. His conduct speaks for itself; and that conduct

corroborates the Affidavit testimony of Patricia Cardoso and Enku Gelaye that it was Plaintiff

himself who wished not to initiate any charges.

Defendant submits that, contrary to the position Plaintiff now purports to hold, he did not

believe that Lauren should be charged with a violation of the CSC. Rather, it was always his

intention to raise issues about Lauren's conduct in the hope that the charges against him would

disappear. Where Lauren initiated charges against Plaintiff; and where he consistently refused to

initiate such charges against Lauren, they are not "similarly situated" such that the lack of

charges against Lauren should somehow be evidence of discrimination against males in the

discipline process at UMass Amherst.[7]

**C.      The Cases Cited By Plaintiff Are Completely Inapposite And Do Not Support
         Plaintiff's Argument That Courts Routinely Order The Types Of Documents
         Sought In This Case.**

Plaintiff argues that, "courts in other jurisdictions routinely order the production of

precisely the type of information Plaintiff now seeks;" and then cites to a number of such

supposed orders (Pl. Memo, p. 13). However, 3 of the 4 Orders cited by Plaintiff do not support

the Plaintiff's position.

In Yu v. VassarCollege, 1:13-cv-04373-RA-MHD (S.D.N.Y), the issue addressed by the

court is not whether the court should order the production of multiple students' files unrelated to

---

[6] (see **Court Document No. 23**, **Levin Aff., Ex. 1** to Plaintiff's Reply to Defendants'
Opposition to Motion for Injunctive Relief, e-mails dated Oct. 2 and Oct. 9, 2013, contained
within **Ex. B** to Levin Aff.).
[7] Plaintiff's refusal to file charges against Lauren is also in itself some evidence of Plaintiff's
lack of credibility with regard to his version of events in the Barcelona incident.

the case at issue. Rather, the issue is whether notice is required to be provided under FERPA to students whose names are included as witnesses **in the Plaintiff's own discipline file**:

> By way of distinction, in this case, the information being sought pertains directly to Plaintiff's personal education file, *not the education file of other students*. To the extent that the names of other students are mentioned within Plaintiff's education file, such references are *indirect* and as a result of the fact that such other students happen to be *Plaintiff's accuser* or *witnesses who aided the accuser in her allegations against Plaintiff.* Certainly, FERPA was not designed to protect indirect information about students in such instances where they have voluntarily and affirmatively placed their identities at issue in the subject student's education file. . . . Insofar as the context here is different from that which ordinarily invokes the "notice" provisions in FERPA, we submit that such notice is not required to the other students whose names are indirectly mentioned in Plaintiff's education file.
>  (See Letter of Plaintiff counsel to the court, dated 3/6/14, in Yu matter, **Exhibit B**).

Similarly, In the case of <u>Doe v. Univ. of the South</u>, 4:09-cv-00062-HSM-SKL, again, the students whose information was being identified were **witnesses to the events of the Plaintiff's Complaint**; and the parties had filed a Joint Motion seeking on Order from the court so that those students could be identified in a manner consistent with FERPA. (See Joint Motion for Issuance of Order Pursuant to FERPA—**Exhibit C**).

In <u>Dempsey v. Bucknell Univ.</u>, 4:1 l-cv-1679-MWB, the Order as cited by the Plaintiff did not relate in any way to ordering a production of student files unrelated to the case at issue. Rather, the defendant university had already agreed to produce Education Records of the plaintiff and of Non-Party Students which it conceded were directly relevant to the Plaintiff's case. However, the university defendant was seeking from the court an order which would outline its responsibilities with regard to the manner in which such information would be produced, and yet still be in compliance with FERPA requirements. (See Defendants' Joint Motion for an Order Regarding Education Records—**Exhibit D**). In fact, the Order as cited by Plaintiff specifically states that, "This Order in no way precludes the Bucknell Defendants from raising appropriate

non-FERPA objections to such requests . . . "  (See **Exhibit E**—Bucknell Order of June 29, 2012).

The only case cited by Plaintiff that even appears to deal with the production of files relating to unrelated discipline matters is *Doe v. The Reed Institute,* No. 15-cv-00617-MO (D. Or.). It is not clear whether the plaintiff in that case had made any kind of significant showing that he was entitled to the production of such documents.

**D.      Even Notwithstanding the Issues Arising Under FERPA, The Request As Made By Plaintiff Is Overly Broad And Should be Rejected.**

Defendant submits that even without the "significantly higher burden" imposed by FERPA, Plaintiff's request for all discipline files arising out of assaults for a period of 10 years is overly broad and should not be allowed. (See <u>Fleming v. City of New York</u>, 233 F. Supp. 2d 613, 615 (S.D.N.Y. 2002) (holding interrogatory that sought identification of "each and every police officer who has filed a complaint against" police department "for discrimination based upon race" for five year period prior to officer's termination was overbroad); <u>Chavez v. DaimlerChrysler Corp.</u>, 206 F.R.D. 615, 622 (S.D. Ind. 2002) (in age discrimination case, employee was not entitled to compel employer's disclosure of all previous lawsuits, grievances, or complaints alleging age discrimination against the employer in the last five years)). Additionally, "[i]nterrogatories must be limited to the 'time frame involving the alleged discriminatory conduct.' <u>Hardrick v. Legal Services Corp.</u>, 96 F.R.D. 617, 619 (D.D.C.1983); see also <u>Breon v. Coca-Cola Bottling Co. of New England</u>, 232 F.R.D. 49, 55 (D.Conn.2005) (a request for production going back twenty years is overly burdensome); <u>Holley v. Pansophic Sys. Inc.</u> 1993 WL 394764, *6 (N.D.Ill.1993) (requests beyond approximately three years not reasonable)." <u>Johnson v. Jung</u>, No. 02 C 5221, 2007 WL 1752608, at *2 (N.D. Ill. June 14, 2007).  The average permitted discovery period in discrimination cases is between three and five

years.  Briddell v. Saint Gobain Abrasives Inc., 233 F.R.D. 57, 60 (D. Mass. 2005).  Here, the

Plaintiff is seeking discovery for a time period of ten years.  See Mack v. Great Atl. & Pac. Tea

Co., 871 F.2d 179, 187 (1st Cir. 1989) (interrogatories were overly broad with respect to time

frame as plaintiff sought data for a 4–year period when a lesser time would plainly have

sufficed).

As noted above, at pp. 10-11, responding to the request would impose an enormous

burden upon the university, which currently receives 2,000-3,000 conduct matters per year; and

which handled many more in years past.  Especially where Plaintiff has not come forward with

evidence that he has been treated differentially because of his sex, any balancing of interests in

this case should weigh in favor of the university.

**CONCLUSION**

For the above-stated reasons, Defendant requests that this court deny Plaintiff's Motion

to Compel, "unredacted copies of Student Conduct files related to complaints made against non-

party University students for alleged assaults from Sept. 1, 2004 to January 1, 2014."

> Respectfully submitted,
>
> DEFENDANTS,
>
> By their attorneys,
>
> /s/ Jean Marie Kelley
> Jean Marie Kelley, Esq.,
> BBO#: 265540
> Senior Litigation Counsel
> University of Massachusetts
> 333 South Street - 4th Floor
> Shrewsbury, MA 01545
> Tel.: 774-455-7303
> Fax: 774-455-7310
> jkelley@umassp.edu

October 2, 2015

## **CERTIFICATE OF SERVICE**

I, Jean Marie Kelley, counsel for the Defendants , hereby certify that this Opposition and Certificate of Service filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Jean Marie Kelley*

Jean Marie Kelley