UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAMES HAIDAK, | ) |
|     Plaintiff, | ) |
| | ) |
|            v. | ) C.A. No. 14-cv-30049-MAP |
| | ) |
| UNIVERSITY OF MASSACHUSETTS | ) |
| AT AMHERST, ENKU GELAYE, | ) |
| DAVID C. VAILLANCOURT, | ) |
| ALLISON BERGER, and | ) |
| PATRICIA CARDOSO, | ) |
|     Defendants. | ) |

MEMORANDUM AND ORDER REGARDING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Dkt. Nos. 118 & 121)

March 9, 2018

PONSOR, U.S.D.J.

## I. INTRODUCTION

Plaintiff has been expelled from the University of
Massachusetts following an incident in which he was found to
have assaulted a fellow student. On the heels of this, he
has filed a two-count complaint against five Defendants: the
University of Massachusetts at Amherst; Enku Gelaye, Dean of
Students and acting Vice Chancellor; David C. Vaillancourt,
Senior Associate Dean of Students; Allison Berger, Associate

Dean of Students; and Patricia Cardoso, Associate Dean of Students.  The first count asserts due process and equal protection claims against all Defendants pursuant to 42 U.S.C. § 1983; the second count charges Defendant University with a violation of Title IX, 20 U.S.C. § 1681.  Both parties have now moved for summary judgment.  For the reasons set forth below, the court will allow Defendants' motion and deny Plaintiff's.

Cases in which a student, usually male, has received discipline for allegedly assaultive or harassing behavior against another, usually female, student can raise difficult questions about the proper balance between the due process rights of the accused and the need to protect the alleged victim.  See, e.g., Doe v. Brandeis Univ., 177 F. Supp. 3d 561 (D. Mass.  2016) (Saylor, J.).

This is not such a case.  Prior to the incident that led to his expulsion, Plaintiff had already been cautioned and disciplined twice for drunken, assaultive behavior; in one instance this prior conduct had led to his arrest by the police.  While the complaint underlying this lawsuit was pending against him in the University disciplinary process,

Plaintiff was warned three times, orally and in writing, to refrain from contact with the female complainant. Nevertheless, with full knowledge of this directive, Plaintiff ignored it to an astounding degree, texting the victim 1700 times and telephoning her over 300 times over a five-week period.  In addition to this, Plaintiff met with the complainant during the prohibition period for multiple sexual trysts, called her for help when he was so intoxicated that he eventually needed temporary hospitalization, and made an appearance at a bar where the complainant worked that turned so menacing that security personnel made him leave.  Plaintiff's justification for his almost mind-boggling contumacy, offered at his deposition, was that these contacts were "consensual" on the part of the complainant and that "the school could not supercede her right as a consenting adult to have conversations with someone she wanted to."  (Haidak Dep. 133:4-8, Dkt. No. 123, Attach. 2.)

This attempted rationalization will not wash.  The no-contact orders could not have been clearer; they countenanced no exceptions for what Plaintiff viewed as

"consensual."  Despite these warnings, and with a history of serious assaultive misconduct, Plaintiff blew through the University's attempts to exercise even minimal control over him.  The sad truth is that, if Plaintiff had simply respected the no-contact orders, covering only a few months, he would almost certainly have graduated years ago.

Plaintiff has been well represented.  Despite counsel's Olympian efforts, however, the starkly egregious facts cannot be explained away.  A largely student panel weighed the evidence and sensibly concluded that Plaintiff was primarily responsible for the ugly underlying incident of assault, as well as for violating the University directives. The University administration, confronting a student with two previous strikes and an aggressive refusal to respect even modest limitations, concluded, equally sensibly, that the proper sanction was expulsion.  The disciplinary mechanism, though not without flaws, reasonably complied with the requirements of due process and equal protection. Accordingly, as noted, the court will allow Defendants' motion for summary judgment and deny Plaintiff's cross motion.

## II.  FACTUAL BACKGROUND

Ordinarily, when addressing a motion for summary
judgment, the court must view the facts in favor of the
nonmoving party, drawing all reasonable inferences in his
favor.  RTR Techs., Inc. v. Helming, 707 F.3d 84, 87 (1st
Cir. 2013).  When facing cross motions for summary judgment,
the court typically "will consider each motion separately,
drawing inferences against each in turn."  Showtime Entm't,
LLC v. Town of Mendon, 769 F.3d 61, 69 (1st Cir. 2014)
(internal quotations omitted).  In this instance, however,
since Defendants' motion for summary judgment will be
allowed, the facts are viewed in the light most favorable to
Plaintiff.  Significant points of dispute will be noted in
the narrative.

A.   The University's Policies

Defendant University provided each enrolled student
with a copy of the Code of Student Conduct, and students
were subject to it so long as they were enrolled in an
academic course or program.  The CSC relevant here covered
student conduct that took place in the academic year 2012-
2013, including misconduct that occurred off-campus "when

the behavior distinctly and directly affect[ed] the University community." (Code of Student Conduct I.D, Dkt. No. 119, Attach. 1 (hereafter "CSC").)

The CSC enumerated what actions would be considered violations of the rules for standards of conduct and scholarship. Four are relevant here: physical assault on another;[1] harassment;[2] failure to comply;[3] and endangering behavior.[4] Any student who violated these regulations could

_____

[1] Physical assault was defined in the 2012-2013 CSC as a "physical attack upon or physical interference with another person which prevents the person from conducting his or her customary or usual affairs, puts the person in fear for his or her physical safety, or causes the person to suffer actual physical injury including hitting, kicking, spitting, or biting." (CSC II.B.1.)
The 2013-2014 CSC amended the definition of physical assault to "include[] physical attack upon or physical interference with a person that causes that person to suffer actual physical injury." (Dkt. No. 133, Attach. 36 at 10.)

[2] Harassment was defined as "repeated use by one or more students of a written, verbal, or electronic expression or a physical act or gesture, or any combination thereof, directed at a person that places that person to be in fear for his or her physical safety." (CSC II.B.2.)

[3] Failure to comply included a refusal to follow any direction by a University official "acting in performance of [his or her] duties." (CSC II.B.13.)

[4] Endangering behavior included actions that endangered the safety of persons (self or others) or property. (CSC II.B.17.)

be subject to disciplinary action by the University.  Any student, faculty or staff member -- or the University itself -- could file a charge against a student for violation of the CSC.[5]

Once a charge had been filed against a student, that student was to receive a Notice of Charge, outlining the violations he or she was accused of committing.  The student had 48 hours to request a Disciplinary Conference to discuss the alleged violations.  The CSC contained procedures for the handling of technical infractions and "minor violations," as well as for repeated violations and more serious infractions.

The process for handling repeated violations and serious infractions could unfold in different ways, depending on the response of the accused student.  If a student did not respond to the Notice of Charge, the case would go before the Hearing Board, in a process that is described below.  If the student did respond to the charge

_____

[5]  It is the University's position that it only instigated charges against a student when there was a complaining witness or a police report.  (Defs.' Statement of Material Facts ¶ 25, Dkt. No. 123.)

and accepted responsibility for the charge at the initial
Discipline Conference, and agreed to specific sanctions for
that behavior, then an Administrative Agreement would be
signed by the student and the staff member.  Signing the
Administrative Agreement indicated that the student accepted
the sanction and waived his or her right to a hearing or to
an appeal.  This avenue meant that the Hearing Board was
never convened.

Notably, if the Notice of Charge for violation of the
CSC involved a more serious class of violation, such as
allegations of violence or a severe act of harassment, and
the University official had a reason to believe, using his
or her professional judgment, that the accused student was a
threat to himself or herself, to others, or to property, the
official could impose an interim restriction.  An interim
restriction could be a suspension, a restriction of access
to certain campus facilities, or a prohibition from
contacting certain individuals or groups within the

community.  Interim restrictions could be imposed without prior notice and became effective immediately.[6]

A deliberate violation of an interim restriction could, of course, become the basis for another Notice of Charge. If the University official had grounds to believe that a student was violating a restriction, the official could request an expedited hearing to address the concern.  In some circumstances, a violation of an interim restriction could be the basis for suspension from the University.

If the student disputed the facts in the Notice of Charge, the matter would be referred to a Hearing Board. Generally, a student was to be notified no fewer than five days before the date of a hearing of its time and place. If, though, the charge involved a violation of an interim restriction, a hearing could be called within one weekday. In either case, the notice of the hearing would also include the specific charge against the student, as well as a citation of the provision of the Code of Student Conduct the

_____

[6]  Despite authorizing University officials to act without notice if they deemed it necessary, the CSC also stated that a meeting with the student "will be held prior to the imposition of interim restrictions whenever reasonably possible."  (CSC VII.C.)

charge related to.  In addition, the notice would provide a summary of the information underlying the charge, including a description of the alleged acts and specific times and places if they were known or reasonably knowable.  Finally, the notice would outline the procedures to be followed during the hearing

Hearings on violations of the CSC took place before a Hearing Board, which comprised between three and five University employees and students appointed by the Vice Chancellor for Student Affairs.  The University bore the burden of proving that a student had violated the CSC by a preponderance of the evidence.  The charged student could bring an advocate to the hearing, but that advocate could not be an attorney, per the CSC.[7]  The Hearing Board could hear testimony of witnesses or read statements, but the formal rules of evidence as observed in court proceedings did not apply.

_____

[7]  The CSC did allow for the presence -- but not participation -- of an attorney where there was either a pending criminal case or a likelihood of a criminal complaint.  It is not clear that this exception applied here, but in any event it is undisputed that Plaintiff's counsel was present at his hearing.

At the conclusion of the hearing, the board was to make a recommendation and forward it to the Dean of Students, along with a written summary of testimony, findings of fact, and rationale. Upon receipt of these documents, the designated University Official would render a written decision on the matter, "consisting of findings of fact, sanction(s), and reasons therefore." (CSC IV.E.11.) This would then be forwarded to the charged student.

The determination of an appropriate sanction could be based, among other factors, on "the student's present demeanor and past disciplinary record [and] the nature of the offense." (CSC V.) Sanctions included expulsion, suspension, deferred suspension, and University probation or reprimand, among others.

A student could appeal the Hearing Board's substantive decision or the resulting sanction to the University Appeals Board (UAB), composed of three University employees and/or students. There were four bases for appeal: (1) procedural error or irregularity materially affecting the decision; (2) "[n]ew evidence not previously available that would have materially affected the decision;" (3) lack of support for

the decision "by substantial evidence;" or (4) lack of
support for the sanction "by the charges and/or the
student's disciplinary history." (CSC VI.B.1-4.) The UAB
would review the hearing records and make a recommendation
to the Vice Chancellor for Student Affairs, who would then
issue a final decision.

B.   Plaintiff's Disciplinary Process

     On April 16, 2013, Defendant University received a call
from a student's mother, who reported that her daughter,
Lauren Gibney, had been physically assaulted by Plaintiff,
her boyfriend, in Barcelona, Spain, where they both were
studying on a University program. Gibney then sent the
University a statement detailing her account of the assault,
which accused Plaintiff of grabbing her wrists and punching
himself in the face with her hands, as well as pinning her
down on a bed. Pursuant to the University's policies,
Gibney's complaint went to the Dean of Students' Office.

     On April 17, 2013, Defendant Gelaye instructed
Defendant Berger to open a student conduct case on the basis
of Gibney's statement. On April 19, 2013, Berger issued to
Plaintiff a Notice of Charge, pursuant to the CSC. The

notice informed Plaintiff that he was charged with violating CSC 2012-13/II.B.1 (physical assault) and 2012-13/II.B.17a (endangering behavior to persons or property). Moreover, the Notice of Charge directed Plaintiff "not to have any direct or indirect contact" with Gibney, including through text messages or social networking sites, or "by having others (friends, acquaintances, family members, attorneys etc.) act on [his] behalf."[8] (Ex. D Notice of Charge, Dkt. No. 16, Attach. 4 at 13.) Berger also directed Plaintiff to contact her office to schedule a conference on the charge.

On May 1, 2013, Plaintiff, having returned from Barcelona, met with Berger and denied the charges against him. After their meeting, Plaintiff sent to Berger an email

---

[8] The proper characterization of this first no-contact order is disputed. Plaintiff maintains that the order constituted a formal "interim restriction" under the CSC, requiring a prior meeting with the student "whenever reasonably possible." (CSC VII.C.) Defendants say that a no-contact order routinely accompanied the Notice of Charge and, further, that this kind of preliminary restriction was not subject to the prior-meeting-if-possible provision. (Defs.' Resp. to Pl.'s Statement of Facts ¶¶ 11 & 39, Dkt. No. 142.) This dispute, as will be seen below, is not material.

containing his version of the incident in Barcelona.[9] According to his version of events, Gibney was the aggressor, who hit and slapped Plaintiff in the eye and kicked him in the groin, and it was only in self defense that Plaintiff pinned her down. This email contained a photograph of alleged injuries to Plaintiff inflicted by Gibney.[10]

Despite the no-contact order, Plaintiff resumed contact with Gibney almost immediately that May, through Skype and text messages, as well as through meetings for "intimate relations." (Pl.'s Mem. of Law in Supp. 5, Dkt. No. 9.) On May 9, 2013, Gibney's mother discovered that Plaintiff was still contacting Gibney. When confronted, Gibney told her mother that Plaintiff was refusing to stop contacting her.

---

[9] According to Defendants, and not apparently disputed by Plaintiff, Berger asked Plaintiff to put his statement in writing because, during their in-person conference, Plaintiff became so distraught that Berger could not understand what he was trying to say. (Defs.' Resp. to Pl.'s Statement of Facts ¶ 44, Dkt. No. 142.)

[10] Defendants dispute Plaintiff's claim about the photograph. At her deposition, Gibney testified that these bruises arose from other physical incidents between her and Plaintiff. (Defs.' Resp. to Pl.'s Statement of Facts ¶ 52, Dkt. No. 142.)

Gibney did not tell her mother that these contacts had occurred, to some extent, with her complicity. Gibney's parents immediately notified Berger that Plaintiff was still in contact with their daughter. Even after this report to the Dean, Plaintiff and Gibney continued their contacts.

On the afternoon of May 9, 2013, Berger spoke on the phone with Gibney about the phone calls and texts from Plaintiff. During this call, Gibney did not tell Berger that she had colluded in the contacts, and Berger had the impression at the end of the call that the contacts were not in any way consensual. Based on this impression, on May 28, 2013, Berger issued a second Notice of Charge to Plaintiff for violating CSC 2012-13/II.B.2 (harassment) and 2012-13/II.B.13 (failure to comply with the direction of university officials). This second notice was sent by mail to Plaintiff's home address in Maryland. Again, the second Notice of Charge contained the explicit, written directive to Plaintiff to stop all contact with Gibney. (Ex. E Notice of Charge, Dkt. No. 16, Attach. 4 at 14.)

On June 3, 2013, Gibney and her mother met with Berger to discuss the contacts between Gibney and Plaintiff. In

this meeting, they discussed whether it would be appropriate for Gibney to apply for a formal restraining order from a local state court.  Gibney sent Berger an email the following day chronicling the number of calls and texts she had received from Plaintiff and stating that she had not yet decided on whether to pursue a restraining order.  Gibney also provided phone records, which indicated that Plaintiff called Gibney 280 times between April 24 and May 28, 2013 (i.e., after the first, but before the second, notice of charge), and 31 times between May 28 and June 1, 2013 (i.e., after the second notice of charge).  The records also confirmed over 1700 text messages from Plaintiff to Gibney during that time frame.[11]  Gibney did not inform Berger that the contact was ever consensual.

On June 17, 2013, by email Berger issued to Plaintiff a third Notice of Charge for violating CSC 2012-13/II.B.2 (harassment) and 2012-13/II.B.13 (failure to comply with the direction of university officials).  Moreover, Berger imposed the interim restriction of suspension, effective

---

[11]  In this same period, Gibney apparently sent to Plaintiff approximately 700 text messages.

immediately, based on Plaintiff's "behavior represent[ing] a direct and imminent threat to [his] safety and the safety of the University community." (Ex. F Notice of Charge, Dkt. No. 16, Ex. 4 at 15.) The third notice informed Plaintiff of his right to a meeting because of the suspension and directed Plaintiff to contact Berger's office within two days.

On June 19, 2013, Berger and Plaintiff, as well as Plaintiff's father, David Haidak, had a second disciplinary conference via telephone regarding both the second and third notices of charge. In this conference, Plaintiff stated that he was considering charges against Gibney for her physical assault on him in Barcelona. Berger stated that Plaintiff could submit a charge, and her office would make a determination based on the submission about how to proceed. However, Berger told Plaintiff that, even if he did file a charge against Gibney, it was unlikely that the charge would be formally addressed until after the conclusion of the disciplinary proceedings against him. In the end, Plaintiff never, at any point, filed anything against Gibney. The phone conference concluded with an agreement that Plaintiff

would supply a response to the charges that he was violating the no-contact orders, and Berger would decide whether to keep the interim suspension in place.

On July 8, 2013, Plaintiff sent his version of events in an email, including excerpts from his texts with Gibney, in an effort to show Berger that the contacts between Gibney and him were, in his view, entirely consensual and even "welcome." This is, in part, disputed. Defendants now concede that <u>some</u> of the contacts and communications between Plaintiff and Gibney were consensual, but they also contend that many, in fact, were not. For purposes of Defendants' motion for summary judgment, the court will assume that the contacts between Plaintiff and Gibney during the period when Plaintiff was prohibited from contacting Gibney were consensual on Gibney's part.

On August 5, 2013, Berger sent Plaintiff an email stating that the interim suspension imposed on June 17, 2013, would continue in effect until further notice. The email did not provide reasons as to why the interim

restriction remained in place.[12]  The email attached a form

for withdrawal from the University, based on a conversation

Berger had had the previous week with Plaintiff's father,

which will be discussed below.

It is significant that, during these summer months,

Defendants took no action to schedule any proceeding before

a Hearing Board.  Accepting Plaintiff's argument as true

that the no-contact order in the first Notice of Charge

constituted an interim restriction under the CSC (VII.B),

the imposition of the interim suspension based on violations

of the no-contact orders appears to call for an expedited

hearing under the CSC (VII.D).[13]  In fact, the first attempt

at recruiting new student Hearing Board members for the

2013-2014 academic year occurred on August 30, 2013.

Student applications to sit on the Hearing Board were due on

_____

[12]  When asked during her deposition why she decided
that the interim restriction of suspension should remain in
place despite receiving the email from Plaintiff showing
Gibney's consensual texts to him, Berger replied,
"[Plaintiff] came across as very unstable to me and in my
experience of working with students over the years I hadn't
seen a student like this."  (Berger Dep. 162:9-15, Dkt. No.
130, Attach. 1.)

[13]  Defendants dispute that the CSC "requires" an
expedited hearing, but admit that Berger did not seek one.

September 13, 2013.  This timetable meant that no trained
Hearing Board was in place until the end of the first month
of the academic year.

On August 21, 2013, Plaintiff sent an email to the
University's Judicial Advisor program.  This program pays
students to act as advisors and advocate for individuals
navigating the University's disciplinary process, either as
complaining students or as charged students.  The Judicial
Advisors attend meetings with charged students at the Dean
of Students Office and assist the students in preparing for
hearings before the Hearing Board, as well as in writing
appeals to the UAB.  On August 26, 2013, Judicial Advisor
Stasie Levin took the assignment of assisting Plaintiff.  In
this role, Levin corresponded frequently with Plaintiff
about his case, including about whether he should file
charges against Gibney and what evidence he could submit to
the Hearing Board.  Additionally, Levin had several
conversations about Plaintiff's case with individual
Defendants, including Berger, Cardoso, and Gelaye.

On August 27, 2013, Plaintiff's father sent an email to
Berger inquiring into whether Plaintiff could take an

"elective leave of absence," as the new academic year was about to begin, Plaintiff was still under suspension, and no date had yet been set for the Hearing Board to convene. On August 29, 2013, Berger replied that the University had no such mechanism as an "elective leave of absence." However, Berger informed him, Plaintiff could withdraw and later apply for readmission.

After this exchange, on August 30, on the advice of his student judicial advisor, Plaintiff called Defendant Gelaye. During their phone conversation, Plaintiff stated to Gelaye that he believed Berger was discriminating against him with respect to the charges. He and Gelaye also once more discussed the option of Plaintiff filing a charge against Gibney based on her assault on him during the incident in Barcelona. Gelaye informed Plaintiff again that he was free to file a charge against Gibney but that his doing so would not change the status of Gibney's case against him. When Plaintiff inquired about lifting his interim suspension,

Gelaye told him that this was not possible until after the
proceeding before the Hearing Board.[14]

On September 1, 2013, Plaintiff withdrew from the
University -- as he put it, "under duress."  Plaintiff wrote
that he was "pushed" into this decision because of the lack
of a timely Hearing Board date, which meant that the
complaint against him would not be addressed until several
weeks into the new school year, at the earliest.  (Defs.'
Resp. to Pl.'s Statement of Facts ¶ 204, Dkt. No. 142.)  If
he remained a student but was under suspension, he would be
faced with trying to catch up with classes, even if the
Hearing Board's eventual decision was favorable to him and
resulted in the lifting of his suspension.

Despite no longer being a student at the University,
Plaintiff moved to an apartment in Amherst in September and,
in the teeth of the three no-contact orders, continued to
pursue a  relationship with Gibney.  On the night of
September 14, 2013, Plaintiff became intoxicated and called

---

[14]  In her memo to file summarizing this conversation,
Gelaye remarked that Plaintiff wept through most of the
conversation, describing the process as unfair and Berger's
attitude as discriminatory.  (Dkt. No. 123, Attach. 8.)

Gibney for a ride.  On the trip home, they got into an argument, during which Plaintiff threatened to kill himself.  Then, Plaintiff exited the car while it was still moving.  Gibney called the police, who took Plaintiff to the hospital, where he remained until he had recovered from his intoxication.  On September 15, 2013, Gibney's mother notified Berger of this contact.

On September 19, 2013, Gibney and her mother met with Berger.  Gibney admitted at the meeting that she had herself sometimes initiated contact with Plaintiff over the summer, but that she no longer wanted contact with Plaintiff.

On September 26, 2013, the melodrama continued.  Plaintiff showed up, appearing intoxicated, at Gibney's work place, a bar in Amherst.  He was the only person at the bar, and he positioned himself uncomfortably close to Gibney.  Security at the establishment removed Plaintiff after the owner asked Gibney if she wanted Plaintiff to leave.  Later in the night, Plaintiff sent Gibney a coarse message on Skype: "Whores don't really understand real life...  They talk to dudes with broken English but really they just

spread their legs and get fucked like the sluts they are ...." (Defs.' Statement of Facts ¶ 43, Dkt. No. 123.)

The following day, on September 27, 2013, Gibney notified Berger about the previous night's contact with Plaintiff. Any claim that Plaintiff's overtures to Gibney by this point were "welcome" or consensual lacks support in the record. With encouragement from Berger's office, Gibney filed an application for a state-court restraining order describing the incident at her workplace and the message Plaintiff wrote her. This application failed to disclose that Gibney's relationship with Plaintiff during some of the prior relevant time period had been, to some extent, consensual on her part, despite the University's no-contact order. After an ex parte hearing, a judge in the Commonwealth's Eastern Hampshire District Court granted a ten-day restraining order. Gibney provided a copy of the temporary restraining order (TRO) to Berger.

On October 2, 2013, the student judicial advisor Levin sent Plaintiff an email. In it, she summarized a conversation she had with Berger, who told Levin, once more, that Plaintiff was free to file charges against Gibney if he

wished.  As before, however, Berger stated that Plaintiff's

charges would not be pursued until after Gibney's charge

against Plaintiff was addressed.

On October 8, 2013, the state court judge held an

adversarial hearing on Gibney's application for an extension

of the ten-day restraining order.  Upon cross-examination by

Plaintiff's counsel, Gibney admitted that her relationship

with Plaintiff had been, at times and to some extent,

consensual, and that she had struck and bitten Plaintiff

during the course of their approximately eighteen-month

relationship.  At the conclusion of the hearing, the judge

declined to extend the TRO.

On October 28, 2013, Berger notified Plaintiff and

Gibney that she would no longer be the contact person for

this case.  In fact, Berger thereafter left the University

for another position.  The new official in charge of the

process was Defendant Cardoso, Associate Dean of Students.

In November, Plaintiff sent Cardoso two proposed pieces of

evidence for consideration by the Hearing Board: a

transcript of the state-court TRO hearing and a picture of

the bite mark on Plaintiff's arm from around the time of the

April 15, 2013, altercation in Barcelona.  In addition,
Plaintiff sent to Gelaye a copy of the TRO hearing
transcript.

On November 15, 2013, Plaintiff and Cardoso had several
phone conversations, during which they discussed what
evidence Plaintiff wished to put before the Hearing Board,
as well as what dates were available for the hearing.[15]  In
these conferences, Cardoso expressed her opinion that
Plaintiff's proposed evidence would likely hurt Plaintiff as
much as, or more than, it helped him, and was, in any event,
largely irrelevant to the inquiry into the April 15 assault
and Plaintiff's subsequent violations of the no-contact
orders.

Cardoso also conferred with Plaintiff to choose a date
for the Hearing Board to convene.  She provided three
different dates, and Plaintiff selected Friday, November 22,
2013, though he was aware he would not be able to attend in
person on that date.  Plaintiff and Gibney received notice

---

[15]  Defendants again characterize Plaintiff's emotional
state during these phone calls as alternating between calm
and highly agitated.  (Defs.' Statement of Material Fact ¶
90, Dkt. No. 123.)

on November 15 that the hearing had been scheduled for November 22, 2013.[16]  The notice included a handout on procedures, and an agenda that specified that charged students would not be permitted to question complaining witnesses directly.  This restriction was new as of the fall of 2013 and had not been in effect the prior spring.

The following day, Plaintiff told Cardoso that he wished to have his mother make a statement at the hearing in his defense.  She would recount, Plaintiff said, a conversation she had with Gibney in February 2013 in Barcelona, several months prior to the April 15 incident that formed the basis of Gibney's charge, during which Gibney purportedly admitted to biting Plaintiff. Plaintiff's mother would also explain that she saw the bruises on her son's arm from the bite.  Cardoso replied that, unless Plaintiff's mother was a witness to the April 15, 2013, incident, she would not be permitted to testify. However, Cardoso explained, Plaintiff's mother could submit a letter that would be included in the file reviewed by the

_____

[16]  The CSC provides that a student is entitled to five business days' notice before a hearing.  Defendants concede that they fell hours short of this requirement.

dean tasked with making a decision on sanctions should the Hearing Board find Plaintiff responsible for the CSC violations.

In the days before the hearing, Gibney's parents contacted the University to object to the use of the restraining order transcript during the student conduct hearing, as well as the fact that Plaintiff's counsel would be present.  Plaintiff, for his part, submitted to Cardoso thirty-six questions he wanted the Hearing Board to ask Gibney, as well as a summary of his view of the charges. Plaintiff's mother also submitted her statement to Cardoso. The day before the hearing, Cardoso notified Plaintiff that she had decided not to permit the transcript from the state court hearing to be submitted to the Hearing Board.

The record is disputed as to whether Plaintiff acceded to Cardoso's decision regarding the transcript.  Defendants contend that Plaintiff agreed not to press the transcript issue, after Cardoso pointed out that it was unnecessary since Gibney was now admitting that she had had voluntary contact with Plaintiff during the no-contact period.  Other portions of the record, however, suggest that Plaintiff was

continuing to press for submission of the transcript.  The
dispute is not material, since the court will assume for
purposes of Defendants' motion that Plaintiff continued to
press for submission of the transcript, and Cardoso declined
to permit it.

Cardoso limited the evidence before the Hearing Board
in other ways.  She did not permit the submission of
Plaintiff's mother's statement or the picture of the bruise
on Plaintiff's arm from February 2013.  Cardoso also pared
the 36 questions submitted by Plaintiff down to sixteen.
These questions omitted inquiries into whether Gibney had
ever hit or bitten Plaintiff and whether she had tried to
conceal her relationship with Plaintiff from her parents.

C.    Hearing and Post-Hearing Process

On November 22, 2013, the Hearing Board convened with
four student members and one staff chair.  Cardoso acted as
the procedural advisor for the hearing; Gibney was present
and Plaintiff attended by phone.  For Plaintiff, retained
counsel and Levin, his judicial advisor, were present; for
Gibney, an advisor/advocate attended.  Contrary to the
Hearing Board agenda, Plaintiff -- not Gibney, as the

complaining witness -- was questioned first.[17]  Neither

Plaintiff nor his advisors were allowed to question Gibney

directly, and only a few of Plaintiff's pre-submitted

questions were asked by the Hearing Board.

According to the Student Conduct Hearing Board Report

(Ex. A Report, Dkt. No. 16, Ex. 2), the board reviewed

statements from Gibney and Plaintiff for each charge against

Plaintiff.  For the charge of assault stemming from the

April 15, 2013, incident in Barcelona, the board reviewed

photos provided by both Gibney and Plaintiff.  For the

charges of harassment stemming, in part, from Plaintiff's

persistent contact with Gibney, the board reviewed

statements from Gibney as well as phone and text message

logs and the actual text messages.

After reviewing the submitted materials, the Hearing

Board, as noted, began its questioning with Plaintiff.

After receiving his responses, they directed questions at

Gibney.  Thereafter, the board took a break to prepare a

--------

[17]  Defendants dispute this characterization.  They
assert that, after reading both statements, the Hearing
Board decided it had no immediate questions for Gibney but
had some for Plaintiff.

final group of questions for both Gibney and Plaintiff.
(Hr'g Tr. 32, Dkt. No. 123, Attach. 9 at 11.)  One of the
questions directed at Plaintiff after the break dealt
specifically with his understanding of the no-contact order
in the Notice of Charge.  Plaintiff answered that, at the
time, though he understood the order from the dean was
designed to protect Gibney, he did not believe he had an
obligation to comply with it, because Gibney was talking to
him voluntarily.  He stated, "[i]n retrospect I should have
followed the school's rule, but I was in a relationship with
her for many years and I was under a lot of pressure and
stress dealing with the hearing and the school."  (Id. at
46.)

Plaintiff's answer to the Hearing Board is consistent
with his testimony during his deposition on December 22,
2015.  When asked about his understanding of the no-contact
order, Plaintiff stated that he understood Defendants'
directive to prohibit his contact with Gibney, but he
decided that Gibney's decision "as a consenting adult" to
contact him "supersede[d]" the directive.  (Haidak Dep.
134:4-8, Dkt. No. 123, Attach. 2.)

After considering the evidence, the Hearing Board concluded that Plaintiff was <u>responsible</u> for a violation of the CSC prohibiting physical assault (II.B.1) and for the two charges for failure to comply with the direction of a University official (II.B.13).  In making this determination of physical assault, the board used the broader definition from the 2012-2013 CSC, and not the narrower definition adopted over the summer.[18]  The Hearing Board concluded that Plaintiff was <u>not</u> <u>responsible</u> for either the one charge of endangering behavior to persons or property (II.B.17a) (because his conduct did not rise to the requisite level of severity), or the two charges of harassment (II.B.2) (because Plaintiff's contact with Gibney was "mutual").

_____

[18]  Plaintiff maintains that the 2013/2014 CSC definition of physical assault was more restrictive than the 2012/2013 CSC.  (<u>See</u> <u>supra</u> n.1.)  The 2012/2013 CSC definition of assault does not require "actual physical injury," while the 2013/2014 CSC definition does.  However, as the Hearing Board concluded that Plaintiff "cause[d] actual physical harm" to Gibney -- which clearly falls within in the more restrictive 2013/2014 CSC definition -- the difference between the two definitions is not material. (Ex. A Report 8, Dkt. No. 16, Ex 2.)

With respect to its findings, the Student Conduct

Hearing Board Report provided the following rationale for

the board's decisions:

> The board finds [Plaintiff] not responsible for
> [endangering behavior to persons or property], because
> his actions did not rise to a level violating this
> policy.  However, his behavior was disproportionate to
> the actions he attributed to [Gibney], and the board
> believes [Plaintiff] did cause physical harm to
> [Gibney's] wrists and arms based on the narratives and
> pictures presented in the hearing.  As such, we find
> [Plaintiff] responsible for [physical assault].
>
> Regarding the second and third incidents, the board
> finds [Plaintiff] not responsible for [harassment] in
> both cases, as the contact after the April incident was
> mutual and non-threatening according to both parties.
> However, we find [Plaintiff] responsible for [failure
> to comply] in both cases because he still knowingly
> violated the directives of the university, and failed
> to address any reservations he might have had with the
> appropriate official.

(Ex. A Report 8, Dkt. No. 16, Ex 2.)

After the Hearing Board issued its report, Defendant

Vaillancourt, Senior Associate Dean of Students, reviewed

the findings and found them to be "consistent with the

charges and based on substantial evidence."  (Vaillancourt

Aff. ¶ 4, Dkt. No. 16, Ex. 2.)

Vaillancourt also reviewed Plaintiff's significant

prior history of misconduct, which involved two serious

incidents.  The first incident occurred on February 27, 2010.  Plaintiff, while intoxicated, punched another student in his dorm and pushed and spat on the resident advisor breaking up the altercation.  Plaintiff was so inebriated at the time that he was placed in protective custody.  He agreed to be found responsible for the CSC violations of endangering behavior, harassment, physical assault, and breach of University policies.  He received the sanctions of housing probation, anger management meetings, and alcohol education workshops.

The second incident occurred on October 28, 2012.  Plaintiff was arrested by the Amherst Town Police and charged with nuisance, noisy and disorderly house, and disturbing the peace.  Plaintiff again agreed to be found responsible for CSC violations for alcohol, endangering behavior, and violations of local or state law.  He received the sanctions of a University reprimand and the writing of a 3-page paper on alcohol and student disturbances.

It is undisputed that Vaillancourt was familiar with Plaintiff from the prior incidents and had been "disheartened" by the paper written by Plaintiff after the

October 28, 2012 incident.  This response is not surprising.

Plaintiff's purported "sanction/reflection" paper stated

that, while he had "empathy" for some of the residents of

Amherst, "Kids will party no matter what.  End of story. ...

Is this responsible?  Certainly not, but it is a simple

truth."  (Ex. E Editorial Response, Dkt. No. 16, Attach. 2

at 20.)

After considering Plaintiff's history of discipline at

the University, Vaillancourt determined that the appropriate

sanction was expulsion.  He reasoned as follows:

> Despite the [two] earlier attempts by the University to
> redirect [Plaintiff's] decision-making and behavior, he
> had not altered his behavior.  Further, in light of his
> flagrant violation of the university's [two] no-contact
> orders, it was clear he would not comply with any
> future directives from the university to ensure the
> safety of himself, [Gibney], or others.

(Vaillancourt Aff. ¶ 9, Dkt. No. 16, Ex. 2.)

Plaintiff takes the position that Vaillancourt failed

to take into account all of the factors listed in the CSC

for determining a sanction, in particular, a student's

present demeanor or character letters.  For example,

Plaintiff points out that he had a 4.0 average and was only

four courses away from his economics degree.  Defendants

deny that Vaillancourt's consideration was inadequate.
Specifically, they note that, though the CSC has no
provision on character letters, Vaillancourt nonetheless
noted them.

On December 3, 2013, Vaillancourt notified Plaintiff by
letter of his expulsion, as well as of his right to file a
letter of appeal.  On December 18, 2013, Plaintiff, through
counsel, filed a 15-page letter of appeal.  As grounds for
his appeal, Plaintiff listed three of the four bases
identified in the CSC: procedural error or irregularity
which materially affected the decision; lack of substantial
evidence to support the decision; and lack of support for
the sanction by the charges or by Plaintiff's disciplinary
history.

As part of his letter of appeal, Plaintiff requested
that Gelaye recuse herself from the appeals process because
she had participated with Cardoso in the decision to exclude
the court transcript and bruise photograph from the hearing.
Gelaye did not recuse herself.  In her role as Vice
Chancellor of Student Affairs and Campus Life, she was the
person responsible for receiving the recommendations of the

University Appeals Board (UAB), and she did so for
Plaintiff's appeal.

On December 19, 2013, the day after the appeal was
filed, the UAB met and recommended that the sanction be
upheld.

> The UAB reviewed this case under the relevant sections
> of the 2011-12 Code of Conduct.  Considering the case
> on each of the four grounds for appeal available under
> the Code, the UAB found: 1) a procedural review
> revealed no procedural error sufficient to have
> materially affected the outcome of the case, 2) the new
> evidence was insufficient to have materially affected
> the decision, 3) the evidence within the case was
> sufficient to have supported the decision, and 4) a
> balancing test of student's disciplinary history and
> the charges supported the sanction as levied.

(Ex. A UAB Letter 2, Dkt. No. 16, Ex. 1.)  That same day,
Gelaye notified Plaintiff by letter that she was upholding
his expulsion from the University based on the UAB
recommendations.[19]

D.  <u>Additional Evidence</u>

---

[19]  Curiously, as Plaintiff points out, the UAB report
is dated December 20, 2013 -- the day after Gelaye notified
Plaintiff of the UAB's decision.  Defendants submit that the
Appeals Board met on December 19, 2013.  Vice-Chancellor
Gelaye reviewed and concurred with the UAB recommendation
and sent a letter to Plaintiff December 19, the day before
the report from the UAB was actually approved.  This anomaly
has no bearing on the court's decision on Defendants'
motion.

As part of the record in support of entry of judgment in his favor, Plaintiff has included evidence of contact between the Dean's office, which was handling his discipline matter, and the University Relations office as proof that Plaintiff's appeal was pre-judged and the decision-makers biased. Specifically, before Plaintiff submitted his appeal, his father sent an email to Vaillancourt "expressing his dismay in the decision."[20] (Pl.'s Statement of Material Facts ¶ 394, Dkt. No. 133.) The email was forwarded to Gelaye, who sent it along to the University Relations office. The person in the University Relations office replied that, without sharing the email, she would notify her contact in the President's Office of Plaintiff's father's communication.

Finally, Plaintiff has also submitted some evidence derived from data produced by Defendants regarding charges

---

[20] The actual email from Plaintiff's father to Vaillancourt stated, in part, "...[I] am especially upset at the way he and we were treated; umass has meant an enormous amount to my family; my father was an associate dean at the university med school; he and my uncle established three full professorships at the med school thru direct family bequests; my mother established a scholarship there; and my father also left a sizable trust to the med school...." (Dkt. No. 133, Attach. 86.)

of assaultive conduct by students that occurred between 2011 and 2015, noting the gender of the complaining and charged students, conduct charged, whether there was a finding of "responsible," and what sanction followed findings of "responsible."  According to the data provided by the University, between 2010 and 2015, 93 males and 26 females were found responsible for assault charges under the CSC. Of these, 13 students were expelled, all male.  Plaintiff has particularly highlighted the cases of two female students who went through the University's discipline system based on charges of physical assault upon male students. The summaries do not include details regarding the incidents, the extent of the injuries to the male victims (if any), or the past disciplinary history of the female students.  In both cases, the female students were found responsible, but in neither case was the female student expelled.  (Id. at ¶¶ 40-42, 97-99, & 401-405.)

Plaintiff's expert witness, Herbert Weisberg, Ph.D., performed an analysis of this evidence, and concluded that "the adjudication process for alleged assault tends to treat males and females differentially."  (Id. at ¶ 405.)  While

Dr. Weisberg did not say that the evidence was "proof" of discrimination or bias, he found the it to be "trending in a certain direction." (Weisberg Dep. 83:13-24, Dkt. No. 133, Attach. 93.)

E.   Procedural History

On March 18, 2014, Plaintiff filed a verified complaint (amended first on April 16, 2014 (Dkt. No. 20) and again on March 4, 2015 (Dkt. No. 68)), along with an emergency motion for injunctive relief (Dkt. No. 2). On May 8, 2014, the parties appeared before the court for argument. On May 27, 2014, the court denied Plaintiff's motion for injunctive relief, finding that "the merits appear to be in equipoise and ... the record lacks an adequate showing of irreparable harm." (Dkt. No. 45.) Thereafter, Defendants responded to the complaint with a motion to dismiss, on which the court heard argument on November 13, 2014. At the conclusion of the hearing, the court denied Defendant's motion. (Dkt. Nos. 51 & 52.) Accordingly, with all Plaintiff's claims intact, the parties moved on to discovery practice.

As noted in the introduction, Plaintiff's Second Amended Verified Complaint comprises two counts. Count I,

brought against the individual Defendants pursuant to 42 U.S.C. § 1983, alleges violations of Plaintiff's due process rights and rights to equal protection of the laws under the Fourteenth Amendment of the United States Constitution. Specifically, Plaintiff claims that his due process rights were violated by Defendants' failure to provide a hearing or establish that he constituted an "imminent threat" before initially suspending him from the University, by failing to provide a hearing before the Hearing Board in a timely fashion, and by expelling him after a hearing in which he was denied the rights to notice of the allegations against him, the opportunity to contest evidence against him, and the ability to present evidence on his own behalf. Plaintiff further claims Defendants denied his rights to equal protection under the laws by not themselves initiating disciplinary charges against Gibney. Plaintiff contends that Defendants failed to do this based on their gender-based bias against males. Count II, brought against Defendant University pursuant to Title IX, 20 U.S.C. § 1681, alleges that Plaintiff's gender was the motivating factor behind Defendants' decision to enforce the CSC against

Plaintiff and not Gibney, to impose sanctions on Plaintiff
for violation of the CSC, and to impose sanctions more
severe than those faced by similarly situated female
students.

### III.  DISCUSSION

Plaintiff has moved for summary judgment on liability
on both his § 1983 and Title IX claims.  His arguments for
liability center on the issues of (1) Defendants Berger's
and Vaillancourt's failure to notify Plaintiff in writing
after his conference with Berger on May 1, 2013, that the
no-contact order in the first Notice of Charge remained in
effect, (2) Defendants Berger's and Gelaye's failure to
provide him with a predeprivation hearing before suspending
him in June 2013, (3) Defendants Berger's and Cardoso's
deprivation of his opportunity to be heard in a reasonable
time due to the seven-month delay between the triggering
incident and the Hearing Board proceeding, and (4) Defendant
University's deliberate indifference to his claim of
intimate partner violence by Gibney.  In turn, Defendants
have moved for summary judgment on all claims, arguing that
as a matter of law the process afforded to Plaintiff

conformed with the requirements of the Fourteenth Amendment of the U.S. Constitution and that his claim under Title IX must fail because there is no evidence in the record supporting Plaintiff's claim that any allegedly "improper conduct occurred on account of his sex." (Dkt. No. 121.)

The court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where both parties simultaneously seek summary judgment, the standard is not altered: the court must consider each motion independently, viewing the facts in the light most favorable to the non-moving party. Showtime Entm't, LLC, 769 F.3d at 69. It is important to underline that, for a disputed fact to warrant denial of a motion for summary judgment, the fact must be material, meaning that it must possess the potential to change the outcome of the lawsuit. The court in its analysis is not obligated to consider "speculative, unsupported, or unreasonable conclusions," only facts adequately supported by the record. Id.

A.    Due Process Claim

Determining exactly what process is due in the context of an educational institution's imposition of discipline requires an inquiry into "the nature of the interest affected, and the circumstances of the deprivation." <u>Gorman v. Univ. of Rhode Island</u>, 837 F.2d 7, 12 (1st Cir. 1988). It is axiomatic that there are two essential requisites of procedural due process: notice and opportunity to be heard. <u>Goss v. Lopez</u>, 419 U.S. 565, 579 (1975). Reasonably adequate notice must at a minimum inform the affected party of "what he is accused of doing and what the basis of the accusation is." <u>Id.</u> at 582. A reasonable opportunity to be heard must afford the accused party a chance "to respond, explain, and defend." <u>Gorman</u>, 837 F.2d at 13.

In evaluating whether the process available to a plaintiff comported with the requirements of due process under the Constitution, a court must consider three factors: (1) the private interest affected by the government action, (2) the risk of a wrongful deprivation of the interest by the procedures used, as well as the benefit of additional or alternative procedures, and (3) the burden on the defendant's interests that the additional or alternative

procedures entail.  <u>Mathews v. Eldridge</u>, 424 U.S. 319, 335

(1976).  A fair process does not necessarily require

procedures that follow "the traditional common law

adversarial method.  Rather, on judicial review the question

presented is whether, in the particular case, the individual

has had an opportunity to answer, explain, and defend, and

not whether the hearing mirrored a common law criminal

trial."  <u>Gorman</u>, 837 F.2d at 14.

Plaintiff's private interest here is great, and

Defendants do not contend otherwise.  The law recognizes

both Plaintiff's property interest in his education and his

liberty interest in his good name and reputation.  <u>Goss</u>, 419

U.S. at 574.  The controversy here centers on whether

Defendants' procedures were adequate given the nature of

Plaintiff's interest, or whether some enhanced protections

were required to bring Defendants' response into alignment

with the Constitution.

The determination whether a defendant university's

procedures comport with "basic fairness" is fact-driven.  As

the First Circuit has made clear, "[b]eyond the right to

notice and hearing, the span of procedural protections

required to ensure fairness becomes uncertain, and must be determined by a careful weighing or balancing of the competing interests implicated in the particular case." Gorman, 837 F.2d at 14.

In evaluating a school's disciplinary processes, the Supreme Court has recognized that "further formalizing the suspension process and escalating its formality and adversary nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching process." Goss, 419 U.S. at 583. "Generally, in examining administrative proceedings, the presumption favors the administrators, and the burden is upon the party challenging the action to produce evidence sufficient to rebut this presumption." Gorman, 837 F.2d at 15.

Plaintiff argues that Defendants' process with respect to notice and opportunity to be heard was flawed in several fundamental ways. The court will first address the issue of the adequacy of notice, then examine the issue of opportunity to be heard.

1.  Notice

Due process demands that an individual be provided with notice regarding the charges against him so that he has an opportunity to respond.  See Goss, 419 U.S. at 581; Mard v. Town of Amherst, 350 F.3d 184, 189 (1st Cir. 2003) ("Due process requires notice that is 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections'...." (citing Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 314 (1950))).  The specific parameters of the notice -- oral or written, timing and content -- depend on the particular circumstances. Goss, 419 U.S. at 579-81.

Plaintiff argues that Defendants deprived him of his due process right to adequate notice of the charges against him when the initial no-contact order was imposed, as well as when he received an interim suspension for violating this order and the subsequent no-contact order.  In particular, Plaintiff finds fault with Defendants' failure to notify him that the initial no-contact order remained in effect after his May conversation with Berger about the alleged assault in Barcelona.  He also contends that his rights were

violated when Berger failed to provide reasons for the
continuation of the no-contact order.

The undisputed facts contained in the summary judgment
record refute Plaintiff's argument.  As noted above at
length, Plaintiff received three Notices of Charge that
clearly explained the accusations against him and informed
him of his rights under the CSC.  The first, dated April 19,
2013, identified the provision of the CSC he was accused of
violating, directed him to a website containing the entirety
of the CSC, and included a brochure for the Judicial Advisor
Program offered by the University for students charged under
the CSC.  This is also the document that informed Plaintiff
of Defendants' directive that Plaintiff not "have any direct
or indirect contact with [] Gibney ... includ[ing], but ...
not limited to comments, words or gestures in person,
through postal mail, email, text, instant messaging, social
networking sites, or by having others ... act on your
behalf."  (Dkt. No. 16, Attach. 4 at 13.)

The second and third Notices of Charge similarly
informed Plaintiff of the nature of the accusations against
him.  (Id. at 14-15.)  The third notice, which imposed the

interim restriction of suspension, specifically explained
the conduct of Plaintiff that warranted the disciplinary
action. (Id. at 15 ("[T]he Dean of Students office was
informed that you continued to contact [Gibney]. [Gibney]
provided the Dean of Students office a copy of her phone
records which confirmed between the issuing of the first and
second Notices of Charge you called [Gibney's] phone
approximately 280 times.").) Furthermore, Defendants
provided several conferences prior to the Hearing Board
proceeding to review the charges and discuss Plaintiff's
options. These written and oral communications are more
than enough to satisfy the notice requirements of the due
process clause of the Fourteenth Amendment.

Plaintiff takes issue with Defendants' failure to
somehow re-affirm the no-contact directive after the May 1,
2013, conversation between Berger and Plaintiff about the
charges against him. No authority, however, required
Defendants to remind Plaintiff of the existing, very clear
no-contact order after the May 1 conversation, or after any
other contact with Plaintiff. The language of the order was
itself broad, detailed, and emphatic. Plaintiff conceded at

his deposition that he knew very well that the University
had directed him to stay away from Gibney, right from the
time she first filed her complaint.  He simply felt no
obligation to comply based on Gibney's supposed consensual
contact with him.  In short, no further "notice" was either
required by the law, or needed by Plaintiff.

Plaintiff further argues that his right to adequate
notice was undermined by Defendants' mischaracterization of
the no-contact order as a "directive," when, according to
Plaintiff, it was actually an "interim restriction," as
provided for under the CSC.  Properly pigeon-holed, the no-
contact order -- the argument runs -- would have entitled
Plaintiff to some extra procedural rights and perhaps put
him on better notice of what might happen to him if he
defied the order.  But it is impossible to discern what
practical effect this re-labeling of the no-contact order
would have had.  A complaint of a frightening incident had
been filed.  Plaintiff was clearly told to stay away from
the complainant while the University administrators and,
eventually, the Hearing Board sorted it out.  Plaintiff

forthrightly concedes that he knew of the content of the order, and its rationale, right from the get-go.

The University cannot be faulted for assuming that anyone in Plaintiff's position, especially someone who had already been disciplined twice, would comply with the no-contact order, whether it was viewed as a "directive" or as an "interim restriction." Simple compliance with the order might well have avoided this whole painful mess, or at least moderated its consequences.

The strictures of due process are not hyper-technical. Mathews, 424 U.S. at 334 ("[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place, and circumstances." (internal quotations omitted)). No tenet of due process requires that an individual know specifically, ahead of time, what sanction may result where there has been prior notice of the type of conduct subject to punishment and the possible consequences for violations of a clear order. O'Neill v. Baker, 210 F.3d 41, 48-49 (1st Cir. 2000). Defendants' due process obligation to apprise Plaintiff of the charges

against him has been satisfied here.  He had

constitutionally adequate notice.[21]

    2.  Opportunity to Be Heard

    Along with notice, due process requires that an

individual have an "opportunity to be heard 'at a meaningful

time and in a meaningful manner'" before a deprivation of

liberty or property.  Mathews, 424 U.S. at 333; Goss, 419

U.S. at 579.  The bar for satisfying this obligation is "not

high: the U.S. Constitution requires only 'some

pretermination opportunity to respond.'" Chmielinski v.

Massachusetts, 513 F.3d 309, 316 (1st Cir. 2008) (quoting

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542

(1985)).  Due process does not set a standard of "best

practices" a state should follow; rather it simply requires

some process that acts as "an initial check against

erroneous decisions."  Id. (quotations omitted).

_____

        [21]  The only other possible, de minimis notice issue
Plaintiff identifies is that Defendants were several hours
short of the five-day notice period provided for in the CSC.
However, the record reflects that Defendants gave Plaintiff
three dates to chose from and he picked the November 22 date
on the same day Cardoso notified him.  Accordingly, there is
no basis to find a due process violation based on this
technicality.

Evaluating whether a state's procedures comport with due process is a case-specific exercise, related to "time, place, and circumstances." <u>Mathews</u>, 424 U.S. at 334 (quotations omitted). "Due process is flexible and calls for such procedural protections as the particular situation demands." <u>Id.</u> (quoting <u>Morrissey v. Brewer</u>, 408 U.S. 471, 481 (1972) (internal quotations omitted)). Plaintiff challenges the adequacy of Defendants' procedures at almost every point of the disciplinary process, beginning with the no-contact order contained in the first Notice of Charge and ending with Plaintiff's appeal of the Hearing Board's decision and the resulting sanction.

First, Plaintiff attacks Defendants' procedures surrounding the issuance of the no-contact orders, the ensuing charges for violating the orders, and the interim suspension after the finding of a violation. Specifically, Plaintiff claims that, in contravention of the CSC, Defendants failed to convene an expedited hearing after imposing what he terms an "interim restriction" on him prohibiting contact with Gibney. This lapse, he argues, was compounded when he was subsequently charged with violating

the restriction.  The final, and most serious, blow fell,
according to this argument, when Plaintiff's repeated,
knowing violation of the no-contact order resulted in his
interim suspension without a prior hearing and without a
finding that Plaintiff was an "imminent threat to himself
... [or] to others."  (Dkt. No. 119, Attach. 1 at 13.)

In weighing these arguments, it is important to bear in
mind that the court's analysis must focus on whether
Plaintiff's constitutional rights have been violated, not on
whether Defendants might have adhered more scrupulously to
the requirements of the CSC.  The Constitution requires only
that a pretermination hearing provide a reasonable "check
against mistaken decisions."  <u>Calderón-Garnier v. Rodríguez</u>,
578 F.3d 33, 38 (1st Cir. 2009).

It is true that the first no-contact order on April 19,
2013, after Gibney's initial complaint, was issued without
any opportunity for Plaintiff to be heard ahead of time.
This fact does not, however, raise due process concerns for
at least three reasons.

First, as a preliminary matter, a no-contact order
does not implicate a substantial property or liberty

interest such as education or reputation.  The procedural

safeguards, in this context, may be more rudimentary than

formal.  <u>See</u> <u>Donovan v. Ritchie</u>, 68 F.3d 14, 18 (1st Cir.

1995) (concluding that inclusion of a ban on athletic and

extracurricular activities along with a brief suspension did

not "trigger a requirement for a more formal set of

procedures").

        Second, as Plaintiff himself recognizes, a

predeprivation hearing before the April 19, 2013, issuance

of the first Notice of Charge, along with its no-contact

order, was not possible as a practical matter.  Plaintiff

was in Spain, thousands of miles away.  (Pl.'s Mem. in

Support 19, Dkt. No. 125.)

        Third, Defendants conducted an in-person conference

with Plaintiff reasonably promptly <u>after</u> the issuance of the

initial charge and no-contact order, on May 1, 2013, to

discuss both the underlying charges filed by Gibney and the

no-contact order.  The conference gave Plaintiff an

opportunity to contest the complaint against him.  It also

gave him an opportunity to contest the no-contact order,

though no evidence exists that he did so at that time.  As

far as the initial order prohibiting contact by Plaintiff with Gibney, this sequence of events fully satisfied the requirements of due process.

The same can be said of Plaintiff's suspension -- accurately classified as an "interim restriction" -- which Defendants imposed on June 17, 2013. As noted earlier, the pretermination process need not be "elaborate" where there is a more robust postdeprivation process. Defendants conferred with Plaintiff regarding the suspension on June 19, 2013.[22] While it may be true that this conference constituted a less elaborate process than the one outlined in the CSC, Defendants' actions nonetheless met the requirements of the Constitution. The undisputed fact is that Plaintiff knew of the no-contact orders and exuberantly defied them. He was given an opportunity to make his case against suspension. His explanation for his conduct -- that Gibney consented to the contact -- could not justify his obstinacy and was rejected by Defendants even after Gibney

---

[22]    This conference was followed by an email from Plaintiff on July 8, 2013, to Berger, who responded with a letter back to Plaintiff on August 5, 2013, advising him that the suspension would continue.

herself finally confessed that it was, to some extent, true. The process underlying the issuance of the interim suspension contained no fatal constitutional flaw.

Next, Plaintiff vigorously argues that the Hearing Board proceeding itself was constitutionally impaired in three respects. First, Defendants improperly excluded the transcript of the TRO hearing in state court, the pictures of the bite mark Gibney left on Plaintiff's arm, and the testimony of his mother. Second, Defendants deprived Plaintiff of the assistance of counsel. Third, Defendants denied Plaintiff the opportunity to confront and cross-examine Gibney. Plaintiff points out that where a case hinges on the credibility of one witness, the ability to cross-examine that witness might be essential to a fair hearing. Furey v. Temple Univ., 884 F. Supp. 2d 223, 252 (E.D. Pa. 2012) (citing Winnick v. Manning, 460 F.2d 545 (2d Cir. 1972)). Here, Plaintiff was not permitted to question Gibney; instead he was told to submit questions to the Hearing Board, of which they posed only a few.

None of these alleged defects, alone or taken together, is sufficient to render Defendants' hearing procedure so

infirm as to deprive Plaintiff of his due process rights.
Exclusion of evidence that is repetitive or secondhand does
not show that the process was unfair or that Defendants were
biased against him.  Moreover, on the issues of fact that
Plaintiff sought to establish with the excluded evidence --
that Gibney had misled her parents and Defendants about her
consensual contact with Plaintiff and that she had also been
physically aggressive with Plaintiff -- the Hearing Board
found in his favor.  These facts simply did not persuade the
board on the ultimate question of his culpability on the
charges before it.

With respect to rights to counsel and to cross-
examination, the First Circuit's 25-year-old decision in
Gorman declined to find either of these elements essential
to due process in the context of school discipline hearings.
Gorman, 837 F.2d at 16.  "[T]he weight of authority is
against representation by counsel at disciplinary hearings,
unless the student is also facing criminal charges stemming
from the incident in question."  Id. (stating further that
for school disciplinary processes, "the right to unlimited
cross-examination has not been deemed an essential

requirement of due process"); cf. Gabrilowitz v. Newman, 582

F.2d 100, 106 (1st Cir. 1978) (recognizing a right to the

presence of counsel at a school disciplinary hearing where

there are parallel criminal proceedings, but limiting the

role of counsel to "safeguard [student's] rights at the

criminal proceeding, not to affect the outcome of the

disciplinary hearing").

Plaintiff's most compelling argument is his objection

to the length of time -- seven months -- between the first

Notice of Charge and the Hearing Board proceeding.  He

argues that this delay violated his right to be heard at a

meaningful time.  In addition, he asserts that he was denied

an expedited hearing for his initial interim suspension.

See Gomes v. Univ. of Maine Sys., 365 F. Supp. 2d 6, 21 (D.

Me. 2005) (stating that tight deadlines are usually

associated with student disciplinary hearings from complaint

to resolution).

Even if the seven-month delay between the first Notice

of Charge and the hearing was not unconstitutional,

Plaintiff argues, the fact that his hearing for his June 17,

2013, suspension did not occur for five months is a

violation of his due process rights.  The delay meant the 2013-14 CSC governed Plaintiff's hearing, instead of the 2012-13 CSC, which provided that charged students could cross-examine complaining witness directly; it led to the economic consequence of Plaintiff suffering a lost semester; it caused Plaintiff to be unable to attend his disciplinary hearing in person due to his employment obligations.

The seven-month delay is a matter of concern.  It is true that a university tends, to some extent, to go into "sleep mode" over the summer.  But due process is a twelve-month obligation.  If the University wishes to avoid a risk of a due process violation, not to mention a violation of its own CSC, it obviously needs to establish a mechanism that allows a prompt response to complaints of this sort over the summer months.

While the delay here was certainly regrettable, and should be avoided in future, it did not, in the context of this case, constitute a deprivation of Plaintiff's due process rights.  First, and most importantly, the delay played no significant part in affecting the outcome of the Hearing Board proceeding.  Cf. Furey, 730 F. Supp. 2d at 394

(discussing due process claim analysis as requiring a plaintiff "to show that additional procedural safeguards would have led to a different result").

It is true that the earlier version of the CSC, applicable over the summer, permitted cross examination of a complaining party, but the Court of Appeals has held that this "is not an essential part of a constitutionally acceptable process." <u>Gorman</u>, 837 F.2d at 16. Moreover, the scheduling of the hearing was not the cause of Plaintiff's absence. He selected the hearing date knowing he would be unavailable.

In the end, the bulk of the evidence in this case was uncontested. Plaintiff admitted he forcibly pinned Gibney down; her injuries were confirmed by photographs. The fact that Plaintiff utterly ignored the repeated no-contact orders is also undisputed. The decision of the panel of Plaintiff's peers was thoughtful and probing, accepting a number of Plaintiff's arguments. The Hearing Board recognized that some fault existed on both sides, but plausibly found that Plaintiff's behavior was disproportionate, while also declining to find him

responsible for the most serious charges.  Moreover, the
decision accepted Plaintiff's argument that the contacts
with Gibney were "consensual," and declined to find
Plaintiff guilty of endangering or harassment.  Its finding
that Plaintiff flouted the University's orders is beyond
reproach.[23]

The sanction of expulsion, while severe, was fully
supported by the largely uncontested record.  The vast
majority of students manage their college careers with no
disciplinary sanctions.  Plaintiff had admitted to two
serious incidents of violent behavior, which had resulted in
sanctions, prior to the Barcelona incident.  While the third
disciplinary proceeding was pending, he defied the
University's efforts to keep Gibney and him apart, even for
a limited period of time.  Defendant Vaillancourt reasonably
determined that, after two prior, lighter sanctions -- which
did not improve Plaintiff's behavior -- it was necessary and

_____

[23]     Plaintiff's reliance on Doe v. University of Notre
Dame, No. 17-cv-298, 2017 WL 1836939 (N.D. Ind. May 8,
2017), is misplaced.  The decision in that case addressed a
motion for a preliminary injunction permitting the plaintiff
to sit for his final exams, not a motion for summary
judgment on the merits.

appropriate to exclude him from the University community.

The charge that bias infected the process holds no
water.  No evidence suggests that Berger became so
personally inflamed against Plaintiff that she could not
treat him fairly.  As for Defendant Gelaye, Plaintiff has
little to offer in support of his charge of bias beyond
disagreement with the outcome of the hearing.  Neither do
the intra-University communications following the receipt of
Plaintiff's father's email offer support to any claim of
bias.  Plaintiff's assertion that Defendants were driven by
a pecuniary interest in expelling Plaintiff to avoid paying
damages for Plaintiff's previous (allegedly
unconstitutional) interim suspension is supported by nothing
but unvarnished conjecture.  A claim of bias must be
supported by more than speculation.  <u>Gorman</u>, 837 F.2d at 15.

Plaintiff's criticism of the UAB process is similarly
unpersuasive.  The fact that Plaintiff's appeal was promptly
rejected proves nothing.  Even if the appeal process was
flawed (and no evidence suggests it was) it is well
established "that a student has no constitutional right to
review or appeal after a disciplinary hearing which

satisfied the essential requirements of due process."
Gomes, 365 F. Supp. 2d at 33.

In sum, the process was adequate.  Its flaws, to the extent they existed, did not affect the substantive outcome. See Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ., 574 F.3d 214, 223 (3d Cir. 2009) (concluding that "any additional or substitute safeguards provided to [plaintiff] would have had no probable value").

While Plaintiff's interests deserved protection here, and were protected, it is important to recognize that Defendants had a significant interest as well: the maintenance of a safe learning environment for students. See Goss, 419 U.S. at 580 ("Some modicum of discipline and order is essential if the educational function is to be performed."); Gorman, 837 F.3d at 13 (discussing "the interest of the school administration to dismiss or expel students for the general benefit of the institution"); Furey, 730 F. Supp. 2d at 393 (recognizing that a school has a "governmental interest ... to maintain order and discipline without prohibitive costs and disruption").

These competing interests both deserve recognition. The First Circuit has recognized that "that the undue judicialization of an administrative hearing, particularly in an academic environment, may result in an improper allocation of resources, and prove counter-productive." Gorman, 873 F.2d at 16. Here, as in other cases, while "the University's disciplinary process was not ideal and could have been better ... it was fundamentally fair and accorded the Plaintiffs the essential elements of due process." Gomes, 365 F. Supp. 2d at 10.

In the particular, complex factual landscape presented by this case, the balance of competing interests was struck fairly. No violation of due process occurred.[24]

B. Title IX Claim

---

[24] The claim under the Fourteenth Amendment for violation of equal protection based on the University's failure to pursue charges against Gibney is specious. Even assuming the University made a practice of initiating charges independently, it can hardly be faulted for declining to do so when the alleged victim himself, Plaintiff, repeatedly declined to file a charge against his supposed attacker. Moreover, for the reasons laid out below in the discussion of Title IX, no sufficient evidence of gender-based discrimination exists on the record.

The First Circuit has not directly addressed the
application of Title IX to university disciplinary
processes.  However, the Second Circuit's opinion in Yusuf
v. Vassar College, 35 F.3d 709 (2d Cir. 1994), provides a
helpful framework for approaching the issue.  Yusef suggests
that a claim of a Title IX violation in a disciplinary
proceeding be evaluated under an "erroneous outcome" or a
"selective enforcement" analysis.  Bleiler v. Coll. of Holy
Cross, No. 11-11541, 2013 WL 4714340, at *5 (D. Mass. Aug.
26, 2013) (Casper, J.) (citing Yusuf, 35 F.3d at 715-16).

Plaintiffs who claim an erroneous outcome must first
offer evidence "sufficient to cast some articulable doubt on
the accuracy of the outcome of the disciplinary proceeding."
Yusuf, 35 F.3d at 715.  Such doubt may be shown by pointing
to evidentiary weaknesses undermining the charges, such as a
witness's motive to lie, or particular procedural flaws that
affected the proof.  Where a plaintiff can point to
sufficient evidence to support a possible error in the
disciplinary proceeding, he or she must then clear a second
hurdle by offering proof of "particular circumstances

suggesting that gender bias was a motivating factor behind the erroneous finding."  <u>Id.</u>

The record in this case is insufficient to support Plaintiff's case on either element.  First, the evidence of an error by the Hearing Board is unpersuasive.  The two findings that Plaintiff violated the no-contact orders are essentially undisputed.  Plaintiff admits he violated the order egregiously but offers the patently inadequate justification that Gibney "consented" to the violations.  He does contest the finding that he was predominantly responsible for the April 2013 incident of assault, arguing that he was acting in self defense.  But the Hearing Board's contrary conclusion was supported by substantial evidence and involved a credibility determination it was in the best position to make.

Even if the Hearing Board erred, the record is entirely devoid of proof demonstrating that gender bias in any way drove the Board's mistake.  Evidence in this category, as <u>Yusef</u> notes, may come in the form of "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making"

showing gender bias.  Id.  Apart from Plaintiff's unhelpful expert offering, which is discussed below, no such proof exists.  No Defendant, no Hearing Board member, no one connected in any way with the charges against Plaintiff or with the sanction ultimately imposed on him, exhibited a shred of evidence in the form of a statement or anything else that suggested that gender-based bias played any part in the disciplinary process.

The "selective enforcement" argument fares no better. To prove this, plaintiffs must point to evidence that, "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender."  Id. Here, Plaintiff must rely entirely on his expert offering, which found that data regarding charges and sanctions for assaultive behavior over several years at the University appeared to be "trending in a certain direction."   This phrase appears to pick up on similar language used by the Second Circuit in Yusuf.  That case, however, addressed a motion to dismiss, where the bar is much lower than it is here.

At this stage, the evidence in the record must be sufficient to convince a reasonable factfinder that an act of selective enforcement, or an especially severe sanction, derived from gender bias. A "trending" pattern will not do. As the expert report itself recognized, while the data demonstrated a possible difference in outcomes for males versus females charged with assault, the expert could not determine the reason for it. (Weisburg Dep. 83-84, Dkt. No. 133, Attach. 93.) He properly conceded that a mere differential was <u>not</u> proof of bias or discrimination, stating "I'm not saying that there is proof here of discrimination, or even bias in sort of a colloquial sense." (<u>Id.</u> at 83:15-17.)

The comparator offered by Plaintiff involving the two female students found guilty of assault but not expelled lacks sufficient detail, such as the discipline histories of the female students or the severity of the incidents, to permit any helpful conclusion about disparate treatment.[25]

---

[25] It is worth noting that, on Plaintiff's first trip through Defendants' discipline process for a charge of physically assaulting another student, Plaintiff was not expelled, just like the female students he now highlights.

In the end it is quite possible that the "trending" observed by Plaintiff's expert toward more charges and more serious discipline imposed on males who committed assaults could reflect the fact that male assaults on females are simply more prevalent and more severe.  Certainly the expert's analysis does nothing to undercut this explanation.

A separate line of cases recognizes liability under Title IX where schools have exhibited a "deliberate indifference" to "severe, pervasive, and objectively offensive" sexual harassment.  <u>Porto v. Town of Tewksbury</u>, 488 F.3d 67, 72 (1st Cir. 2007) (examining the Supreme Court's holding in <u>Davis ex rel. LaShonda D. v. Monroe County Board of Education</u>, 526 U.S. 629 (1999)).  This deliberate indifference "must, at a minimum, cause [students] to undergo harassment or make them liable or vulnerable to it."  <u>Id.</u> (internal quotations omitted; alteration in original).  The harassment "must be so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school."  <u>Id.</u> (internal quotations omitted).

Here, Plaintiff's only evidence of any severe or pervasive discriminatory environment is that the Defendants were deliberately indifferent to alleged violence perpetrated against him by Gibney.  As an initial matter, it is hard to fault the University for not pursuing charges against Gibney when Plaintiff himself declined to do so. More importantly, even if Plaintiff's characterization of Gibney's behavior were believed, the fact that the University took no action in response to this one incident would hardly be sufficient to demonstrate the existence of a pervasive discriminatory environment.  The pattern of conduct here, even accepting Plaintiff's version of it entirely, in no way approximated the sort of lengthy course of brutality described in the Supreme Court's <u>LaShonda D.</u> decision.  Even with the court accepting Plaintiff's claim that he declined to pursue a charge against Gibney because Defendants indirectly discouraged him from doing so, this evidentiary insufficiency is fatal to any claim of a pervasive environment of harassment.

Plaintiff's contention that his violation of the no-contact order should have been disregarded because his

actions were "consensual" or "welcome" and because Gibney violated the order too will not support a claim of discrimination. Plaintiff, not Gibney, was charged with assault. Plaintiff, not Gibney, was given three written warnings to stay away from Gibney -- warnings that obviously contained no exception for "consensual" contact. Berger's oral reminder to Gibney that she should also stay away from Plaintiff offers no parallel to Plaintiff's situation. The fact that she for some time disregarded Berger's directive and was not disciplined cannot be viewed as constituting evidence of gender bias given their different positions.

In sum, the record here will not support any claim for a violation of Title IX.

### IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Dkt. No. 121) is hereby ALLOWED and Plaintiff's cross-motion (Dkt. No. 118) is hereby DENIED. This case may now be closed.

It is So Ordered.

 /s/ Michael A. Ponsor   
MICHAEL A. PONSOR
U.S. District Court
